1  Jeffrey M. Feldman (AK Bar No. 7605029)
2  SUMMIT LAW GROUP PLLC
   315 Fifth Avenue South, Suite 1000
3  Seattle, WA 98104-2682
4  Phone: (206) 676-7000
   jefff@summitlaw.com
5
6  Ralph H. Palumbo (WA Bar No. 4751)
   Lynn M. Engel (WA Bar No. 21934)
7  (Pro Hac Vice applications to be filed)
8  YARMUTH LLP
   1420 Fifth Avenue, Suite 1400
9  Seattle, WA 98101
   Phone: (206) 516-3800
10 rpalumbo@yarmuth.com
11 lengel@yarmuth.com

12 *Attorneys for Bristol Bay Economic Development Corporation,*
   *Bristol Bay Native Association, Inc. and Bristol Bay Reserve Association*
13
14 Megan R. Condon (AK Bar No. 1810096)
   Matthew N. Newman (AK Bar No. 1305023)
15 NATIVE AMERICAN RIGHTS FUND
16 745 West 4th Avenue, Suite 502
   Anchorage, AK 99501
17 Phone: (907) 276-0680
   mcondon@narf.org
18 mnewman@narf.org
19
   *Attorneys for United Tribes of Bristol Bay*
20
21 Scott Kendall (AK Bar. No. 0405019)
   HOLMES, WEDDLE & BARCOTT
22 701 W. 8th Avenue, #700
   Anchorage, AK 99501
23 Phone: (907) 274-0666
24 smkendall@hwb-law.com

25 *Attorney for Bristol Bay Regional*
   *Seafood Development Association, Inc.*
26

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 1
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
2060 676 7001

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA
### AT ANCHORAGE

BRISTOL BAY ECONOMIC
DEVELOPMENT CORPORATION,
BRISTOL BAY NATIVE ASSOCIATION,
INC., UNITED TRIBES OF BRISTOL
BAY, BRISTOL BAY REGIONAL
SEAFOOD DEVELOPMENT
ASSOCIATION, INC., and BRISTOL BAY
RESERVE ASSOCIATION,

                     Plaintiffs,

     v.

CHRIS HLADICK, in his official capacity
as Regional Administrator of the U.S.
Environmental Protection Agency,
Region 10; MATTHEW Z. LEOPOLD, in
his official capacity as General Counsel for
EPA and delegated authority of the
Administrator; U.S. ENVIRONMENTAL
PROTECTION AGENCY,

                     Defendants.

CASE NO. 3:19-CV-00265-TMB

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**Administrative Procedure Act, 5 U.S.C.
§§ 702–06; Clean Water Act, 33 U.S.C.
§ 1251 et. seq.**

       Plaintiffs Bristol Bay Economic Development Corporation, Bristol Bay Native

Association, Inc., United Tribes of Bristol Bay, Bristol Bay Regional Seafood Development

Association, Inc., and Bristol Bay Reserve Association (collectively, "Plaintiffs") file this

Complaint for Declaratory and Injunctive Relief, and allege as follows.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 2
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
2006670.0001

# I. INTRODUCTION

1. The Bristol Bay watershed, and its ecologically important streams, wetlands, lakes and ponds, provide habitat for the world's largest wild salmon runs, ranging from 30 to 60 million fish annually. Bristol Bay salmon are economically, culturally and ecologically critical to Alaskan communities, generating $1.5 billion in annual revenue and supporting 14,000 jobs. Bristol Bay salmon have also been the foundation of Alaska Native cultures in the region for thousands of years and continue to sustain some of the last intact wild salmon-based cultures in the world.

2. The proposed Pebble mine would destroy thousands of acres of critical habitat and miles of salmon streams that are essential to Bristol Bay's commercial, recreational and subsistence salmon fisheries.

3. This case challenges the U.S. Environmental Protection Agency's (EPA) unlawful withdrawal of its Proposed Determination that development of the Pebble deposit in the headwaters of Bristol Bay, Alaska could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the world-class fishery they support. 84 Fed. Reg. 45,749 (Aug. 30, 2019).

4. EPA issued its Proposed Determination in July 2014 pursuant to Section 404(c) of the Clean Water Act ("CWA"), 33 U.S.C. §1251 et. seq. *See* U.S. Envtl. Prot. Agency, Proposed Determination of the U.S. Environmental Protection Agency Region 10 Pursuant to Section 404(c) of the Clean Water Act: Pebble Deposit Area, Southwest Alaska (2014) ("Proposed Determination").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 3
CASE NO. 3:19-CV-00265-TMB

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 3 of 40

5.      In the Proposed Determination, EPA found that "Alaska's Bristol Bay watershed . . . is an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America." Proposed Determination at ES-1.

6.      To protect these nationally and globally significant resources, EPA proposed restricting "discharge of dredged or fill material related to mining the Pebble deposit into waters of the United States. …" Proposed Determination at 5-1.

7.      In 2014, Pebble Limited Partnership ("PLP"), the proponent of the Pebble mine, sued EPA in three separate lawsuits.  In May 2017, EPA and PLP settled the litigation. Settlement Agreement between EPA and Pebble Limited Partnership (May 11, 2017) ("Settlement Agreement").

8.      Under the Settlement Agreement, EPA committed to "initiate a process to propose to withdraw the Proposed Determination." Settlement Agreement, ¶ III.A.5.

9.      As required by the Settlement Agreement, EPA issued a proposal to withdraw the Proposed Determination in July 2017 and requested public comments. Proposal to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska, 82 Fed. Reg. 33,123 (July 19, 2017) ("Proposal to Withdraw").

10.      After receiving over a million comments, the overwhelming majority in opposition to EPA's proposal to withdraw the Proposed Determination, EPA decided to leave the Proposed Determination "in place pending further consideration by the Agency of information that is relevant to the protection of the world-class fisheries

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 4
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 4 of 40

contained in the Bristol Bay watershed." Notice of the decision was published in the Federal Register on February 28, 2018. 83 Fed. Reg. 8,668-8,671 (Feb. 28, 2018).

11. Subsequently, without any "further consideration," EPA reversed course, announcing its decision to withdraw the Proposed Determination on July 30, 2019. Notice of the decision was published in the Federal Register on August 30, 2019. 84 Fed. Reg. 45,749.

12. Plaintiffs seek vacatur of EPA's decision to withdraw the Proposed Determination and declaratory and injunctive relief because the decision is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## II. JURISDICTION AND VENUE

13. This action arises under the CWA, 33 U.S.C. § 1251 et. seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702–06. This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and §§ 2201–02 (declaratory judgment).

14. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the District of Alaska and the waters, wetlands, and wildlife at issue are in Alaska.

## III. PARTIES

### A. Plaintiffs

15. Plaintiff Bristol Bay Economic Development Corporation ("BBEDC") is a 501(c)(4) non-profit corporation whose mission is to promote economic growth and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 5
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 5 of 40

opportunities for residents of its member communities through sustainable use of the Bristol Bay and Bering Sea resources. BBEDC undertakes programs and management to foster economic and social benefits for the residents and communities of Bristol Bay in order to ensure sustainability of the region's renewable natural resources, including its salmon fisheries and other fish stocks and fisheries.

16.    Plaintiff Bristol Bay Native Association, Inc. ("BBNA") is a non-profit corporation and tribal consortium whose mission is to advance the social, cultural, and economic interests of the Tribes and Alaska Native people of the Bristol Bay Region including by prioritizing protection of Bristol Bay's salmon fisheries (commercial, subsistence and sport) and salmon habitat in all land management decisions.

17.    Plaintiff United Tribes of Bristol Bay ("UTBB") is a tribally chartered consortium of fifteen federally recognized tribes in Bristol Bay. Each member tribe passed a tribal resolution delegating its governmental powers to UTBB to implement the Bristol Bay Regional Visioning Project, a region-wide action plan developed by Bristol Bay's tribal communities focused on improving economic development opportunities, preserving cultural and subsistence resources, and increasing educational opportunities for tribal youth. UTBB is organized as a consortium of tribal governments working to protect the traditional way of life of the indigenous people of Bristol Bay and the natural resources upon which that way of life depends. UTBB's mission is to advocate for sustainable communities through development consistent with our traditional values.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 6
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 6 of 40

18. Plaintiff Bristol Bay Regional Seafood Development Association, Inc. ("BBRSDA") is a 501(c)(6) non-profit corporation, established in 2005 to implement the provisions of AS 44.33.065. BBRSDA's mission is to maximize the value of the Bristol Bay fishery for the benefit of its members, and it works to achieve this mission through strategies focused on marketing, quality, and sustainability. BBRSDA's membership consists of all 1,863 Bristol Bay salmon driftnet (S03T) permit holders and operates a successful branding/marketing program for Bristol Bay Sockeye Salmon which relies heavily on the fishery's abundance and positive reputation for pristine habitat.

19. Plaintiff Bristol Bay Reserve Association ("BBRA") is a non-profit corporation which was established in 2013. BBRA's mission is to promote the interests of its members who own commercial fishing vessels and participate in the Bristol Bay commercial salmon drift fishery. BBRA has approximately three hundred and fifty (350) member vessel owners. Approximately twenty-five percent (25%) of the vessels participating in the Bristol Bay commercial salmon drift fishery are BBRA member vessels.

20. Plaintiffs and their members and supporters have long-standing interests in the world-class fisheries of Bristol Bay. Plaintiffs' staff and members live and/or work in Bristol Bay and near the Pebble deposit area. Plaintiffs' interests in the environmental and aquatic resources protected by EPA's Proposed Determination are

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 7
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 7 of 40

legally protected under the CWA. Each Plaintiff submitted comments on the Proposed Determination, and on EPA's proposal to withdraw the Proposed Determination.

21.     EPA's decision to withdraw the Proposed Determination has caused and will continue to cause actual, concrete injuries to Plaintiffs, their members and staff unless redressed by the relief sought in this case.

**B.      Defendants**

22.     Defendant Chris Hladick is the Regional Administrator of Region 10 of EPA and is sued in his official capacity.

23.     Defendant Matthew Z. Leopold is General Counsel for EPA, acting by delegated authority for the EPA Administrator, and is sued in his official capacity.

24.     Defendant EPA is the federal agency responsible for implementing and enforcing a variety of federal environmental laws, including the CWA. Specifically, EPA is charged with oversight of the permitting program under Section 404 of the CWA.

## IV.  STATUTORY FRAMEWORK

**A.      The Clean Water Act**

25.     Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 8
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 8 of 40

26.     Congress established several goals for the Act, including attainment and preservation of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife. . ." 33 U.S.C. § 1251(a)(2).

27.     To further these goals, Congress prohibited "discharge of any pollutant" into navigable waters except in accordance with the CWA. 33 U.S.C. § 1311(a).

28.     Congress delegated authority to the U.S. Army Corps of Engineers ("Corps") to issue permits for the discharge of dredged or fill material under Section 404 of the CWA. 33 U.S.C. § 1344.

29.     In its permit review, the Corps must evaluate applications under a public interest review, as well as the environmental criteria set forth in the CWA Section 404(b)(1) Guidelines, regulations promulgated by EPA. *See* 33 C.F.R. Part 320, 40 C.F.R. Part 230.

30.     The Guidelines prohibit the permitting of any discharge of dredged or fill material: (1) if a practicable alternative to the proposed discharge would have less adverse impact on the aquatic ecosystem; (2) if the discharge will cause or contribute to significant degradation of the environment; (3) if the discharge will cause or contribute to violations of water quality standards; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10.

31.     Under Section 404(c), Congress gave the EPA Administrator the authority "to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 9
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 9 of 40

for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a). CWA 404(c) is commonly referred to as EPA's "veto authority" because Congress authorized EPA to preclude or override the Corps' decision to issue a 404 permit.

32.    An "unacceptable adverse effect" is an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. In evaluating the unacceptability of such impacts, consideration must be given to the relevant portions of the Section 404(b)(1) [G]uidelines (40 CFR part 230)." 40 C.F.R. § 231.2(e).

33.    In making a decision under 404(c), the EPA Administrator must "take into account all information available to him, including any written determination of compliance with the Section 404(b)(1) Guidelines." 40 C.F.R. § 231.1(a).

34.    If the Regional Administrator has reason to believe that an "unacceptable adverse effect" could result from using a defined area for the disposal of dredged or fill material, the Regional Administrator must notify the Corps of his intent to issue a public notice of a proposed determination. 40 C.F.R. § 231.3(a)(1).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 10
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB    Document 1    Filed 10/08/19    Page 10 of 40

35.     After the Corps receives the Regional Administrator's notice, it "will not" issue a 404 permit for the defined area. 33 C.F.R. § 323.6(b). However, the Corps may process a permit application while a Section 404(c) review is underway. *Id.*

36.     Separate from the Section 404(c) process, Section 404(q) of the CWA authorizes EPA and the Corps to enter into agreements to minimize the delays in the issuance of Section 404 permits. 33 U.S.C. § 1344(q). Pursuant to Section 404(q), EPA and the Corps have executed a Memorandum of Agreement ("MOA") that sets forth procedures through which EPA can elevate its concerns about pending permit applications. Memorandum of Agreement Between the EPA and the Department of the Army 7-8 (Aug. 11, 1992), available at https://www.epa.gov/sites/production/files/2015-06/documents/1992_moa_404q.pdf.

