BRYAN SCHRODER
United States Attorney
District of Alaska

MARK A. NITCZYNSKI
U.S. Department of Justice – ENRD
Environmental Defense Section
999 18th Street; South Terrace; Suite 370
Denver, CO 80202
Phone: (303) 844-1498; Fax: (303) 844-1350
Email: mark.nitczynski@usdoj.gov

BRIAN UHOLIK
Environment and Natural Resources Division
4 Constitution Square
150 M Street, N.E.
EDS/4th Floor
Washington, D.C. 20002
Phone: (202) 305-0733; Fax: (202) 514-8865
Email: brian.uholik@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA
## AT ANCHORAGE

| | |
|---|---|
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION, *et al.,* | CASE NO. 3:19-CV-00265-SLG |
| Plaintiffs, | |
| v. | |
| CHRIS HLADICK, U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.,* | |
| Defendants. | |
| SALMONSTATE, *et al.,* | CASE NO. 3:19-CV-00267-SLG |
| Plaintiffs, | |

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED)

v.

CHRIS HLADICK, U.S.
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,

                        Defendants.

TROUT UNLIMITED,                          CASE NO. 3:19-CV-00268-SLG

                        Plaintiffs,

            v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,

                        Defendants.

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

   I.   STATUTORY AND REGULATORY BACKGROUND ...............................3

     A.  Section 404 of the Clean Water Act .................................................3

     B.  EPA's regulations implementing section 404(c)...............................6

       1.  Proposed Determination .........................................................7

       2.  Withdrawal of Proposed Determination, or Recommended Determination...........8

       3.  Final Determination ................................................................9

     C.  The 404(q) Memorandum ..............................................................10

   II.  FACTUAL BACKGROUND...................................................................11

STANDARD OF REVIEW .....................................................................................19

ARGUMENT ..........................................................................................................21

   I.   The Court Lacks Jurisdiction Because EPA's Withdrawal Decision is Committed to Agency Discretion by Law................................21

   II.  EPA's Decision is Presumptively Unreviewable.................................25

   III. There is No "Law to Apply" in Reviewing the Discretionary Decision to Withdraw the Proposed Determination ........................16

   IV. The RA's Withdrawal Decision Required a Complicated Balancing of Factors Peculiarly Within EPA's Expertise .................31

CONCLUSION .......................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Adams v. FAA,*
  1 F.3d 955 (9th Cir. 1993) .............................................................................................23

*Alaska v. Kerry,*
  972 F.Supp.2d 1111 (D. Alaska 2013) .....................................................................23, 30

*Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs,*
  515 F.Supp.2d 1 (D.D.C. 2007) ....................................................................................28

*Argabright v. United States,*
  35 F.3d 472 (9th Cir. 1994) ....................................................................22, 23, 24, 30

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .......................................................................................................20

*Auer v. Robbins,*
  519 U.S. 452 (1997) .......................................................................................................31

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .......................................................................................................20

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) .......................................................................................................21

*Bowles v. Seminole Rock & Sand Co.,*
  325 U.S. 410 (1945) .......................................................................................................31

*Cascade Conservation League v. M.A. Segale, Inc.,*
  921 F. Supp. 692 (W.D. Wash. 1996) .................................................26, 28, 29, 32

*Cato v. United States,*
  70 F.3d 1103 (9th Cir. 1995) .........................................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) .......................................................................................................21

*City & Cty. of San Francisco v. U.S. Dep't of Transp.,*
796 F.3d 993 (9th Cir. 2015)................................................................................passim

*City of Olmstead Falls v. EPA,*
266 F.Supp.2d 718 (N.D. Ohio 2003) ...........................................................................28

*City of Santa Clara, Cal. v. Andrus,*
572 F.2d 660 (9th Cir. 1978)........................................................................................22

*Dep't of the Army v. Blue Fox, Inc.,*
525 U.S. 255 (1999)......................................................................................................21

*Doe v. Holy See,*
557 F.3d 1066 (9th Cir. 2009) ......................................................................................20

*E.J. Friedman Co., Inc. v. United States,*
6 F.3d 1355 (9th Cir. 1993)..............................................................................20, 21, 23

*Hallstrom v. Tillamook Cty.,*
493 U.S. 20 (1989)........................................................................................................20

*Heckler v. Chaney,*
470 U.S. 821 (1985).................................................................................................passim

*Hinck v. United States,*
550 U.S. 501 (2007)......................................................................................................23

*Hodge v. Dalton,*
107 F.3d 705 (9th Cir. 1997).........................................................................................20

*ICC v. Bhd. of Locomotive Eng'rs,*
482 U.S. 270 (1987)......................................................................................................22

*Kingman Reef Atoll Invs., L.L.C. v. United States,*
541 F.3d 1189 (9th Cir. 2008) ......................................................................................19

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019)..................................................................................................31

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994)......................................................................................................19

*Lane v. Pena,*
   518 U.S. 187 (1996) ...........................................................................................................19

*Leslie Salt Co. v. United States,*
   896 F.2d 354 (9th Cir. 1990) .............................................................................................31

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) .............................................................................................21, 22, 32

*Menominee Indian Tribe of Wisconsin v. EPA,*
   360 F. Supp. 3d 847 (E.D. Wis. 2018) ..............................................................................28

*Mingo Logan Coal Co. v. EPA,*
   714 F.3d 608 (D.C. Cir. 2013) .......................................................................... 3, 27, 28, 34

*Mingo Logan Coal Co. v. EPA,*
   829 F.3d 710 (D.C. Cir. 2016) ...........................................................................................29

*Newman v. Apfel,*
   223 F.3d 937 (9th Cir. 2000) .............................................................................................22

*Newport Galleria Group v. Deland,*
   618 F. Supp. 1179 (D.D.C. 1985) ................................................................................28, 34

*Pebble Ltd. Partnership v. EPA,*
   155 F.Supp.3d 1000 (D. Alaska 2014) ..............................................................................11

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,*
   915 F. Supp. 378 (N.D. Ga. 1995) *aff'd* 87 F.3d 1242 (11th Cir. 1996) ...................................28

*Rank v. Nimmo,*
   677 F.2d 692 (9th Cir. 1982) .............................................................................................23

*Rouse v. U.S. Dep't of State,*
   567 F.3d 408 (9th Cir. 2009) .............................................................................................20

*Ruff v. Hodel,*
   770 F.2d 839 (9th Cir. 1985) .............................................................................................23

*Safe Air for Everyone v. Meyer,*
   373 F.3d 1035 (9th Cir. 2004) ...........................................................................................20

*Sierra Club v. Whitman*,
　268 F.3d 898 (9th Cir. 2001)..................................................................21, 23, 24, 26, 32

*Southern Ry. Co. v. Seaboard Allied Milling Corp.*,
　442 U.S. 444 (1979) ........................................................................................29, 30

*Steel Co. v. Citizens for a Better Env't*,
　523 U.S. 83 (1998) ....................................................................................................19

*United States v. Kubrick*,
　444 U.S. 111 (1979) ................................................................................................20

*United States v. Mitchell*,
　463 U.S. 206 (1983) ................................................................................................19

*United States v. Nordic Vill., Inc.*,
　503 U.S. 30 (1992) ..................................................................................................19

*Warren v. Fox Family Worldwide, Inc.*,
　328 F.3d 1136 (9th Cir. 2003) ........................................................................20

*Webster v. Doe*,
　486 U.S. 592 (1988) ........................................................................................22, 24

*Weyerhauser Co. v. U.S. Fish and Wildlife Svc.*,
　139 S. Ct. 361 (2018) ........................................................................21, 28, 29

## STATUTES

5 U.S.C. § 701(a)(2) .......................................................................................passim

21 U.S.C. § 301 *et seq.*.................................................................................25

33 U.S.C. § 1251(a)(2)...................................................................................4

33 U.S.C. § 1319(a)(3)...................................................................................5

33 U.S.C. § 1344(a)........................................................................................4

33 U.S.C. § 1344(b)........................................................................................5

33 U.S.C. § 1344(b)(1)...................................................................................4

33 U.S.C. § 1344(c)...................................................................................................passim

33 U.S.C. § 1344(e)..........................................................................................................4

33 U.S.C. § 1344(h)..........................................................................................................4

33 U.S.C. § 1344(h)(1)(A)................................................................................................4

33 U.S.C. § 1344(n)..........................................................................................................5

33 U.S.C. § 1344(q)..........................................................................................................5

33 U.S.C. § 1344(s)...........................................................................................................5