37.     Under the MOA, if EPA believes that a permit "may result in substantial and unacceptable impacts to aquatic resources of national importance" it must send the Corps a letter during the public comment period for the permit application. MOA at 7. After sending the Corps its letter, EPA has 25 calendar days to determine whether a "discharge will have a substantial and unacceptable impact" and notify the Corps of its conclusion. *Id.* A finding that a discharge will have a substantial and unacceptable adverse impact triggers consultation procedures between the Corps and EPA. However, the Corps may still issue a permit if, after the end of consultation, it disagrees with EPA. *See id.* at 8–10.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 11
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 11 of 40

**B.**     **The Administrative Procedure Act**

38.     The Administrative Procedure Act ("APA") requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

39.     An agency's analysis is arbitrary and capricious if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016).

40.     Under the APA, an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856 (1983).

41.     An agency's change in position is arbitrary and capricious under the APA unless the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Facsimile: (206) 676-7001

reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–516, 129 S. Ct. 1800 (2009).

42.     Although an agency is entitled to change its course when its view of what is in the public's interest changes, the "agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007).

## V.    FACTUAL BACKGROUND

43.     The Bristol Bay watershed is a pristine and intact environment. Proposed Determination at ES-1. As Former EPA Regional Administrator Dennis McLerran noted, the streams, rivers, wetlands, lakes, and other waters of Bristol Bay "comprise one of the most productive, pristine, valuable, and vulnerable ecosystems remaining in North America today." Dennis McLerran, Letter, EPA Regional Administrator, to Thomas Collier, et al., Feb. 28, 2014 at 1.

44.     The Bristol Bay watershed also supports the largest sockeye salmon fishery in the world. *Id.* at 2. Nearly half of the world's sockeye salmon catch comes from Bristol Bay. EPA, An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska (2014) (EPA 910-R-14-001C) ("Watershed

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 13
CASE NO. 3:19-CV-00265-TMB

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Assessment"), at 1-1. The Bristol Bay fishery drives a regional economy, with far-reaching impacts throughout Alaska down to the lower-48. *See* U.S. Army Corps of Engineers, Pebble Project EIS Draft Environmental Impact Statement ("Draft EIS"), Feb. 2019, at 3.6-5, 3.6-13 to 3.6-14.

45.    Many of those in the Bristol Bay region, including Plaintiffs' members, lead a subsistence way of life, and are dependent on the fisheries and wildlife of the Bristol Bay watershed. EPA, Frequently Asked Questions about Bristol Bay 404c Process, available at https://www.epa.gov/bristolbay/frequently-asked-questions-about-bristol-bay-404c-process; Proposed Determination at ES-1 and 3-52.

46.    The Bristol Bay watershed also supports a prolific outdoor recreation industry dependent on the thriving fishery. *See* Letter from 43 Senators and Congressman to President Trump, Oct. 11, 2017; Proposed Determination at 6-2 to 6-3.

47.    Given these significant resources, and the threat posed by potential mining, in 2010, six federally recognized tribes, all of whom later founded Plaintiff UTBB, petitioned EPA to exercise its authority under Section 404(c) of the CWA to protect the Nushagak and Kvichak watersheds from development of the Pebble deposit. Joint Letter from Nondalton Tribal Council, Koliganik Village Council, New Stuyahok Traditional Council, Ekwok Village Council, Curyung Tribal Council, and Levelock Village Council, to Lisa P. Jackson, Administrator: U.S. Envtl. Prot. Agency, & Dennis J. McLerran, Regional Administrator: U.S. Envtl. Prot. Agency, Region 10 (May 2, 2010).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 14
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

48.    In response, EPA initiated a scientific assessment "to determine the significance of Bristol Bay's ecological resources and evaluate the potential impacts of large-scale mining on these resources." Watershed Assessment at ES-1.

## A.    The Bristol Bay Watershed Assessment

49.    Explaining its decision to undertake the Watershed Assessment, EPA stated "[b]ased upon information known to EPA about the proposed mine at the Pebble deposit and its potential impacts on fishery resources, and as a result of multiple inquiries, concerns, and petitions to EPA to use its authorities to protect these fishery resources, EPA decided to conduct an ecological risk assessment before considering any additional steps" under 404(c). Proposed Determination at ES-3.

50.    The Watershed Assessment was the result of "three years of study, two rounds of public comment, and independent, external peer review." *Id*. at ES-3; *see also* 2-7, 2-9 to 2-10.

51.    In the Watershed Assessment, EPA identified and considered three mining scenarios. Watershed Assessment at ES-10. The three mining scenarios "represent different stages of mining at the Pebble deposit, based on the amount of ore processed: Pebble 0.25 (approximately .25 billion tons . . . of ore over 20 years), Pebble 2.0 (approximately 2.0 billion tons . . . of ore over 25 years), and Pebble 6.5 (approximately 6.5 billion tons . . . of ore over 78 years)." *Id*.   The major components of the mine scenarios considered included an open pit mine, waste rock piles, and one or more tailing storage facilities, and an 86-mile transportation corridor within the Kvichak

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 15
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

River watershed that includes a gravel-surfaced road, four pipelines and a port. *Id.* These scenarios were based on "preliminary mine details put forth in Northern Dynasty Minerals'[1] *Preliminary Assessment of the Pebble Mine* (Ghaffari et al. 2011)" and scientific information from mines around the world. *Id.* at 6-1.