33 U.S.C. § 1362(6)..........................................................................................................4

**RULES**

Fed. R. Civ. P. 12(b).................................................................................................2, 35

Fed. R. Civ. P. 12(b)(1)..................................................................................................20

Fed. R. Civ. P. 12(b)(6)..................................................................................................20

**REGULATIONS**

33 C.F.R. § 323.2(c).........................................................................................................4

33 C.F.R. § 323.2(e)(1)....................................................................................................4

33 C.F.R. § 323.6(b).........................................................................................................7

40 C.F.R § 1.5(a)..............................................................................................................6

40 C.F.R. Pt. 230.........................................................................................................4, 17

40 C.F.R. Pt. 231.........................................................................................................6, 7

40 C.F.R. § 231.1(c).........................................................................................................6

40 C.F.R. § 231.2(e).........................................................................................................6

40 C.F.R. § 231.3 .................................................................................................. 17, 31

40 C.F.R. § 231.3(a) ....................................................................................................... 6

40 C.F.R. § 231.3(a)(1) ................................................................................................... 7

40 C.F.R. § 231.3(a)(2) ............................................................................................. 7, 17

40 C.F.R. § 231.4(a) ................................................................................................. 8, 17

40 C.F.R. § 231.4(b)-(g) ................................................................................................. 8

40 C.F.R. § 231.5 .......................................................................................................... 30

40 C.F.R. § 231.5(a) ........................................................................................... 8, 30, 31

40 C.F.R. § 231.5(b) ....................................................................................................... 9

40 C.F.R. § 231.5(c) ....................................................................................................... 9

40 C.F.R. § 231.5(c)(1) ................................................................................................... 9

40 C.F.R. § 231.5(c)(2) ................................................................................................... 9

40 C.F.R. § 231.6 ..................................................................................................... 9, 17

40 C.F.R. § 231.8 ............................................................................................................ 7

40 C.F.R. § 232.2 ............................................................................................................ 4

## FEDERAL REGISTER NOTICES

44 Fed. Reg. 58,076 (Oct. 9, 1979) ....................................................................passim

82 Fed. Reg. 33,123 (Jul. 19, 2017) ............................................................................13

83 Fed. Reg. 8,668 (Feb. 28, 2018) .............................................................................14

84 Fed. Reg. 45,749 (Aug. 30, 2019) ..................................................................passim

## OTHER AUTHORITIES

*Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary
    (last visited Dec. 10, 2019) .............................................................................................................27

# INTRODUCTION

These consolidated cases are not justiciable. Plaintiffs seek to challenge a decision by the United States Environmental Protection Agency ("EPA") that the Clean Water Act and EPA's implementing regulations make wholly discretionary. Because that decision is committed to EPA's discretion by law, it is unreviewable under the Administrative Procedure Act ("APA"). The Clean Water Act ("CWA") accords EPA discretionary authority to prohibit or restrict discharges of dredged or fill material into "waters of the United States" under section 404(c), and EPA's regulations implementing this section lay out procedural steps by which the Agency may exercise this discretionary authority.

These cases relate to the Pebble Limited Partnership's ("PLP's") announced intent to obtain federal permits necessary to mine valuable ore and mineral deposits attendant to Bristol Bay in southwestern Alaska. The unusual situation presented by these cases began nearly six years ago, in 2014. EPA's Region 10 office then took the step of initiating a CWA section 404(c) review process *before* a section 404 permit application was submitted to the U.S. Army Corps of Engineers ("Corps") for the project.

After EPA Region 10 published a "Proposed Determination" under section 404(c) in July 2014, the review process was enjoined in a separate lawsuit before this Court. As a result, EPA did not resume the process until after EPA reached a settlement of that lawsuit in May 2017. This required EPA to initiate a process to propose to withdraw the Proposed Determination and also prevented EPA from making a Recommended Determination—the next affirmative step in its section 404(c) review process—for a number of years. EPA proposed to withdraw the Proposed Determination in July 2017 and solicited public

comments on the proposed withdrawal. EPA suspended the proposed withdrawal proceeding in January 2018.

In December 2017, PLP submitted a section 404 permit application to the Corps for mining of the Pebble deposit. The Corps then issued a public notice stating that an Environmental Impact Statement would be required in connection with the permitting process. Shortly thereafter, EPA formally began working with the Corps as a cooperating agency under the National Environmental Policy Act ("NEPA"). In February 2019, the Corps published a draft EIS and a "Section 404 Public Notice." Both provided EPA with new processes to begin working directly with the Corps to evaluate the proposed discharges and their effects. Those processes revealed that EPA and the Corps had preliminary differences in their views on a variety of technical matters related to the potential impacts from the project. In July 2019, EPA submitted approximately 150 pages of comments to the Corps related to those issues.

After resuming its consideration of whether to withdraw the Proposed Determination or leave it in place, EPA Region 10 published notification in the Federal Register on August 30, 2019, that it was withdrawing the Proposed Determination. The Region determined that key circumstances changed significantly after it issued the Proposed Determination in 2014. The mining scenarios on which the Proposed Determination was based had been superseded by the permit application and information generated during the NEPA and section 404 permitting processes. EPA explained that it could use those processes, as anticipated in its regulations, in the post-application context to address the new, developing factual record and the agencies' differing preliminary views about potential project impacts. EPA determined

that the "appropriate sequencing" under these circumstances is to use these processes during permit review. This approach makes more sense than addressing the technical issues through the prior, separate section 404(c) process under which the Region had issued a Proposed Determination many years back. Nonetheless, EPA acknowledged that, if its concerns about potential impacts from the project are not addressed to its satisfaction, EPA retains the authority to initiate a new section 404(c) process based on the complete record that includes the information developed during the permit review.

Plaintiffs in these consolidated cases challenge that decision to withdraw a *Proposed* Determination and continue by other processes. Pursuant to well-established principles of law, Plaintiffs' claims should be dismissed. Judicial review of the withdrawal decision is not available because it is committed to EPA's discretion by law. It is, thus, not subject to APA review. Decisions "not to enforce" are presumptively unreviewable. EPA's discretionary decision to forgo the section 404(c) process is akin to the exercise of prosecutorial discretion. In addition, Congress provided no "law to apply" in reviewing EPA's withdrawal decision. Furthermore, the decision involved a complicated balancing of factors within EPA's expertise. EPA is better equipped to conduct that balancing than the courts. The Court should therefore dismiss the complaints.

<b><u>BACKGROUND</u></b>

## I.       STATUTORY AND REGULATORY BACKGROUND

### A. Section 404 of the Clean Water Act

The Clean Water Act of 1972 sets out several goals, including attainment and preservation of "water quality which provides for the protection and propagation of fish,

shellfish, and wildlife . . . ." 33 U.S.C. § 1251(a)(2). To further its goals, the Act prohibits "discharge of any pollutant" into navigable waters except in accordance with the Act's terms. *Id.* § 1311(a). The term "pollutant" encompasses not only chemical and biological waste but also, *e.g.*, rock and sand. 33 U.S.C. § 1362(6).

The Act creates two types of permits that authorize discharges of pollutants, one of which is relevant here. Section 404 enables the Corps and approved States to issue permits for discharges of dredged or fill material. 33 U.S.C. § 1344(a), (e), (h). Pollutants are known as "fill material" when their discharge either replaces any portion of a water of the United States with dry land or changes the bottom elevation of a water body. *See* 33 C.F.R. § 323.2(e)(1); 40 C.F.R. § 232.2. The term "dredged material" means "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c); 40 C.F.R. § 232.2.

Congress established an intricate balance between the Corps and EPA for implementing the section 404 program, including various responsibilities over permitting, rulemaking, enforcement and project "vetoes." The Corps is the federal entity charged with issuing section 404 permits, 33 U.S.C. § 1344(a), and the Corps issues all section 404 permits in Alaska. The CWA vests EPA with several authorities, including the ability to authorize individual States to issue section 404 permits, 33 U.S.C. § 1344(h), but Alaska has not sought to assume this authority. The Act requires EPA, in conjunction with the Corps, to issue regulations known as "404(b)(1) Guidelines" that govern the evaluation of permit applications. *Id.* § 1344(b)(1), (h)(1)(A)(i); *see* 40 C.F.R. Pt. 230. The Act also requires the Corps to enter into agreements with EPA and other agencies to coordinate regarding the

issuance of section 404 permits.  33 U.S.C. § 1344(q).  Pursuant to that requirement, EPA

and the Corps have entered into a memorandum of agreement referred to here as the

"404(q) Memorandum."  *See* Administrative Record ("AR") Document 12,585.  In addition,

the Corps and EPA may enforce violations of section 404.  33 U.S.C. §§ 1344(n), (s),

1319(a)(3).