52.     EPA recognized that, "[t]he exact details of any future mine plan for the Pebble deposit or for other deposits in the watershed will differ from our mine scenarios." *Id.* at ES-10. The uncertainty about the specific future mine plans was irrelevant because EPA's "scenarios reflect[ed] the general characteristics of mineral deposits in the watershed, modern conventional mining technologies and practices, the scale of mining activity required for economic development of the resource, and the infrastructure needed to support large-scale mining." *Id.* As a result, EPA stated that the three mining scenarios considered in the Watershed Assessment "realistically represent the type of development plan that would be anticipated for a porphyry copper deposit in the Bristol Bay watershed." *Id.*

53.     EPA found that even the smallest mine scenario of 0.25 billion tons of ore over 20 years would: (1) eliminate, block or dewater 38 kilometers of streams; (2) eliminate, block or dewater 8 kilometers of anadromous steams; (3) alter 20% or more of streamflow in 15 kilometers of stream; (4) result in direct toxicity to invertebrates in 21 kilometers of stream; (5) result in the loss of 4.9 square kilometers

---

[1] The Pebble Limited Partnership ("PLP") is a subsidiary of Northern Dynasty Minerals. Proposed Determination at ES-5, n.4.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 16
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

of wetlands, lakes, and ponds from the mine footprint; (6) result in an unquantifiable loss of streams from reduced streamflow below the mine footprint; and (7) impact 4.7 square kilometers of wetlands, lakes, and ponds from the access road. Watershed Assessment at ES-18.

**B.    The Proposed Determination Findings**

54.    Based on the scientific findings in the Watershed Assessment, EPA concluded in the Proposed Determination that "mining of the Pebble deposit at any of [the three mining scenarios identified,] even the smallest, could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." Proposed Determination at ES-5.

55.    EPA stated, the "[Watershed] Assessment established that the extraction, storage, treatment, and transportation activities associated with building, operating, and maintaining one of the largest mines ever built would pose significant risks to the unparalleled ecosystem that produces one of the greatest wild salmon fisheries left in the world. In simple terms, the infrastructure necessary to mine the Pebble deposit jeopardizes the long-term health and sustainability of the Bristol Bay ecosystem." Proposed Determination at ES-3.

56.    The Proposed Determination characterized the potential adverse impacts identified by the Watershed Assessment as an underestimate because EPA only considered "the footprint impacts associated with the mine pit, [tailing storage facilities], and waste rock piles" and not the additional support facilities necessary for

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 17
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

mining in the region. Proposed Determination at 2-17. The EPA also did not consider impacts "from potential accidents and failures as a basis for its findings" despite the "high likelihood" that a failure would occur. *Id.* at ES-6.

57.     In the Proposed Determination, EPA found that loss of headwaters in Bristol Bay would: "fundamentally alter surface and groundwater hydrology and, in turn, the flow regimes of receiving—or formerly receiving—streams. Such alterations would reduce the extent and frequency of stream connectivity to off-channel habitats, as well as reduce groundwater inputs and their modifying influence on the thermal regimes of downstream habitats …. These lost streams also would no longer support or export macroinvertebrates, which are a critical food source for developing alevins, juvenile salmon, juvenile northern pike, and all life stages of other salmonids and forage fish." Proposed Determination at 4-9.

58.     EPA found that "[t]he greatest impacts would be at the [tailings storage facility] location in the [North Fork Koktuli] watershed. Coho salmon spawn or rear in nearly 50% of the stream length within the [tailings storage facility] footprint." Proposed Determination at 4-4.

59.     EPA recognized that the impacts would be far-reaching: "the coho salmon streams that the Pebble 0.25 stage mine would eliminate or dewater likely play an important role in the life cycle of that species in all three watersheds." Proposed Determination at 4-6.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 18
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 18 of 40

60.     EPA found that the 0.25 mine scenario would result in the elimination, dewatering, or fragmenting of nearly 5 miles of streams with documented occurrence of anadromous fish and approximately 19 miles of tributaries to anadromous fish streams. Proposed Determination at 4-17. EPA found that this would be "an unprecedented impact in Alaska" and the "effects of their loss would reverberate to downstream habitats and affect species such as coho, Chinook, sockeye, and chum salmon." *Id*. at 4-19.

61.     EPA concluded that the loss of these headwater tributaries could have unacceptable adverse effects on fishery areas. Proposed Determination at 4-19.

62.     EPA found that the 0.25 mine scenario would eliminate, dewater, or fragment more than 1,200 acres of wetlands, lakes, and ponds, of which approximately 1,100 of those acres are contiguous with anadromous streams or their tributaries. Proposed Determination at 4-20.

63.     EPA found that the loss of these wetlands, lakes, and ponds would be "a very large and unprecedented impact under the CWA Section 404 regulatory program in Alaska." Proposed Determination at 4-21.

64.     EPA found that the 0.25 mine would consume large volumes of water drawn from surface and groundwater sources. Proposed Determination at 4-22. The Watershed Assessment calculated that the 0.25 mine would reduce flow in more than 45 miles of streams. *Id*. at 4-23. The adverse impacts from streamflow alteration "could jeopardize the long-term sustainability of these fisheries." *Id*. at 4-27. EPA found that

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 19
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 19 of 40

drawdown would alter stream flows by more than 20% in approximately 9 miles of stream and that such a change could pose unacceptable adverse impacts to the salmon fisheries of both the South and North Fork of the Koktuli. *Id.* at 4-28.

65.     EPA found that "areas that do not support salmon for many years are not likely to become productive again . . . . Both the 20-year life of the Pebble 0.25 stage mine and the 40 years or more during which dewatering would persist are many times longer than the 2- to 5-year life span of coho and Chinook salmon. Thus, as successive year classes of salmon return and are unable to reach their natal spawning grounds and produce fry, the cycle of spawning would be interrupted …. The substantial spatial and temporal extent of stream habitat losses to the Pebble 0.25 stage mine suggest that these losses would reduce the overall capacity and productivity of Chinook, and particularly coho, salmon in the [South Fork Koktuli, North Fork Koktuli, and Upper Talarik Creek] watersheds." Proposed Determination at 4-7.

66.     Based on the findings in the Proposed Determination and the Watershed Assessment, EPA proposed restrictions on "the discharge of dredged or fill material related to mining the Pebble deposit into waters of the United States within the potential disposal site …" Proposed Determination at 5-1.