The Act also provides that the Corps' permitting authority under section 404 is

subject to EPA's authority under section 404(c).  33 U.S.C. § 1344(b), (c).  Section 404(c)

authorizes EPA to prohibit the specification of, or deny or restrict the use of, any defined

area as a disposal site for dredged or fill material:

> The [EPA] Administrator is authorized to prohibit the specification (including
> the withdrawal of specification) of any defined area as a disposal site, and he is
> authorized to deny or restrict the use of any defined area for specification
> (including the withdrawal of specification) as a disposal site, whenever he
> determines, after notice and opportunity for public hearings, that the discharge
> of such materials into such area will have an unacceptable adverse effect on
> municipal water supplies, shellfish beds and fishery areas (including spawning
> and breeding areas), wildlife, or recreational areas. . . .

33 U.S.C. § 1344(c).  Section 404(c) also specifies that, "[b]efore making such determination,

the Administrator shall consult with the [Corps]."  *Id.*  There is no mention of proposed

determinations or withdrawals of proposed determinations in section 404(c).  *Id.*

Section 404's division of authority between EPA and the Corps is the result of a

Congressional compromise.  Congress allowed the Corps to specify fill disposal sites and

issue permits, but it authorized EPA to prohibit, withdraw, deny or restrict use of any

defined area for disposal of dredged or fill material whenever EPA determines that the

discharge of those materials will have certain unacceptable adverse effects.  *See Mingo Logan*

*Coal Co. v. EPA*, 714 F.3d 608, 612-14 (D.C. Cir. 2013) (upholding EPA's authority to make

a Final Determination under section 404(c) after the Corps had issued a section 404 permit).

### B. EPA's regulations implementing section 404(c)

In 1979, EPA promulgated regulations governing the exercise of its section 404(c)

authority. *See* 40 C.F.R. Pt. 231; 44 Fed. Reg. 58,076 (Oct. 9, 1979). Those regulations,

which apply to "all existing, proposed or potential disposal sites" for discharges of fill

material, 40 C.F.R. § 231.1(c), establish multi-step rules of procedure for EPA to evaluate

potential effects and potentially make a 404(c) final determination to prohibit, deny or

restrict disposal in a defined area. *See* 40 C.F.R. Pt. 231. The rules include internal

delegations of authority from the Administrator to the appropriate Regional Administrator.[1]

The discretionary section 404(c) review process begins with an EPA Regional

Administrator ("RA"), who "may" initiate certain "actions" for the section 404(c) review

proceedings if he has "reason to believe," after evaluating the available information, that an

"'unacceptable adverse effect' *could result*" from the use of any defined area as a disposal site

for dredged or fill material. 40 C.F.R. § 231.3(a) (emphasis added).[2] The "information

available" to the RA would include any record developed during coordination between EPA

and the Corps during the interagency process described in the 404(q) Memorandum. 84

---

[1] EPA has ten regional offices, designated EPA Region 1 through EPA Region 10. The chief of each regional office is the Regional Administrator. *See* 40 C.F.R § 1.5(a). EPA Region 10 is based in Seattle, and has responsibility for EPA matters in Alaska, Washington, Oregon, and Idaho.

[2] "Unacceptable adverse effect" is defined to mean "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e).

Fed. Reg. 45,749, 45,752 (Aug. 30, 2019). Once EPA initiates the section 404(c) process, the District Engineer at the Corps may not issue a permit for the discharge of dredged or fill material at a site located in the defined area until final action is taken by EPA under 40 C.F.R. Pt. 231—a period of time that the regulations envision as lasting only for several months. 40 C.F.R. § 231.3(a)(2); 33 C.F.R. § 323.6(b). However, the District Engineer may process a permit application during the section 404(c) process. 33 C.F.R. § 323.6(b).

       1.  <u>Proposed Determination</u>

The first step in the process is that the RA "will" notify the Corps' District Engineer, the owner of the site, and the permit applicant, if any, that he intends to issue a public notice of a proposed determination to prohibit or withdraw the specification, or to deny, restrict or withdraw the use for specification, of any defined area as a disposal site. 40 C.F.R. § 231.3(a)(1). After that, the regulations allow for a minimum 15-day period during which the owner or applicant may seek to demonstrate, to the satisfaction of the RA in his discretion, that no unacceptable adverse effects will occur. *Id.* § 231.3(a)(2).[3] If such a demonstration is not made to the satisfaction of the RA, and the District Engineer does not notify the RA that the Corps will take corrective action to prevent the unacceptable adverse effects, then the RA "shall" publish notice of a proposed determination "in accordance with" the applicable procedures. *Id.* § 231.3(a)(2). As EPA explained in the preamble to its section 404(c) regulations, a "proposed determination does not represent a judgment that discharge

---

[3] The EPA Administrator or the RA may extend the time requirements in EPA's section 404(c) regulations upon a showing of good cause. 40 C.F.R. § 231.8. Notice must be published in the Federal Register and through other forms, as appropriate. *Id.*

of dredged or fill material will result in unacceptable adverse effects; it merely means that the [RA] believes that the issue should be explored." 44 Fed. Reg. 58,082. After the RA publishes the proposed determination, any interested person may submit comments during a 30- to 60-day comment period. 40 C.F.R. § 231.4(a). In addition, where there is significant public interest in the proposed determination, or if an affected landowner or the permit holder or applicant requests a hearing, the RA shall convene a public hearing consistent with the requirements of the regulations. *Id.* § 231.4(b)-(g).

        2. <u>Withdrawal of Proposed Determination, or Recommended Determination</u>

Within 30 days after the conclusion of the public hearing or, if no hearing is held, within 15 days after the conclusion of the public comment period, the RA must either withdraw the proposed determination or prepare a recommended determination to prohibit, deny, restrict, or withdraw the use for specification. *Id.* § 231.5(a) (the RA is to "either withdraw the proposed determination or prepare a recommended determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use or specification, of the disposal site because the discharge of dredged or fill material at such site *would be likely* to have an unacceptable adverse effect.") (emphasis added).

The regulations provide a process—but not a standard—for a decision to withdraw a proposed determination. *See* 40 C.F.R. § 231.5(a). If the RA decides to withdraw the proposed determination, then the RA must "promptly" notify the Administrator[4] of the

---

[4]  In 1984, the EPA Administrator delegated the authority to make final determinations under section 404(c) to EPA's national CWA Section 404 program manager, who is the Assistant Administrator for Water. That delegation remains in effect. With regard to EPA's Section 404(c) action for the Pebble deposit area, on March 22, 2019, Administrator Wheeler delegated to the General Counsel, Matthew Z. Leopold, the authority to perform all

RA's intent to withdraw. *Id.* § 231.5(c). The Administrator has the option to review the

RA's proposed withdrawal and, if so, has 10 days to notify the RA of the intent to review.

*Id.* § 231.5(c). If the Administrator decides against review, then the RA must publish a

notice of the withdrawal, which "shall constitute final agency action." *Id.* § 231.5(c)(1).[5] If

the RA instead prepares a recommended determination, it must be "promptly" forwarded

along with the administrative record to the Administrator at EPA Headquarters for review.

*Id.* § 231.5(b).

        3.  <u>Final Determination</u>

After reviewing the RA's recommendation to prohibit specification or to deny,

restrict, or withdraw the use for specification, EPA Headquarters must initiate consultation

with the Corps' Chief of Engineers, the owner, and the permit applicant, if any, who have 15

days to notify EPA Headquarters of their intent to take corrective action to prevent the

unacceptable adverse effects. *Id.* § 231.6. EPA Headquarters must then make a final

decision affirming, modifying, or rescinding the RA's recommended determination, and

publish notice of that decision in the Federal Register. *Id.* That final determination

constitutes "final agency action" for purposes of judicial review. *Id.* If EPA decides to

affirmatively exercise its authority in a final determination, that action would include its

functions and responsibilities retained by the Administrator or previously delegated to the
Assistant Administrator for Water.

[5] If the Administrator decides to review the proposed withdrawal, then copies of the
notification of the intent to review shall be sent to the persons who commented on the
proposed determination or participated at the hearing, and final agency action does not
occur until the Administrator makes a determination on the proposed withdrawal. *Id.* §
231.5(c)(2).

determination that "the discharge of such materials into such areas *will have* an unacceptable adverse effect." 33 U.S.C. § 1344(c) (emphasis added).