67.     EPA received over 670,000 comments on the Proposed Determination with 99% of those comments supporting the Determination.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 20
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 20 of 40

**C. EPA Considered Withdrawing the Proposed Determination Satisfying its Obligations under a Settlement Agreement with PLP**

68. In May 2014, PLP sued EPA, challenging EPA's authority to utilize Section 404(c) prior to PLP submitting a permit application. *See Pebble Ltd. P'ship v. United States Envtl. Prot. Agency*, 155 F. Supp. 3d 1000, 1004 (D. Alaska 2014), *aff'd sub nom. Pebble Ltd. P'ship v. U.S. E.P.A.*, 604 F. App'x 623 (9th Cir. 2015). In September 2014, PLP sued EPA, alleging that EPA created committees with scientists and environmental groups opposed to the mine in violation of the Federal Advisory Committee Act ("FACA"). *See Pebble Ltd. P'ship v. Envtl. Prot. Agency*, 310 F.R.D. 575, 578 (D. Alaska 2015). In October 2014, PLP sued EPA over failures to comply with the Freedom of Information Act ("FOIA"). *See Pebble Ltd. P'ship v. United States Envtl. Prot. Agency*, No. 3:14-CV-0199- HRH, 2016 WL 128088, at *1 (D. Alaska Jan. 12, 2016).

69. The first case, challenging EPA's authority under 404(c), was resolved in EPA's favor. The Ninth Circuit affirmed the district court's holding that EPA's initiation of the 404(c) process did not constitute final agency action. *Pebble Ltd. P'ship*, 604 F. App'x at 625.

70. In May 2017, EPA and PLP settled the remaining litigation over compliance with FACA and FOIA. Settlement Agreement between EPA and Pebble Limited Partnership (May 11, 2017).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 21
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

71.     Under the Settlement Agreement, EPA committed to "initiate a process to propose to withdraw the Proposed Determination ...." Settlement Agreement at ¶ III.A.5.

72.     The settlement precluded EPA from proceeding under 404(c) with a Recommended Determination until the notice of the final environmental impact statement (EIS) regarding PLP's permit application was published in the Federal Register or 48 months from the effective date of the settlement, whichever was earlier in time. Settlement Agreement, ¶ III.A.1. Neither triggering event has occurred yet. The Corps anticipates releasing a final EIS in early 2020; the 48-month period from the settlement date would expire in March 2021. *See* U.S. Army Corps of Engineers, Pebble Project EIS, EIS Schedule, https://pebbleprojecteis.com/schedule.

73.     The settlement allowed EPA to "use the Bristol Bay Watershed Assessment without any limitation." Settlement Agreement, ¶ III.A.3.

74.     As required by the Settlement Agreement, EPA issued a proposal to withdraw the Proposed Determination in July 2017 and requested public comments. Proposal to Withdraw, 82 Fed. Reg. 33,123.

75.     EPA gave three reasons to support the proposed withdrawal. First, it noted that the "proposal reflects the Administrator's decision to provide PLP with additional time to submit a permit application and potentially allow the Army Corps permitting process to initiate without having an open and unresolved Section 404(c) review." 82 Fed. Reg. at 33,124. Second, EPA wanted to "remove any uncertainty, real or perceived,

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 22
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

about PLP's ability to submit a permit application and have that permit application reviewed." *Id*. Lastly, EPA asserted that withdrawing the Proposed Determination would allow "the factual record regarding any forthcoming permit application to develop …." *Id*.

76.    EPA acknowledged that a pending "Section 404(c) process did not prohibit PLP from filing a permit application and the Army Corps could have processed such a permit application while a Section 404(c) review was ongoing." 82 Fed. Reg. at 33,123.

77.    In the notice for the Proposal to Withdraw, EPA limited its request for comments to the reasons it offered for withdrawing the Proposed Determination. 82 Fed. Reg. at 33,124.

78.    EPA stated that it was not "soliciting comment on the proposed restrictions or on science or technical information underlying the Proposed Determination." 82 Fed. Reg. at 33,124.

79.    On December 22, 2017, PLP submitted a Section 404 permit application to the Corps. 84 Fed. Reg. at 45,750. On January 5, 2019 the Corps issued a public notice of PLP's permit application and the Corps' determination that an EIS would be required for review of the permit application. *Id*.

80.    On January 31, 2018, in an internal EPA presentation for EPA's Office of Federal Activities, EPA stated that the withdrawal was proposed based on policy rationale and reiterated that EPA did not solicit comment on the proposed restrictions or on science or technical information underlying the Proposed Determination.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 23
CASE NO. 3:19-CV-00265-TMB

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**D. EPA Decided Not to Withdraw its 404(c) Proposed Determination Pending Further Consideration of Substantive Information**

81. After receiving more than one million comments, with "[a]n overwhelming majority express[ing] opposition to withdrawal of the Proposed Determination," EPA decided not to withdraw the Proposed Determination. Notification of Decision Not To Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit, Area, Southwest Alaska, 83 Fed. Reg. 8,668-8,671 (Feb. 28, 2018); *see also* EPA, EPA's Work in the Bristol Bay Watershed, Presentation for Office of Federal Activities, Jan. 31, 2018, at 16 (approximately 99% of the more than one million comments opposed withdrawal).

82. Addressing the decision not to withdraw the Proposed Determination, then-Administrator Scott Pruitt noted, "it is my judgment at this time that any mining projects in the region likely pose a risk to the abundant natural resources that exist there. Until we know the full extent of that risk, those natural resources and world-class fisheries deserve the utmost protection. Today's action allows EPA to get the information needed to determine what specific impacts the proposed mining project will have on those critical resources." EPA, News Release, EPA Administrator Scott Pruitt Suspends Withdrawal of Proposed Determination in Bristol Bay Watershed, Will Solicit Additional Comments, Jan. 26, 2018.

83. In its decision not to withdraw the Proposed Determination, EPA recognized that because PLP had submitted its CWA permit application, "Region 10

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 24
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

will not forward a signed Recommended Determination, if such a decision is made, before either May 11, 2021, or public notice of a final EIS on PLP's Section 404 permit application regarding the Pebble deposit, whichever comes first." 83 Fed. Reg. at 8,670.

84. Rejecting the rationale that the Proposed Determination should be withdrawn in order to allow the "factual record for [the] Section 404 permit application to develop," EPA concluded: "[T]hat the factual record regarding the permit application can develop notwithstanding the Proposed Determination. EPA has discretion to consider that factual record after it has been further developed before Region 10 determines whether to forward a signed Recommended Determination to EPA Headquarters and, if such a decision is made, to determine the contents of such a Recommended Determination. As such, this reason does not support withdrawal of the Proposed Determination at this time." 83 Fed. Reg. at 8,670.

85. EPA's decision not to withdraw "leaves [the Proposed] Determination in place pending consideration of any other information that is relevant to the protection of the world-class fisheries contained in the Bristol Bay watershed in light of the permit application that has now been submitted to the Corps." 83 Fed. Reg. at 8,670.