### C.     The 404(q) Memorandum

As mentioned above, EPA and the Corps have entered into an agreement as required by CWA section 404(q). Consistent with Congress's intricate division of section 404 authority between EPA and the Corps, the 404(q) Memorandum affirms that the Corps is the sole federal entity responsible for making final section 404 permit decisions and that EPA retains its authority under section 404(c). 404(q) Memorandum, AR 12,585 at 193462-63, 193470-71. The 404(q) Memorandum also establishes policies and procedures that "provide and encourage communication and full consideration of [the] agencies' views concerning proposed projects . . . ." *Id.* at 193464. The Corps is to serve as the "project manager" for the evaluation of permit applications, but "[i]t is recognized that the EPA has an important role in the [Corps'] Regulatory Program under the Clean Water Act, [NEPA], and other relevant statutes." *Id.* at 193463.

EPA is to provide "substantive, project-related information (within EPA's area of expertise and authority) on the impacts of activities being evaluated by the Corps," along with expert information on "appropriate and practicable measures to mitigate adverse impacts." *Id.* "Pursuant to [EPA's] authority under Section 404(b)(1)," EPA also may provide its "views regarding compliance with the section 404(b)(1) Guidelines." *Id.* The Corps, in turn, is to "fully consider EPA's comments when determining compliance with [NEPA], the section 404(b)(1) Guidelines, and other relevant statutes, regulations and policies." Specifically, the Corps will "fully consider the EPA's views when determining

whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit." *Id.* The 404(q) Memorandum also sets forth procedures for elevating policy issues and individual permit decisions within the agencies. *Id.* at 193466-71.

## II.  FACTUAL BACKGROUND

The Pebble deposit contains copper, gold and molybdenum, and is located in the Bristol Bay region, approximately 200 miles southwest of Anchorage. *See* Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska, 84 Fed. Reg. 45,749. The Bristol Bay watershed includes large salmon fisheries, including the largest sockeye salmon fishery in the world, which support significant commercial, sport and subsistence fishing activities. *See id.*

In 2011, before PLP submitted a CWA section 404 permit application to the Corps to mine a portion of the Pebble deposit, EPA began an assessment to understand how large-scale mining could potentially affect the fisheries in the Bristol Bay watershed. 84 Fed. Reg. at 45,749. EPA issued the Bristol Bay Watershed Assessment in January 2014. *Id.* While such an assessment is not required under section 404(c), it was part of the information on which EPA relied in 2014, when EPA Region 10 initiated its CWA section 404(c) review. *See id.*[6]

---

[6]  PLP challenged the initiation of the review process, but this Court dismissed the challenge because there was no final agency action, *Pebble Ltd. Partnership v. EPA*, 155 F.Supp.3d 1000 (D. Alaska 2014), and the Ninth Circuit affirmed the dismissal on the same grounds in an unpublished opinion.

In July 2014, EPA Region 10 "preemptively" (*i.e.*, before a section 404 permit application had been submitted) published its Notice of Proposed Determination under section 404(c) to restrict the use of certain waters within the watershed for use as disposal sites for dredged or fill material associated with mining the Pebble deposit. 84 Fed. Reg. at 45,749-50. The Proposed Determination addressed hypothetical mining scenarios based on information compiled from a number of sources. *Id.* at 45,749, 45,753. EPA received approximately 670,000 comments on the Proposed Determination and held a number of public hearings throughout southwest Alaska. *Id.* at 45,750.

The next step in the section 404(c) regulatory process typically would have been for EPA Region 10 either to forward a Recommended Determination to EPA headquarters or to withdraw the Proposed Determination. *Id.* However, PLP filed a lawsuit that alleged that EPA formed three *de facto* advisory committees in violation of the Federal Advisory Committee Act ("FACA"). *Id. See Pebble Ltd. Partnership v. EPA,* No. 3:14-cv-00171 (D. Alaska). In November 2014, the court determined that PLP had a fair chance of success on the merits, and entered an injunction that halted EPA's section 404(c) review process until the case was resolved. 84 Fed. Reg. at 45,750.

In May 2017, EPA and PLP entered into a settlement that resolved the FACA litigation and other matters. 84 Fed. Reg. at 45,750. The court dissolved the injunction and dismissed the action, and EPA agreed to "initiate a process to propose to withdraw the Proposed Determination." *Id.* EPA also agreed not to move forward with a Recommended Determination—if any—until May 11, 2021, or until EPA publishes a notice of the Corps' final Environmental Impact Statement ("EIS") for the project, whichever is earlier. *Id.*

In July 2017, EPA Region 10 proposed to withdraw the Proposed Determination. 84 Fed. Reg. at 45,750; *see* 82 Fed. Reg. 33,123 (July 19, 2017). In the notice, Region 10 stated that, "[b]ecause the Agency retains the right under the settlement [of the FACA litigation and other matters] to ultimately exercise the full extent of its discretion under section 404(c), including the discretion to act prior to any potential Army Corps authorization of discharge of dredged or fill material associated with mining the Pebble deposit, the Agency believes that withdrawing the Proposed Determination now, while allowing the factual record regarding any forthcoming permit application to develop, is appropriate at this time for this particular matter." 84 Fed. Reg. at 45,752 (quoting 82 Fed. Reg. 33,124). EPA sought input on three potential bases on which to withdraw the Proposed Determination: (1) to provide PLP with additional time to submit a section 404 permit application; (2) to remove potential uncertainty about PLP's ability to submit a permit application and have it reviewed; and (3) to allow the factual information related to a potential permit application to develop. *Id.* at 45,750. EPA received approximately one million public comments on the proposal and held two public hearings in the Bristol Bay watershed. *Id.* EPA also consulted with federally recognized tribal governments and with Regional and Village Corporations. *Id.*

In December 2017, PLP submitted a CWA section 404 permit application to the Corps. *Id.* In early January 2018, the Corps issued a notice of the permit application and stated that an EIS for the application would be required under NEPA. *Id.* The Corps invited federal and state agencies, including EPA, to be cooperating agencies on the development of the EIS. *Id.* In late January 2018, EPA Region 10 issued a notice that

announced a "suspension" of the proceeding to withdraw the Proposed Determination. *Id.*
*See* 83 Fed. Reg. 8,668 (February 28, 2018).

On March 1, 2018, EPA Region 10 accepted the Corps' invitation to serve as a
cooperating agency for development of the EIS. 84 Fed. Reg. at 45,750. In that capacity,
EPA has participated in meetings and provided comments on early drafts of EIS materials,
and has provided scoping comments to the Corps. *Id.* The Corps released a draft EIS and
"Section 404 Public Notice" in February 2019. *Id.* On July 1, 2019, EPA submitted over
100 pages of public comments on the Corps' draft EIS and submitted over 50 pages of
public comments on the Corps' section 404 public notice. *Id.* In its comments on the
Corps' section 404 public notice, EPA initiated the dispute resolution procedures for
individual permit cases pursuant to the 404(q) Memorandum. *Id.* at 47,755. Importantly,
EPA could not initiate coordination under the 404(q) Memorandum until the Corps
provided notice of the application for comment. 84 Fed Reg. at 45,755; see 404(q)
Memorandum, AR 12,585 at 193465.

In June 2019, the EPA General Counsel, acting by delegated authority for the
Administrator, who has recused himself from Pebble-related matters, directed Region 10 to
"continue deliberating regarding whether to withdraw the 2014 Proposed Determination or,
alternatively, decide to leave the 2014 Proposed Determination in place." 84 Fed. Reg. at
45,750. EPA published notification of its withdrawal of the Proposed Determination in the
Federal Register on August 30, 2019. 84 Fed. Reg. 45,749. In the notice, EPA clarified that
it was not basing its decision on technical judgments about whether PLP's mine proposal
will comply with the section 404(b)(1) Guidelines or result in "unacceptable adverse effects"

under CWA section 404(c). *Id.* at 45,756. Instead, EPA emphasized that key circumstances had changed significantly after PLP submitted its permit application and the Corps published notice of it. In particular, the *hypothetical* mining scenarios in the Proposed Determination had been superseded. Project-specific information had been, and was continuing to be, developed in connection with the multi-year permitting process. *Id.* at 45,452-56. The record had grown significantly and would continue to grow until the Corps issues a final EIS. *Id.* at 45,753. In addition, the Corps had made preliminary determinations that in certain respects conflict with EPA's preliminary assessments in the 2014 Proposed Determination. *Id.* Furthermore, separate opportunities became available to address EPA's environmental concerns with the Corps, including as a cooperating agency in the Corps' NEPA process, as a commenter on the Corps' section 404 public notice, and by invoking the processes available in the 404(q) Memorandum. *Id.* at 45,752-53.