86. Further, EPA's decision not to withdraw the Proposed Determination states that "[t]he Agency intends at a future time to solicit public comment on what further steps, if any, the Agency should take under Section 404(c) to prevent unacceptable adverse effects to the watershed's abundant and valuable fishery resources

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 25
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 25 of 40

in light of the permit application that has now been submitted to the U.S. Army Corps of Engineers." 83 Fed. Reg. at 8,668.

87.     Because EPA decided to leave the Proposed Determination in place, it found "comments stating that EPA cannot withdraw a Proposed Determination without considering the proposed restrictions or the science or technical information underlying the Proposed Determination . . . . moot." 83 Fed. Reg. at 8,670.

88.     EPA's decision not to withdraw also found "that there is good cause under 40 CFR 231.8 to extend the regulatory time frames in 40 CFR 231.5(a) in order to allow for an additional public comment period and to align with the timeframes established in the settlement agreement." 83 Fed. Reg. at 8671.

E.     **EPA General Counsel Reinitiates Process to Withdraw Proposed Determination**

89.     On June 26, 2019, EPA General Counsel Matthew Z. Leopold, acting pursuant to a delegation of authority from the EPA Administrator, *see* 84 Fed. Reg. at 45,751, n.1, directed Region 10 to resume its consideration whether to withdraw the 2014 Proposed Determination. *See* Memorandum Re Resuming consideration of the withdrawal of the July 2014 Proposed Determination to restrict use of the Pebble Deposit Area as a disposal site, from Matthew Z. Leopold, General Counsel, U.S. EPA, to Christopher Hladick, Regional Administrator, Reg. 10, U.S. EPA, undated, at 2–3. Leopold asserted that the suspension of the withdrawal has created "confusion" and that "lifting the suspension is appropriate." *Id.*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 26
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

Case 3:19-cv-00265-TMB    Document 1    Filed 10/08/19    Page 26 of 40

90.    The June 26, 2019 EPA directions came from Leopold, rather than Administrator Wheeler, because the Administrator formally recused himself pursuant to Executive Order 13770. *See* EPA Memorandum from Administrator Wheeler, Subject: Updated Recusal Statement, March 20, 2019, at 1.

**F.    EPA Decision to Withdraw the Proposed Determination**

91.    A month later, on July 30, 2019, EPA announced that it was withdrawing its Proposed Determination. *See* EPA, News Release, EPA Withdraws Outdated, Preemptive Proposed Determination to Restrict Use of the Pebble Deposit Area as a Disposal Site, July 30, 2019, https://www.epa.gov/newsreleases/epa-withdraws-outdated-preemptive-proposed-determination-restrict-use-pebble-deposit. EPA formally withdrew the Proposed Determination in a decision signed July 30, 2019, and published in the Federal Register on August 30, 2019. 84 Fed. Reg. 45,749 (Aug. 30, 2019). EPA did not provide a new opportunity for public comment.

92.    EPA's decision to withdraw the Proposed Determination is a final agency action. *See* 40 C.F.R. § 231.5(c)(1).

93.    In its decision to withdraw the Proposed Determination, EPA acknowledges that two of EPA's rationales for withdrawal in 2017 to provide additional time for PLP to submit a permit application and to allow for Corps review of that permit application no longer apply.

94.    Instead, EPA justifies its decision to withdraw based on "the need for any final EPA 404(c) decision to be based on the entire record," and the fact that "the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 27
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 27 of 40

Proposed Determination which in its current form does not account for the full record and does not grapple with differing conclusions … should not serve as a basis for such a decision." 84 Fed. Reg. at 45,754. Second, EPA asserts that "there are other processes available now, including the 404(q) MOA process, for EPA to resolve any issues with the Corps as the record develops." *Id*.

95.     EPA also notes that "EPA is not seeking to resolve any conflicting preliminary conclusions of the Agencies or conclusively address the merits of the underlying technical issues." 84 Fed. Reg. at 45,754. Further, EPA states that "EPA is not basing its decision-making on technical consideration or judgments about whether the mine proposal will ultimately be found to meet the requirements of the 404(b)(1) Guidelines or results in 'unacceptable adverse effects' under CWA Section 404(c)." *Id*. at 45,756.

96.     In withdrawing the decision without any further public process, EPA claims that "EPA has satisfied all of the procedural requirements for withdrawing a proposed determination provided in [the 404(c) regulations]." 84 Fed. Reg. at 45,756.

97.     EPA's rationale for withdrawing the Proposed Determination is directly contrary to the rationale EPA stated in its 2018 Suspension Decision *not to withdraw* the Proposed Determination.

98.     EPA's 2018 decision not to withdraw the Proposed Determination expressly states:

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 28
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 28 of 40

As previously noted, the Corps has already initiated its permit review process for PLP's application. Even if EPA leaves the Proposed Determination in place at this time, EPA will provide PLP with nearly three and a half years (unless a final EIS for the project is noticed sooner) to advance through the permit review process before Region 10 could forward a signed Recommended Determination to EPA Headquarters, if such a decision is made. Thus, in light of EPA's forbearance from proceeding to the next step of the section 404(c) process until a later time as described above, EPA concludes that the factual record regarding the permit application can develop notwithstanding the Proposed Determination. EPA has discretion to consider that factual record after it has been further developed before Region 10 determines whether to forward a signed Recommended Determination to EPA Headquarters and, if such a decision is made, to determine the contents of such a Recommended Determination. As such, this reason does not support withdrawal of the Proposed Determination at this time.

83 Fed. Reg. at 8,670.

99. In withdrawing the Proposed Determination, EPA did not acknowledge or explain its direct reversal in position from its 2018 decision to *not* withdraw the Proposed Determination.

## G. PLP's Proposed Mine is Much Larger than the EPA-Reviewed 0.25 Mining Scenario

100. EPA based the Proposed Determination restrictions on the 0.25-billion-ton mining scenario, which is the smallest mine scenario that the agency considered. Proposed Determination at ES-5 to ES-6.

101. PLP's 404 permit application is for a 1.44 billion ton mine. 2018 Project Description at 1.

102. The 0.25 mining scenario included a 20-year mining plan, extracting 31,100 tons of ore per day. Proposed Determination at 2-16. PLP's 2018 amended 404

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 29
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 29 of 40

permit application proposed a mine with a milling rate of 180,821 tons of ore per day. 2018 Project Description at 1. This is almost six times larger than the amount associated with the smallest mining scenario that EPA reviewed and found posed unacceptable adverse effects.