There are several differences between the scenarios that EPA addressed in the 2014 Proposed Determination and the proposal in PLP's permit application. Among other things, PLP's proposal would: eliminate cyanide leaching as part of ore processing; place a liner under a disposal facility for certain mine "tailings" and waste rock; reduce the amount of waste rock; and relocate treated water discharge areas, which may reduce impacts related to "dewatering" of the open pit. 84 Fed. Reg. at 45,753.

Using the "process opportunities" now available in both the NEPA and CWA contexts, EPA has brought its expertise to bear, and has provided significant technical comments and expressed particular concerns regarding the impacts of the project. *Id.* at 45,754-55. As one summary example, EPA informed the Corps that EPA "has concerns

regarding the extent and magnitude of the substantial proposed impacts to streams, wetlands, and other aquatic resources that may result, particularly in light of the important role that these resources play in supporting the region's valuable fishery resources." *Id.*[7]

EPA recognized in its withdrawal notice that the Corps, through well-established processes of continued analysis and coordination with EPA, may resolve some of the issues that EPA has raised. 84 Fed. Reg. at 45,755. EPA also emphasized that, under its regulations, where a permit application is pending, the "normal" process in the initial stages of a potential section 404 proceeding would involve the RA's review of the record developed during EPA's coordination with the Corps during the permit review process. *Id.* at 45,752. Indeed, an explanatory comment within EPA's regulations states EPA's expectation that those processes "will normally be exhausted prior to any final decision whether to *initiate* a

---

[7] EPA's comments on the Corps' draft EIS and on the Corps' notice of PLP's permit application included much more detail. For example, EPA specifically cautioned the Corps about the potential impacts on fish habitat. AR 12,595 at 196198. ("If spawning and rearing habitats no longer exist at sufficient levels (in terms of quantity or quality), or no longer exist in proximity to each other, the abundance, productivity, and sustainability of fish populations will be compromised. These habitats need to remain both sufficiently represented and connected, throughout the project area, to sustain resiliency and persistence of fish populations."). EPA also commented that the draft EIS "appears to lack certain critical information about the proposed project and mitigation," and thus "likely underestimates impacts and risks to groundwater and surface water flows, water quality, wetlands, aquatic resources, and air quality" from the proposed project. *Id.* at 196146. EPA advised that, "Inclusion of the additional information and analyses we have identified, or further explanation in the EIS of these issues, is essential to more fully evaluate and disclose the potential impacts and identify practicable measures to mitigate those impacts." *Id.*

404(c) proceeding." *Id.* at 45,752 (emphasis added); *see* 40 C.F.R. § 231.3.[8] EPA explained

that this approach is consistent with the preamble to its 1979 regulations. These state that

the *start* of a section 404(c) process "will ordinarily be preceded by an objection to the permit

application." 84 Fed. Reg. at 45,752 (quoting 44 Fed. Reg. 58,080). EPA also stated there

that "[t]he fact that 404(c) may be regarded as a tool of last resort implies that EPA will first

employ its tool of 'first resort,'" that is, "comment and consultation with the permitting

authority at all appropriate stages of the permit process." *Id.* (quoting 44 Fed. Reg. 58,080).

Furthermore, EPA emphasized in its withdrawal notice that EPA is to coordinate

with the Corps throughout the section 404(c) process to assess whether "corrective action"

may be taken to prevent an "unacceptable adverse effect" that otherwise might be addressed

in a final section 404(c) determination. 84 Fed. Reg. at 47,555; *see* 40 C.F.R. §§ 231.3(a)(2),

231.4(a), 231.6.[9] This coordination specifically includes consultation with the Corps about

potential corrective action before the Region can publish a Proposed Determination and

before EPA can make a final section 404(c) determination. 40 C.F.R. §§ 231.3(a)(2), 231.6.

As EPA explained in its withdrawal notice, while the Corps participated in EPA's 2014

---

[8]  EPA's 1979 regulations refer to a "section 404 referral process" that is now established in
the 1992 404(q) Memorandum. *See* 84 Fed. Reg. at 45,752 n.3.

[9]  As the section 404 permitting authority, the Corps plays a key role in implementing any
corrective action measures. 84 Fed. Reg. at 45,752; *see* 44 Fed. Reg. at 58,081. The Corps
also plays a central role in ensuring that any discharge of dredged or fill material complies
with the CWA section 404(b)(1) Guidelines, which include requirements to, among other
things, minimize the adverse effects of the discharge of dredged or fill material, and use
compensatory mitigation to offset unavoidable impacts that are authorized through a section
404 permit. *See* 40 C.F.R. Pt. 230, Subparts H, J.

process prior to issuance of the Proposed Determination, the Corps' engagement was limited because PLP had not yet submitted its permit application. 84 Fed. Reg. at 45,755. The Corps is now in a far better position to provide information regarding corrective actions that may prevent unacceptable adverse effects. *Id.*

Accordingly, EPA Region 10 explained in the withdrawal notice that, "at this time, the appropriate sequencing" is to work through the usual permitting process "rather than through a separate 404(c) process initiated in 2014 that does not reflect the full record." 84 Fed. Reg. at 45,754. For these and the other reasons articulated in the notice, the Region determined:

> [I]t is more appropriate to use well-established mechanisms to raise project-specific issues as the record develops during the permitting process and consider the full record before potential future decision-making on this matter, instead of maintaining a section 404(c) process that is now five years old and does not account for the voluminous information provided in the permitting process.

*Id.* at 45,753.[10] EPA also explained that its decision would provide "clarity and certainty that EPA Region 10 will be working through the Corps' permitting process, including as a cooperating agency, and the 404(q) [Memorandum] process for engagement on this matter."

---

[10]   *See also* 84 Fed. Reg. at 45,753 ("EPA did not know and could not know when it issued its 2018 suspension exactly how long the NEPA process would take and how it would proceed. Given the current status of the NEPA process, it is now clear that EPA's 2014 Proposed Determination does not account for the significant project-specific information that has been developed . . . during the multi-year permitting process."); *id.* at 45,755 (while EPA stated in connection with the suspension that the factual record could develop notwithstanding the 2014 Proposed Determination, "given the need for any final EPA 404(c) decision to be based on the entire record, EPA has concluded that a Proposed Determination which in its current form does not account for the full record and does not grapple with differing conclusions, including those noted previously, should not serve as a basis for such a decision.").

84 Fed. Reg. 45,756. EPA also stated repeatedly that, if its concerns are not adequately resolved during the permitting process, then it may later initiate a new section 404(c) process based on the full record before the agencies at that time. *Id.* at 45,754-56; *see id.* at 45,754 ("If in the future EPA decides to proceed under its 404(c) authority, a new proposed determination would be appropriate to ensure consideration by the Regional Administrator of the full record prior to making the required determination [that an unacceptable adverse effect could result] and ensure meaningful public engagement through the public comment period on any new proposed determination.").

## STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction and may hear cases only to the extent expressly provided by statute. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The burden of establishing subject matter jurisdiction rests with the plaintiff. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008). To establish such jurisdiction in a suit against the United States, the plaintiff must show that its claims fall within an applicable waiver of sovereign immunity. *Cato v. United States*, 70 F.3d 1103, 1107 (9th Cir. 1995).

The United States may not be sued without its consent, and that consent is a prerequisite for jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Waivers of sovereign immunity "must be unequivocally expressed in [the] statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). Any such waiver is strictly construed in favor of the government. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992). Further, the United States may define the terms and conditions upon which it

may be sued. *United States v. Kubrick*, 444 U.S. 111, 117–18 (1979); *see also Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 27 (1989). If the conditions of the waiver are not met, the claim must be dismissed. *Hodge v. Dalton*, 107 F.3d 705, 707 (9th Cir. 1997); *see also E.J. Friedman Co., Inc. v. United States*, 6 F.3d 1355, 1357, 1359-60 (9th Cir. 1993) (APA does not waive sovereign immunity where agency action is unreviewable under section 701(a)(2)).