103.    The 0.25 mining scenario included a total surface area (including the mine pit, waste rock pile and tailings storage facility) of 4.09 square miles. Proposed Determination at 2-16. The total footprint of PLP's proposed mine (Alternative 1 in the draft EIS) is 12.6 square miles. Draft EIS at 2-120. This is approximately three times larger than the smallest mining scenario that EPA reviewed and found posed unacceptable adverse effects.

**H.    EPA Has Expressed Significant Concerns as a Cooperating Agency in the NEPA Review Process for PLP's Proposed Mine**

104.    On July 1, 2019, during a concurrent public comment period on the Corps' Public Notice of PLP's Section 404 permit application and the Corps' draft EIS for the proposed project, EPA submitted comments under both the CWA and NEPA. Letter from Regional Administrator Hladick to Colonel Borders, re Public Notice POA-2017-0271 for a CWA Section 404 permit, July 1, 2019 ("EPA DEIS CWA Comments"); Letter from Regional Administrator Hladick to Shane McCoy, Program Manager, U.S. Army Corps of Engineers, Alaska District, re U.S. Army Corps of Engineers' February 2019 Draft Environmental Impact Statement for the Pebble Project (CEQ Number

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 30
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 30 of 40

20190018; EPA Region 10 Project Number 18-0002-COE), July 1, 2019 ("EPA DEIS NEPA Comments").

105. EPA's DEIS CWA Comments found: "the values of the potentially affected aquatic resources in this case are among the highest evaluated under CWA Section 404 and support important commercial, sport, and subsistence fisheries for salmon and other fishes . . . The EPA has concerns regarding the extent and magnitude of the substantial proposed impacts to streams, wetlands, and other aquatic resources that may result, particularly in light of the important role these resources play in supporting the region's valuable fishery resources." EPA DEIS CWA Comments at 3.

106. EPA's DEIS CWA Comments stated that "the nature and extent of the proposed discharges acknowledged in the DEIS reflect some of the most highly significant and complex discharge activities with the potential for serious adverse impact contemplated by the Guidelines. For these reasons, the level of information, evaluation, and documentation necessary for this project to demonstrate compliance with the Guidelines is significant." EPA DEIS CWA Comments at 9.

107. EPA's DEIS CWA Comments concluded that "[o]ur review finds that the [Public Notice], DEIS, and supporting documents do not contain sufficient information to address the factual determinations required by 40 C.F.R. § 230.11 and to make a reasonable judgment that the proposed discharges will comply with the [404(b)(1)] Guidelines under 40 C.F.R. § 230.12.6." EPA DEIS CWA Comments at 12. EPA also

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 31
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 31 of 40

noted that the DEIS "likely underestimates the extent, magnitude, and permanence of the adverse effects . . . ." *Id.*

## I.     EPA Review under 404(q)

108.   In EPA's DEIS CWA Comments, EPA also provided notice to the Corps, under Section 404(q) of the CWA: "Pursuant to the field level procedures outlined in Part IV, paragraph 3(a) of the 1992 Memorandum of Agreement (MOA) between EPA and the Department of the Army regarding CWA Section 404(q), Region 10 finds that this project as described in the [Public Notice] may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance." EPA DEIS CWA Comments at 3 and 55.

109.   EPA further stated: "The EPA recognizes that the standard set out in the MOA is similar to the Section 404(c) standard. However, Region 10's decision to utilize the coordination procedures under the MOA is not a decision regarding its Section 404(c) action and should not be interpreted as such. The EPA has not made a decision regarding whether to withdraw the 2014 Proposed Determination or leave it in place. Region 10 is coordinating under the MOA at this time to ensure that the EPA can continue to work with the Corps to address concerns raised during the permitting process." EPA DEIS CWA Comments at 55.

110.   Pursuant to the MOA, once a letter is sent under paragraph 3(a), the Regional Administrator has 25 calendar days after the end of the public comment period to notify the District Engineer by letter that "the discharge <u>will</u> have a substantial and

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 32
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

unacceptable impact on aquatic resources of national importance." *See* 1992 MOA at Part IV, 3(b).

111.   On July 25, 2019, EPA sent a letter to the Corps requesting an extension of the timeline provided in the MOA. Letter from Matthew Z. Leopold, EPA General Counsel, to the Hon. R.D. James, Assistant Secretary of the Army, July 25, 2019 ("Leopold 7/25/19 Letter"), at 2. EPA identified that "[u]nder the current timeline provided in the MOA, EPA would need to make a decision about whether to send a letter under paragraph 3(b) on or before July 26, 2019." *Id.*

112.   In the July 25, 2019 letter, EPA stated: "Given the significance of the project, substantive issues raised in EPA's comment letters on the Alaska District's DEIS and 404 [Public Notice] as well as the number of other comments received by the District which the Corps must devote resources to considering, EPA recognizes that it is not practicable for the Corps to engage in the activities described above in the 25 calendar days contemplated by MOA. As a result, we request your acknowledgement that under the particular circumstances here, fulfilling each of our agency's roles under the statute, regulations and MOA warrants taking more time for additional engagement in the 404(q) process." Leopold 7/25/19 Letter at 2. EPA requested that the EPA and the Corps "extend the deadline described in paragraph 3(b) beyond the 25 days contemplated in 404(q) MOA for this project." *Id.* Specifically, EPA sought "an extension of the deadline to send a letter under paragraph 3(b) of the 404(q) MOA to 30

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 33
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 33 of 40

days after the Corps provides EPA with the preliminary drafts of decision documents, draft permit and Record of Decision, for its consideration." *Id.*

113.    On July 26, 2019, Assistant Secretary of the Army R.D. James replied to EPA's request for an extension. *See* Letter from R.D. James, Assistant Secretary of the Army, to Matthew Z. Leopold, EPA General Counsel, July 26, 2019 ("James 7/26/19 Letter"). The Corps agreed to an extension on a much shorter timeframe of ninety calendar days and prior to completion of draft decision documents. *Id.*

114.    The Corps anticipates issuing a Record of Decision in the summer of 2020. *See* U.S. Army Corps of Engineers, Pebble Project EIS, EIS Schedule, https://pebbleprojecteis.com/schedule.