A Rule 12(b)(1) motion may be made on the basis that the complaint, together with documents attached to the complaint and any judicially noticed facts, fails to establish subject matter jurisdiction. *Warren v. Fox Family Worldwide, Inc.* 328 F.3d 1136, 1139 (9th Cir. 2003). In deciding a facial attack, the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Doe v. Holy See,* 557 F.3d 1066, 1073 (9th Cir. 2009). The court does not, however, accept the truth of legal conclusions cast in the form of factual allegations. *Id.* Rule 12(b)(1) jurisdictional attacks may also be factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment," and the court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* , 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court accepts as true the material factual allegations contained in the complaints and draws all reasonable inferences in the non-moving parties' favor. *Rouse v. U.S. Dep't of State*, 567 F.3d 408, 411 (9th Cir. 2009).

**ARGUMENT**

**I.     The Court Lacks Jurisdiction Because EPA's Withdrawal
        Decision is Committed to Agency Discretion by Law**

"Suits against the EPA, as against any agency of the United States, are barred by

sovereign immunity, unless there has been a specific waiver of that immunity."  *Sierra Club v.*

*Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S.

255, 260 (1999)).  While the APA contains a waiver of the United States' sovereign

immunity, that waiver is limited here because the APA bars judicial review of agency actions

that are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  For this reason, this

Court does not have jurisdiction over Plaintiffs' challenges to EPA Region 10's decision to

withdraw the Proposed Determination.

While there is a general presumption of reviewability of agency actions under the

APA, this is "just" a presumption, and 5 U.S.C. § 701(a)(2) expressly provides an exception.

*Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S.

340, 349 (1984)); *see Weyerhauser Co. v. U.S. Fish and Wildlife Svc.*, 139 S. Ct. 361, 370 (2018)

(noting the tension between the prohibition against review in section 701(a)(2) and the

direction to review in section 706(2)(A)).  Even though section 701(a)(2) stakes out "a very

narrow exception," *see, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410

(1971); *E.J. Friedman Co., Inc.*, 6 F.3d at 1359, "the Supreme Court has indicated that the §

701(a) hurdle must be cleared 'before any review at all may be had' under the APA."  *E.J.*

*Friedman Co.*, 6 F.3d at 1359 (quoting *Heckler v. Chaney*, 470 U.S. 821, 828 (1985)).

One circumstance in which section 701(a)(2) precludes judicial review is where "the

statute is drawn so that a court would have no meaningful standard against which to judge

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 21

the agency's exercise of its discretion." *Heckler*, 470 U.S. at 830. In such circumstances, there are no "judicially manageable standards," or essentially no "law to apply," in evaluating the agency's exercise of discretion. *Id.* (quoting *Overton Park*, 401 U.S. at 410); *see also City of Santa Clara, Cal. v. Andrus*, 572 F.2d 660, 666 (9th Cir. 1978) (even "the existence of some law generally applicable to the subject matter in question will not necessarily" allow for review; "[t]here is 'law to apply' only if a specific statute limits the agency's discretion to act in the manner which is challenged" (emphasis added)).

Another circumstance in which section 701(a)(2) bars review is when "the agency's action requires a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise, including the prioritization of agency resources, likelihood of success in fulfilling the agency's statutory mandate, and compatibility with the agency's overall policies." *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) (quoting *Heckler*, 470 U.S. at 831); *see, e.g., Lincoln*, 508 U.S. at 193.

The Supreme Court has applied this express exclusion from APA review in multiple contexts. In *Lincoln v. Vigil*, the Court addressed an agency's allocation of funds from a lump-sum appropriation. 508 U.S. at 192. The Court also has interpreted section 701(a)(2) to preclude judicial review of the CIA's termination of an employee, *see Webster v. Doe*, 486 U.S. 592, 599-601 (1988), and an agency's refusal to grant reconsideration of an action because of material error, *see ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270 (1987).

In accord with Supreme Court caselaw, on numerous occasions the Ninth Circuit also has held that agency decisions were "committed to agency discretion by law" and, accordingly, unreviewable. *See, e.g., Argabright v. United States*, 35 F.3d 472, 476 (9th Cir. 1994)

(IRS's decision not to abate interest unreviewable); *Adams v. FAA*, 1 F.3d 955, 956 (9th Cir. 1993) (FAA's denial of renewal of pilot examiner designation not reviewable); *E.J. Friedman Co.*, 6 F.3d at 1359 (IRS's refusal to release a tax lien unreviewable); *Ruff v. Hodel*, 770 F.2d 839, 842 (9th Cir. 1985) (determination of membership unreviewable where statute said such proof must be "satisfactory to the Secretary"); *Rank v. Nimmo*, 677 F.2d 692, 699-700 (9th Cir. 1982) (VA's decision whether to accept assignment of loans in default was not reviewable).[11] This Court has followed suit. *See Alaska v. Kerry*, 972 F.Supp.2d 1111, 1134 (D. Alaska 2013).

This restriction on judicial review applies presumptively to agency decisions not to take "enforcement actions" against regulated parties. *See Heckler*, 470 U.S. at 837-38; *see also City & Cty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015) ("*Heckler* carved out a presumption of unreviewability of an agency's decision not to take enforcement action."). This presumption is not exclusive to litigation brought under the APA; it applies broadly to agency refusals to investigate or enforce. *Sierra Club*, 268 F.3d at 902. Absent clear indication by Congress otherwise, such decisions are not subject to judicial review because of their particular, discretionary nature. In making such decisions, an agency is not limited to considering whether a "violation" has occurred. *Heckler*, 470 U.S. at 831. Even assuming that the violation has occurred, the agency must assess "whether

---

[11] In *Argabright*, the Ninth Circuit joined other Courts of Appeal that uniformly held that the decisions not to abate were unreviewable. 35 F.3d at 475-76. The Supreme Court then emphasized its approval of those cases, and discussed that Congress later made such decisions reviewable by specifying in the statute that the decisions were reviewable under an abuse of discretion standard. *Hinck v. United States*, 550 U.S. 501, 503-04, 506-08 (2007).

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 23

agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* Accordingly, such decisions customarily involve the complicated balancing of a number of factors that are "peculiarly within [the agency's] expertise." *Id.* "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32. In these ways and others, agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 831-32. *See, e.g., Sierra Club*, 268 F.3d at 902-03.

The courts' evaluation of whether review is precluded by section 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based." *Webster*, 486 U.S. at 600 (discussing *Overton Park* and *Heckler*). Such examination addresses, first and foremost, the statutory language under which the agency decision was made. *See, e.g., id.*; *City & Cty. of San Francisco,* 796 F.3d at 1002-03; *Argabright*, 35 F.3d at 474-76.

As discussed below, applying these principles here shows that EPA's withdrawal decision is unreviewable. EPA's decision was akin to a decision not to pursue enforcement under CWA section 404(c) at that time, which is presumptively unreviewable under section 701(a)(2). In addition, the language of section 404(c), EPA's implementing regulations, the structure of the CWA, including the balance that Congress created between EPA and the Corps, and the unique circumstances of this case demonstrate that EPA's decision is

committed to agency discretion by law. There is no "law to apply" in reviewing the decision, and the decision required the complicated balancing of factors within EPA's expertise.

## II.  EPA's Decision is Presumptively Unreviewable

EPA's decision to withdraw the Proposed Determination is a decision "not to enforce" that is presumptively unreviewable under 5 U.S.C. § 701(a)(2). In both the Supreme Court and the Ninth Circuit, the presumption of unreviewability of agency actions not to enforce applies to a range of agency decisions. For example, *Heckler* involved the programmatic determination whether to enforce the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, with respect to drugs used to administer the death penalty. *See* 470 U.S. at 824-25. In addition, in *City and County of San Francisco*, the Ninth Circuit held that the Pipeline and Hazardous Materials Safety Administration's acceptance of a state's annual certification of its intrastate pipeline safety program was unreviewable under 5 U.S.C. § 701(a)(2). 796 F.3d at 1001-03. The court described the challenged agency action—the approval of the state's annual certification—as a "decision not to enforce." *Id.* at 1002. Similarly, the court determined that the agency's "decision not to pursue rejection of the [state's] certification" was a "close analog to a decision not to enforce." *Id.* at 1004. On that basis, the court concluded that, "[a]s we have explained, decisions not to enforce are presumptively unreviewable under 5 U.S.C. § 701(a)(2)." *Id.*

Here, CWA section 404(c) bestows authority on EPA to (1) prohibit or withdraw the specification by the Corps of any defined area as a disposal site, and (2) deny or restrict the use of any defined area as a disposal site. 33 U.S.C. § 1344(c). Imposing such prohibitions, withdrawals, denials or restrictions constrains a regulated party's ability to discharge dredged

or fill material into the specified areas. This authority to prohibit or limit the party's discharges is akin to a regulatory enforcement mechanism. Accordingly, EPA's decision to withdraw its Proposed Determination and, thus, not pursue further its section 404(c) process, was a decision not to enforce that is presumptively unreviewable. *See Heckler*, 470 U.S. at 824-25; *City and Cty. of San Francisco*, 796 F.3d at 1001-03. *See also Cascade Conservation League v. M.A. Segale, Inc.*, 921 F. Supp. 692, 699 (W.D. Wash. 1996) (EPA's decision not to review or reverse the Corps' determination that a section 404 permit was not required because the activity was within an exception under CWA section 404(f) was a decision to not take an "enforcement action" and was unreviewable).