## VI.  <u>FIRST CLAIM</u>

A.    **EPA's Withdrawal Decision Is Not Supported by the Record and EPA Failed to Acknowledge and Explain Its Reversal**

**(Violation of 33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

115.    Plaintiffs re-allege and incorporate by reference the allegations made in all preceding paragraphs.

116.    EPA stated that it decided to withdraw the Proposed Determination because (1) "there is new information that has been generated since 2014," and (2) "there are other processes, including the 404(q) MOA process, for EPA to resolve any issues with the Corps as the record develops." 84 Fed. Reg. at 45,753–45,754.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 34
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 34 of 40

117.   Neither new information, nor the 404(q) process, support EPA's decision to withdraw the Proposed Determination. EPA failed to articulate a rational connection between the facts found and the decision made, rendering its decision to withdraw arbitrary and capricious.

118.   Under EPA's regulations implementing 404(c), the record includes all information obtained during the 404(c) process, including the administrative record for any 404 permit developed by the Corps. *See* 40 C.F.R. § 231.5(e).

119.   Because all information obtained by EPA and the Corps since EPA issued its Proposed Determination is part of the 404(c) record, it is properly before EPA when making a decision to withdraw or finalize the Proposed Determination. Consequently, new information cannot be a basis for EPA's decision to withdraw the Proposed Determination.

120.   Nothing under the CWA, EPA's implementing regulations or guidance precludes EPA from maintaining the Proposed Determination while the 404(q) process moves forward and both EPA and the Corps evaluate the proposed project.

121.   In its 2018 decision *not to withdraw* the Proposed Determination, EPA found that good cause existed to leave the Proposed Determination in place pending completion of the 404 permit review under the CWA and the associated environmental review of the proposed project under NEPA.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 35
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 35 of 40

122. Because the 404(c) process can be suspended for good cause pending review of the permit and analysis pursuant to NEPA, EPA's decision to withdraw because there is a 404(q) process underway is arbitrary.

123. EPA's 2018 decision *not to withdraw* the Proposed Determination was an agency policy position, made after public notice and comment and published in the Federal Register.

124. In withdrawing its Proposed Determination, the EPA failed to acknowledge and explain the reversal of its conclusions in its prior 2018 decision *not to withdraw* the Proposed Determination, specifically (a) that good cause existed to extend regulatory timelines; (b) that the Proposed Determination did not impede development of the factual record associated with permit review, and that EPA has the discretion to consider that factual record, and thus development of the factual record did not support withdrawal of the Proposed Determination; and (c) that EPA would address  substantive issues underlying the Proposed Determination before making a final 404(c) decision.

125. In withdrawing its Proposed Determination, the EPA also failed to acknowledge and explain its reversal of the conclusion made three weeks before in EPA's DEIS Comments that Pebble Mine's proposed discharges were "highly significant and complex discharge activities with the potential for serious adverse impact contemplated by the [404(b)(1)] Guidelines." EPA DEIS CWA Comments at 3.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 36
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 36 of 40

126. For the reasons identified above, EPA's decision to withdraw the Proposed Determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706.

127. The EPA's failure to provide a reasoned explanation for its reversal in agency position is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706.

## VII. SECOND CLAIM

**A. EPA Improperly Relied on Factors which Congress Has Not Intended It to Consider and Failed to Consider Relevant Key Factors**

**(Violation of 33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

128. Plaintiffs re-allege and incorporate by reference the allegations made in all preceding paragraphs.

129. EPA failed to consider the substantive findings it made in support of its Proposed Determination when it withdrew the Proposed Determination.

130. EPA also failed to consider the findings made in EPA's DEIS CWA Comments, that "the [Public Notice] DEIS, and supporting documents do not contain sufficient information to address the factual determinations required by 40 C.F.R. § 230.11 and to make a reasonable judgment that the proposed discharges will comply with the [404(b)(1)] Guidelines under 40 C.F.R. § 230.12." EPA DEIS CWA Comments at 12.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 37
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 37 of 40

131. EPA's decision to withdraw the Proposed Determination fails to acknowledge, or consider, the project's compliance with the 404(b)(1) Guidelines.

132. EPA's decision to withdraw the Proposed Determination fails to acknowledge, or consider, the fact that it has found that the project may have substantial unacceptable adverse impacts.

133. EPA unlawfully precluded science and technical information from its decision to withdraw when it issued its July 19, 2017 public notice, stating that it was "not soliciting comment on the proposed restrictions or science or technical information underlying the Proposed Determination." 82 Fed. Reg. at 33,124; *see also* 84 Fed. Reg. at 45,756.

134. EPA unlawfully precluded science and technical information from its decision to withdraw when it stated in its August 30, 2019 public notice that such information "remains outside the bounds of EPA's basis for its decision." 84 Fed. Reg. at 45,756.

135. Because compliance with the 404(b)(1) Guidelines and whether the project poses unacceptable adverse impacts are important and key aspects of 404(c) review, EPA's failure to consider these aspects when withdrawing the Proposed Determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 38
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 38 of 40

A. Declare that EPA's withdrawal of the Proposed Determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the CWA and the APA;

B. Vacate and set aside EPA's withdrawal of the Proposed Determination;

C. Enter appropriate injunctive relief;

D. Award Plaintiffs all reasonable costs and attorney's fees as authorized by law; and

E. Award Plaintiffs such other relief as this Court deems just and proper.

DATED this 8th day of October, 2019.

SUMMIT LAW GROUP PLLC
*Attorneys for Bristol Bay Economic Development Corporation, Bristol Bay Native Association, Inc. and Bristol Bay Reserve Association*

By: *s/ Jeffrey M. Feldman*
Jeffrey M. Feldman (AK Bar No. 7605029)

YARMUTH LLP
*Also Attorneys for Bristol Bay Economic Development Corporation, Bristol Bay Native Association, Inc. and Bristol Bay Reserve Association*

By: *s/ Ralph H. Palumbo*
Ralph H. Palumbo, *Pro Hac Vice pending*
 (WA Bar No. 4751)
By: *s/ Lynn M. Engel*
Lynn M. Engel, *Pro Hac Vice pending*
 (WA Bar No. 21934)

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 39
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 39 of 40

NATIVE AMERICAN RIGHTS FUND
*Attorneys for United Tribes of Bristol Bay*

By: *s/ Megan R. Condon*
Megan R. Condon (AK Bar No. 1810096)
By: *s/ Matthew N. Newman*
Matthew N. Newman (AK Bar No. 1305023)

HOLMES, WEDDLE & BARCOTT
*Attorney for Bristol Bay Regional*
*Seafood Development Association, Inc.*

By: *s/ Scott Kendall*
Scott Kendall (AK Bar. No. 0405019)

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF - 40
CASE NO. 3:19-CV-00265-TMB

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Case 3:19-cv-00265-TMB   Document 1   Filed 10/08/19   Page 40 of 40