The presumption of unreviewability that attaches to EPA's decision can be "overcome by indications that Congress intended otherwise" *Sierra Club*, 268 F.3d at 903-04; *see also Heckler*, 470 U.S. at 832-34. In this case, however, unreviewability is supported by a number of factors, as discussed in more detail below. This is the very sort of decision that courts should not address, and instead should leave to the agency.

## III.    There is No "Law to Apply" in Reviewing the Discretionary Decision to Withdraw the Proposed Determination

Under section 404(c), EPA "is *authorized* to prohibit the specification . . . of any defined area as a disposal site, and . . . to deny or restrict the use of any defined area for specification . . . as a disposal site *whenever*" EPA determines that the discharge of dredged or fill material into any defined area "will have an *unacceptable* adverse effect" on, among other things, "fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c) (emphasis added.) The statutory language also states that EPA must provide notice and opportunity for public hearing before making a determination that the

discharge will have an "unacceptable adverse effect," that EPA "shall" consult with the Corps before making such a determination, and that EPA "shall set forth in writing and make public" the findings and reasons for making such a determination. *Id.*

The substantive portions of section 404(c) are drafted in terms of discretion. The language stating that EPA "is authorized to" take the actions set forth in section 404(c) is the same phrasing that the Supreme Court addressed in the general enforcement provision in *Heckler*, where the Court concluded the statute's "enforcement provisions thus commit *complete discretion* to the [agency] to decide how and when they should be exercised." *Heckler*, 470 U.S. at 835 (emphasis added).[12] The Court's conclusion is unsurprising given the definitions. "Authorized" means "endowed with authority." *See* https://www.merriam-webster.com/dictionary/authorized (last visited Dec. 10, 2019). "Authority," in turn, means "freedom granted by one in authority: right." *See* https://www.merriam-webster.com/dictionary/authority (last visited Dec. 10, 2019). Accordingly, in section 404(c), Congress gave EPA the ability and freedom to impose section 404(c) constraints by prohibiting, denying, or restricting the specification of disposal sites for dredged or fill material "whenever" it "determines" that the discharge would have certain "unacceptable" adverse effects. 33 U.S.C. § 1344(c). This is "classic language of discretion." *City and Cty. of San Francisco*, 796 F.3d at 1002. *See, e.g., Mingo Logan Coal Co.*, 714 F.3d at 612-14 (discussing

---

[12] In *Heckler*, the Court also discussed statutory text that would allow for review of a decision not to enforce because there *was* law to apply. 470 U.S. at 833-34 (discussing text providing that, upon the filing of a complaint by a union member, the secretary of Labor "shall investigate such complaint and, if he finds probable cause to believe that a violation . . . has occurred . . . he shall . . . bring a civil action . . . .").

discretionary nature of section 404(c)); *City of Olmstead Falls v. EPA*, 266 F. Supp. 2d 718, 723 (N.D. Ohio 2003) (EPA's authority under section 404(c) is of an "obvious discretionary nature").[13]

In addition, section 404(c) says nothing about an EPA decision to withdraw a proposed determination, which occurs at an early stage in the review process. 33 U.S.C. § 1344(c). Section 404(c) provides no requirements or substantive standards against which to review EPA's withdrawal decision here.[14]

---

[13] Other cases that address EPA's decisions under section 404(c) also emphasize the discretionary nature of EPA's actions, and are nearly uniform in upholding the United States' longstanding position that EPA's discretionary decisions under section 404(c) are not reviewable. *See, e.g., Menominee Indian Tribe of Wisconsin v. EPA*, 360 F. Supp. 3d 847, 854-55, 859 (E.D. Wis. 2018) (EPA's decision to withdraw objections to a section 404 permit was committed to the agency's discretion and thus unreviewable); *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 915 F. Supp. 378, 381 (N.D. Ga. 1995), *aff'd* 87 F.3d 1242 (11th Cir. 1996) (EPA's section 404(c) authority is unreviewable because it is "committed to agency discretion by law"); *Cascade Conservation League*, 921 F. Supp. at 698-99 (section 404(c) did not impose a nondiscretionary duty on EPA under CWA section 505(a)(2), and EPA decision not to take "enforcement action" under section 404(c) was unreviewable under APA); *Newport Galleria Group v. Deland*, 618 F. Supp. 1179, 1181-82 (D.D.C. 1985) (Congress gave EPA "wide discretion" in section 404(c)); *but see Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F.Supp.2d 1, 4-5 (D.D.C. 2007) (in post-permit context based on full record from the permit proceedings, and where the court was bound by the D.C. Circuit's "repeated[]" and "narrow[]" readings of *Heckler*, deciding (incorrectly) that EPA's decision not to "veto" the permit was reviewable).

[14] This is one of the distinctions between this case and the situation in *Weyerhauser*, 139 S. Ct. 361. In addition, the statutory text in *Weyerhauser* used the mandatory "shall" to impose a "categorical requirement" that the agency address certain impacts in designating "critical habitat," and so those impacts needed to be weighed in assessing whether to exclude an area from such habitat. *Id.* at 370-71. That requirement provided the courts with "law to apply" in reviewing the agency's decision. *Id.* at 371-72. Furthermore, *Weyerhauser* did not address a discretionary decision not to enforce, and so was not analyzed that way under *Heckler*. *Id.* at

To the extent that section 404(c) imposes standards or requirements, those are mainly procedural and only apply in the context of determinations that the discharges "will have an unacceptable adverse effect" on the specified resources. 33 U.S.C. § 1344(c). Before making such a determination, EPA "shall" consult with the Corps. *Id.* And if EPA makes such a determination, then EPA "shall" set forth in writing and make public the findings and reasons for making the determination. *Id. Cf. Cascade Conservation League*, 921 F. Supp. at 698 ("[Section 404(c)] requires the Administrator [of EPA] to consult with the Corps and to set forth his findings in writing *when* he chooses to prohibit a specification (or withdrawal thereof) or to deny or restrict the use of a designated area. If the Administrator does not choose to take these actions, the mandatory language "shall consult" and "shall set forth" does not come into play at all.") (Emphasis in original.) In addition, if EPA makes a final section 404(c) determination to prohibit, deny, or restrict the specification of disposal sites, then the statutory standard for EPA's determination—*i.e.*, that the discharge will have an "unacceptable adverse effect" on the resources listed in section 404(c)—provides the basis for any judicial review in a challenge to the determination. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718, 724-26 (D.C. Cir. 2016).

The contrast between discretionary and mandatory language in section 404(c) further supports the conclusion that EPA's withdrawal decision is committed to agency discretion by law. In assessing whether there is "law to apply" in reviewing an agency decision, the courts have relied heavily on such contrasts. *See, e.g., Southern Ry. Co. v. Seaboard Allied Milling*

---

370-72. *Weyerhauser* also did not address the agency's complicated balancing of factors within the agency's expertise. *Id.*

*Corp.*, 442 U.S. 444, 455-60 (1979); *City and County of San Francisco*, 796 F.3d at 1002-03;

*Argabright*, 35 F.3d at 475-76; *Alaska v. Kerry,* 972 F. Supp. 2d at 1134.

For these reasons, the CWA supplies "no law to apply" to EPA's decision to

withdraw a proposed determination.  In addition, looking to EPA's regulations also would

not provide judicially manageable standards in reviewing EPA Region 10's withdrawal

decision.  While EPA's regulations establish interim procedures—including for the issuance

and withdrawal of proposed determinations—that could lead to a final determination to

prohibit, deny or restrict the specification of disposal sites, they do not alter the overall

discretionary process that Congress created in section 404(c) or provide "law to apply."

The portion of EPA's regulations entitled "Recommended determination" addresses

the withdrawal of proposed determinations.  40 C.F.R. § 231.5.  Within 15 days after the

conclusion of the public comment period, or within 30 days after the public hearing if one is

held, the RA must "either withdraw the proposed determination or prepare a recommended

determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use

or specification, of the disposal site because the discharge of dredged or fill material at such

site would be likely to have an adverse effect."  40 C.F.R. § 231.5(a).  While this provision

provides an interim guidepost for the RA's decision to move forward with a recommended

determination (*i.e.*, continue to pursue a final determination), it does not say anything to limit

the RA's discretion to withdraw a proposed determination.  *See* 84 Fed. Reg. at 45,751 ("the

regulations do not provide a regulatory standard for the [RA's] decision to withdraw a

proposed determination").  This view is consistent with EPA's summary and explanation of

its regulations when the Agency promulgated them in 1979.  *See* 44 Fed. Reg. at 58,082 (the

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 30

RA decides whether to withdraw a proposed determination after he "reviews the information available to him."). And the preamble contemplated that a proposed determination was to be an early, preliminary stage of the process. *Id.* (a proposed determination "merely means that the Regional Administrator believes that the issue should be explored."); *see also* 40 C.F.R. § 231.3.[15]

Accordingly, there are no "judicially manageable standards . . . for judging how and when [the] agency should" decide whether to withdraw a proposed determination and, thus, section 701(a)(2) precludes review of Plaintiffs' challenges to EPA's decision here.

## IV. The RA's Withdrawal Decision Required a Complicated Balancing of Factors Peculiarly Within EPA's Expertise

In *City and Cty. of San Francisco*, the Ninth Circuit summarized the reasons why "agency enforcement decisions" typically are unsuited for judicial review:

> (1) "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," such as allocation of resources and agency priorities; (2) an agency is better equipped to make that balancing than a court; (3) an agency's refusal to enforce does not implicate personal liberty or

---

[15] The text of 40 C.F.R. § 231.5(a) unambiguously provides no substantive regulatory standard for the RA's decision to withdraw a proposed determination. However, if this Court were to determine that the text is genuinely ambiguous on this issue, then EPA's interpretation of its regulations would be entitled to "*Kisor*" deference, under which EPA's interpretation is controlling unless plainly erroneous or inconsistent with the regulation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-19 (2019); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945); *see also Leslie Salt Co. v. United States*, 896 F.2d 354, 357 (9th Cir. 1990) (the agency's interpretation of its own regulation is entitled to deference "amounting to a plain error standard."). EPA's interpretation is reasonable; it is EPA's "authoritative" and "official position"; it implicates EPA's expertise, knowledge, and experience, and falls within EPA's authority under section 404(c); and it reflects EPA's "fair and considered judgment." *See Kisor*, 139 S. Ct. at 2414-19.

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 31

property rights, which courts are often called on to protect; and (4) an agency's decision not to enforce is analogous to prosecutorial discretion, an arena in which courts have traditionally not interfered.

796 F.3d at 1001-02 (citing and quoting *Heckler*, 470 U.S. at 831-32). All of those factors are implicated here. As discussed above, EPA's decision not to pursue its CWA section 404(c) authority was akin to a decision not to pursue enforcement. Accordingly, that decision does not impinge on the regulated entity's liberty or property rights; it also is akin to an exercise of prosecutorial discretion. In addition, as discussed further below, the decision is unreviewable because it required a complicated balancing of factors that are peculiarly within EPA's expertise, and the agency is better equipped to conduct that balancing than the courts. *See, e.g., Lincoln*, 508 U.S. at 192-93 (agency allocating funds from a lump-sum appropriation was "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities") (quoting *Heckler*, 470 U.S. at 831-32).

Generally, any Regional Administrator's decision to withdraw a proposed determination will involve the complex decisionmaking that goes into discretionary agency enforcement decisions. *See, e.g., Heckler*, 470 U.S. at 831; *City and Cty. of San Francisco*, 796 F.3d at 1002; *Sierra Club*, 268 F.3d at 902-03; *see also Cascade Conservation League*, 921 F. Supp. at 699 (in section 404(c) context, "an agency's decision not to take enforcement action involves a careful balancing of the need for enforcement against the chances of success and the resources it would require"); 44 Fed. Reg. 58,079 (discussing EPA's "necessary discretion in deciding when to act or whether to act at all"). EPA has many projects, facilities and tasks to which to allocate its limited resources, and it must be able to choose how best to set its priorities and allocate such resources among them at a particular time. This applies with

even more force where there is a separate permitting process with a new record of information that EPA determined will provide a comprehensive forum to address the potential environmental effects of the project at issue.

Indeed, the facts of this particular project involved the especially complicated balancing of numerous factors related to EPA's withdrawal decision. For example, because EPA initiated the section 404(c) process and issued the Proposed Determination before PLP submitted its permit application, the Corps' engagement in those processes was limited. 84 Fed. Reg. at 45,755. Also because of the pre-permit context, Region 10 issued the Proposed Determination using hypothetical mining scenarios that were based on sources available at that time. *See, e.g., id.* at 45,753. And, largely because EPA's section 404(c) process had been enjoined, the Proposed Determination was five years old when EPA withdrew it. *Id.* at 45,749.

Furthermore, the Proposed Determination did not address the voluminous, project-specific information that was (and is) being developed in connection with the multi-year permitting process. *See, e.g., id.* at 45,752-53. EPA now has available opportunities to participate in the development of the record and to address its environmental concerns with the Corps, using the more customary processes described in EPA's regulations. *See, e.g., id.* at 45,752. EPA already has done so, as demonstrated by its submission of more than 100 pages of detailed comments on the draft EIS and more than 50 pages of comments on the Corps' notice of the permit application, and EPA will continue to work constructively with the Corps as a cooperating agency. *Id.* at 45,754.

EPA also retains its other authorities under section 404. For example, EPA retains its authority to elevate the permitting decision, as described in the 404(q) Memorandum, and EPA currently is exercising authority under that memorandum. In addition, EPA retains its authority to initiate a new section 404(c) review and make a final 404(c) determination that prohibits, restricts, denies or withdraws the specification of disposal sites in connection with the project (and such limits may be in addition to any limits that the Corps may impose in the section 404 permit). *See* 84 Fed. Reg. at 45,754-56; *see also Mingo Logan Coal Co.*, 714 F.3d at 613 (EPA retained discretion to initiate section 404(c) proceedings after Corps issued notice of intent to issue section 404 permit); *Newport Galleria Group*, 618 F. Supp. at 1181-84 (same). In a new 404(c) context, EPA would have the opportunity to issue a new proposed determination based on the full record and to ensure meaningful public engagement on it. 84 Fed. Reg. at 45,754.

As EPA explained in the withdrawal notice, these were among the factors that EPA balanced when EPA determined in this particular matter that it was better to prioritize its work on the current, permit-related processes rather than on the process involving a 2014 Proposed Determination. Overall, the situation presented in this case calls out for allowing EPA to retain what the Ninth Circuit has described succinctly as "regulatory flexibility." *City and Cty. of San Francisco*, 796 F.3d at 1002.

Finally, it is important to recognize that EPA undertook this balancing and decisionmaking within the context of the intricate relationship between EPA and the Corps, as established by the compromise that Congress reached in CWA section 404. Congress directed the agencies to manage this relationship, and it is the very sort of relationship that

"courts are not institutionally well-equipped to micromanage . . . ." *City and Cty. of San Francisco*, 796 F.3d at 1002 (discussing the "delicate federal-state relationship" at issue under the Pipeline Safety Act).

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b) should be granted.

Respectfully submitted this 10th day of December, 2019.

 /s/  Mark A. Nitczynski   
MARK A. NITCZYNSKI
United States Department of Justice - ENRD
Environmental Defense Section
999 18th Street; South Terrace, Suite 370
Denver, CO 80202
Phone: (303) 844-1498; Fax: (303) 844-1350
Email: mark.nitczynski@usdoj.gov

BRIAN UHOLIK
Environment and Natural Resources Division
4 Constitution Square
150 M Street, N.E.
EDS/4th Floor
Washington, D.C. 20002
Phone: (202) 305-0733; Fax: (202) 514-8865
Email: brian.uholik@usdoj.gov

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 10, 2019, I caused to be filed the foregoing DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b) using the Court's CM/ECF system, which serves copies on counsel of record.


<u>/s/ Mark A. Nitczynski</u>