Jeffrey M. Feldman (AK Bar No. 7605029)
SUMMIT LAW GROUP PLLC
315 5th Avenue South, Suite 1000
Seattle, WA 98104-2682
Phone: (206) 676-7000
jeff@summitlaw.com

Ralph H. Palumbo (*Pro Hac Vice*)
Lynn M. Engel (*Pro Hac Vice*)
YARMUTH LLP
1420 5th Avenue, Suite 1400
Seattle, WA 98101
Phone: (206) 516-3800
rpalumbo@yarmuth.com
lengel@yarmuth.com

*Attorneys for Bristol Bay Economic Development Corporation, Bristol Bay Native
Association, Inc., and Bristol Bay Reserve Association*

Megan R. Condon (AK Bar No. 1810096)
Matthew N. Newman (AK Bar No. 1305023)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: (907) 276-0680
mcondon@narf.org
mnewman@narf.org

*Attorneys for United Tribes of Bristol Bay*

Scott Kendall (AK Bar No. 0405019)
HOLMES, WEDDLE & BARCOTT
701 West 8th Avenue, #700
Anchorage, AK 99501
Phone: (907) 274-0666
smkendall@hwb-law.com

*Attorney for Bristol Bay Regional Seafood Development Association, Inc.*

Brian Litmans (AK Bar No. 0111068)
Katherine Strong (AK Bar No. 1105033)
TRUSTEES FOR ALASKA
1026 West 4th Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
blitmans@trustees.org
kstrong@trustees.org

*Attorneys for SalmonState, Alaska Center, Alaska Community Action on Toxics, Alaska Wilderness League, Cook Inletkeeper, Defenders of Wildlife, Friends of McNeil River, McNeil River Alliance, National Parks Conservation Association, National Wildlife Federation, Sierra Club, and Wild Salmon Center*

Jacqueline M. Iwata (*Pro Hac Vice*)
Thomas D. Zimpleman (*Pro Hac Vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street, N.W., Suite 300
Washington, DC 20005
Phone: (202) 289-2377
jiwata@nrdc.org
tzimpleman@nrdc.org

Joel R. Reynolds (*Pro Hac Vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1314 2nd Street
Santa Monica, CA 90401
Phone: (310) 434-2300
jreynolds@nrdc.org

*Attorneys for Natural Resources Defense Council*

Thomas S. Waldo (AK Bar No. 9007047)
Erin Whalen (AK Bar No. 1508067)
EARTHJUSTICE
325 4th Street
Juneau, AK 99801
Phone: (907) 586-2751
twaldo@earthjustice.org
ewhalen@earthjustice.org

*Attorneys for Earthworks*

Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED
3105 Lake Shore Drive, Suite 102B
Anchorage, AK 99517
Phone: (907) 277-1590
austin.williams@tu.org

Paul A. Werner (*Pro Hac Vice*)
Steven P. Hollman (*Pro Hac Vice*)
Abraham J. Shanedling (*Pro Hac Vice*)
Rachelle P. Bishop (*Pro Hac Vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTION LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006-6801
Phone: (202) 747-1900
pwerner@sheppardmullin.com
shollman@sheppardmullin.com
ashanedling@sheppardmullin.com
rbishop@sheppardmullin.com

*Attorneys for Trout Unlimited*

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 3:19-cv-00265-SLG |
| CHRIS HLADICK *et al.*, | |
| Defendants. | |
| SALMON STATE *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 3:19-cv-00267-SLG |
| CHRIS HLADICK *et al.*, | |
| Defendants. | |
| TROUT UNLIMITED, | |
| Plaintiff, | |
| v. | Case No. 3:19-cv-00268-SLG |
| U.S. ENVIRONMENTAL PROTECTION AGENCY *et al.* | |
| Defendants. | |

**PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

LIST OF SHORT NAMES AND ACRONYMS ............................................................. x

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 4

    I.     Congress gave EPA regulatory authority to protect fisheries, wildlife, or recreational areas from unacceptable adverse effects ................................... 4

    II.    EPA proposed, and then withdrew, restrictions that would have protected fisheries, wildlife, and recreational areas in Bristol Bay ............................ 8

        A.    EPA has found that mining the Pebble deposit could have unacceptable adverse effect on Bristol Bay ....................................... 8

        B.    EPA withdraws the Proposed Determination without considering unacceptable adverse effects ........................................................... 12

ARGUMENT ................................................................................................................. 16

    I.     EPA's withdrawal of its Proposed Determination is presumptively reviewable ................................................................................................... 16

    II.    EPA's Withdrawal Decision is not an administrative decision traditionally committed to agency discretion .................................................................. 18

    III.   The Clean Water Act and EPA's regulations provide law to apply ........... 25

        A.    There is law to apply to Plaintiffs' claims ...................................... 26

        B.    EPA's cases are inapposite ............................................................... 31

IV.    Balancing factors does not render a decision unreviewable, and EPA did not balance any factors when withdrawing the Proposed Determination ... 36

CONCLUSION ............................................................................................................. 41

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ............................................. 43

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ................................................................................................ 16

*Adams v. FAA*,
1 F.3d 955 (9th Cir. 1993) ....................................................................................... 35

*Alliance to Save the Mattaponi v. U.S. Army Corps of Engineers*,
515 F. Supp. 2d 1 (D.D.C. 2007) .............................................................. 24, 25, 27, 32

*Alaska v. Kerry*,
972 F. Supp. 2d 1111 (D. Alaska 2013) ........................................................ 33, 36, 37

*American Horse Protection Association, v. Lyng*,
812 F.2d 1 (D.C. Cir. 1987) .......................................................................... 19, 20, 21

*Animal Legal Defense Fund v. U.S. Department of Agriculture*,
632 F. App'x 905 (9th Cir. 2015) .......................................................................... 19, 20

*Animal Legal Defense Fund v. Veneman*,
469 F.3d 826 (9th Cir. 2006) ................................................................................... 20

*Argabright v. United States*,
35 F.3d 472 (9th Cir. 1994) ............................................................................... 33, 34

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) .................................................................................. 25

*Cascade Conservation League v. M.A. Seagle, Inc*,
921 F. Supp. 692 (W.D. Wash. 1996) .................................................................. 24, 38

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ................................................................................................ 31

*City and County of San Francisco v. U.S. Department of Transportation*,
796 F.3d 993 (9th Cir. 2015) ............................................... 22, 23, 34, 36, 38, 40

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page iv
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 7 of 56

*City of Olmstead Falls v. EPA*,
  266 F. Supp. 2d 718 (N.D. Ohio 2003)........................................................................ 32

*County of Esmeralda v. Department of Energy*,
  925 F.2d 1216 (9th Cir. 1991) ............................................................................. 26, 30

*County of Santa Clara v. Andrus*,
  572 F.2d 660 (9th Cir. 1978) ...................................................................................... 39

*Department of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ........................................................... 16, 17, 18, 24, 26, 29, 37

*Dunlop v. Bachowski*,
  421 U.S. 560 (1975)...................................................................................................... 16

*E.J. Friedman Co. v. United States*,
  6 F.3d 1355 (9th Cir. 1993) ........................................................................................ 35

*Environmental Integrity Project v. McCarthy*,
  139 F. Supp. 3d 25 (D.D.C. 2015) .............................................................................. 20

*Goldman v. BP P.L.C.*,
  No. 3:06-CV-00260 JWS, 2007 WL 9718420 (D. Alaska Sept. 19, 2007)................... 9

*Greater L.A. Council on Deafness, Inc. v. Baldrige*,
  827 F.2d 1353 (9th Cir. 1987) .................................................................................... 27

*Heckler v. Chaney*,
  470 U.S. 821 (1985)............................................................. 18, 19, 25, 29, 34, 36, 37

*Hinck v. United States*,
  550 U.S. 501 (2007)........................................................................................ 33, 34, 36

*Interstate Commerce Commission v. Brotherhood of Locomotive Engineers*,
  482 U.S. 270 (1987)...................................................................................................... 24

*International Union, United Mine Workers of America v. U.S. Deparment of Labor*,
  358 F.3d 40 (D.C. Cir. 2004) ................................................................................. 20, 21

*Judulang v. Holder*,
565 U.S. 42 (2011) ................................................................................. 29, 30

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ................................................................................. 31

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ................................................................................. 37, 38

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) ......................................................................... 16, 17, 26

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ......................................................................... 19, 22

*Menominee Indian Tribe of Wisconsin v. EPA*,
360 F. Supp. 3d 847 (E.D. Wis. 2018) ....................................................... 32

*Mingo Logan Coal Co. v. EPA*,
714 F.3d 608 (D.C. Cir. 2013) ............................................................ 5, 6, 26

*Newman v. Apfel*,
223 F.3d 937 (9th Cir. 2000) ..................................................................... 31

*Newport Galleria Group v. Deland*,
618 F. Supp. 1179 (D.D.C. 1985) .............................................................. 32

*Pebble Limited Partnership v. EPA*,
155 F. Supp. 3d 1000 (D. Alaska 2014) .................................................... 12

*Pinnacle Armor, Inc. v. United States*,
648 F.3d 708 (9th Cir. 2011) ......................................................... 17, 26, 30

*Port of Seattle v. FERC*,
499 F.3d 1016 (9th Cir. 2007) ................................................................... 37

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*,
915 F. Supp. 378 (N.D. Ga. 1995) ............................................................ 31

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page vi
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*Rank v. Nimmo*,
   677 F.2d 692 (9th Cir. 1982) ...................................................................... 35

*Ruff v. Hodel*,
   770 F.2d 839 (9th Cir. 1985) ...................................................................... 35

*Sierra Club v. Whitman*,
   268 F.3d 898 (9th Cir. 2001) ...................................................................... 19

*Southern Railway Co. v. Seaboard Allied Milling Corp.*,
   442 U.S. 444 (1979) ................................................................................... 34

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ........................................................................ 9

*Webster v. Doe*,
   486 U.S. 592 (1988) ................................................................................... 24

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
   139 S. Ct. 361 (2018) ........................................................................ 17, 25

*Williams Natural Gas Co. v. FERC*,
   872 F.2d 438 (D.C. Cir. 1989) ...................................................... 20, 21, 38

## STATUTES

5 U.S.C. § 701(a)(2) ......................................................................... 17, 25, 37

5 U.S.C. § 706(2)(A) .................................................................................... 16

25 U.S.C. § 565a(b) ..................................................................................... 35

26 U.S.C. § 6325(b)(2)(B) ............................................................................ 35

26 U.S.C. § 6404(e)(1) ................................................................................. 33

33 U.S.C. § 1251(a) ................................................................................. 4, 29

33 U.S.C. § 1311(a) ....................................................................................... 4

33 U.S.C. § 1344(a) ....................................................................................... 4

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page vii
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

33 U.S.C. § 1344(b) ................................................................................. 4

33 U.S.C. § 1344(c) .............................................................. 1, 4, 5, 23, 26

33 U.S.C. § 1344(q) ................................................................................. 7

33 U.S.C. § 1365(a)(2) ........................................................................... 32

33 U.S.C. § 1909(b) ............................................................................... 31

49 U.S.C. § 60105 .................................................................................. 34

49 U.S.C. § 60105(f) .............................................................................. 22

## REGULATIONS

33 C.F.R. § 323.2(c) ................................................................................ 4

33 C.F.R. § 323.2(e) ................................................................................ 4

33 C.F.R. § 323.6(b) ............................................................................ 6, 8

40 C.F.R. pt. 230 ...................................................................................... 4

40 C.F.R. § 230.10(c) ......................................................................... 5, 28

40 C.F.R. § 231.1(a) ......................................................................... 28, 39

40 C.F.R. § 231.2(e) ...................................................................... 5, 6, 26

40 C.F.R. § 231.3(a) ...................................................................... 6, 7, 26

40 C.F.R. § 231.3(d) ................................................................................ 7

40 C.F.R. § 231.4(a) .................................................................... 6, 26, 27

40 C.F.R. § 231.4(b) ................................................................................ 6

40 C.F.R. § 231.5(a) ........................................................................... 7, 28

40 C.F.R. § 231.5(b) ................................................................................ 7

40 C.F.R. § 231.5(c) ........................................................................ 7, 16, 38

40 C.F.R. § 231.6 ................................................................................... 7

## FEDERAL REGISTER NOTICES

44 Fed. Reg. 58,076 (Oct. 9, 1979) .................................................. 4, 5

56 Fed. Reg. 58,247 (Nov. 18, 1991) ................................................. 22

82 Fed. Reg. 33,123 (July 19, 2017) .................................................. 13

83 Fed. Reg. 8668 (Feb. 28, 2018) ................................................ 13, 14

84 Fed. Reg. 45,749 (Aug. 30, 2019) ........................................... 15, 16

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 12 of 56

## LIST OF SHORT NAMES AND ACRONYMS

| Corps | U.S. Army Corps of Engineers |
|-------|------------------------------|
| EPA | U.S. Environmental Protection Agency |
| PLP | Pebble Limited Partnership |
| Proposed Determination | *Proposed Determination of the U.S. Environmental Protection Agency Region 10 Pursuant to Section 404(c) of the Clean Water Act, Pebble Deposit Area, Southwest Alaska* (July 2014) |
| Watershed Assessment | *An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska (Jan. 2014)* |
| Withdrawal Decision | *Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska*, 84 Fed. Reg. 45,749 (Aug. 30, 2019) |
| 2018 Decision Not to Withdraw | *Notification of Decision Not To Withdraw Proposed Determination To Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska*, 83 Fed. Reg. 8668 (Feb. 28, 2018) |
| 404(b)(1) Guidelines | *Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material,* 40 C.F.R. Part 230 |
| 404(q) Memorandum | Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army (Aug. 11, 1992) |

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                    Page x
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 13 of 56

# INTRODUCTION

This case presents straightforward claims for judicial review under the Administrative Procedure Act (APA) of arbitrary and capricious agency action. Plaintiffs challenge the sudden withdrawal by the Environmental Protection Agency (EPA) of proposed restrictions (called a "proposed determination" under EPA's regulations) on large-scale mining activity in the headwaters of Bristol Bay, Alaska. Acting pursuant to Section 404(c) of the Clean Water Act, EPA conducted years of scientific analysis and determined in 2014 that activities associated with a mine a little over one-sixth the size of that currently proposed by the Pebble Limited Partnership (PLP) could have "unacceptable adverse effect" on the Bristol Bay watershed. 33 U.S.C. § 1344(c). EPA published notice of its Proposed Determination and its proposal to withdraw in the Federal Register and sought comments. Public comment overwhelmingly supported finalizing the Proposed Determination and opposed withdrawing it. Commenters also explained that EPA's rationales for withdrawing the Proposed Determination — which were not based on its concerns being alleviated, but on PLP's ability to have its permit application reviewed — misconstrued EPA's regulations. Then-Administrator Scott Pruitt and Regional Administrator Chris Hladick publicly agreed with these comments in 2018 and decided to leave the Proposed Determination in place pending consideration of

additional information relevant to unacceptable adverse effects. But last summer, EPA (including Mr. Hladick) abruptly and arbitrarily reversed course.

EPA's reversal paves the way for the Army Corps of Engineers (Corps) to issue a permit for the proposed Pebble Mine. Plaintiffs thus ask this Court to review EPA's published explanation for withdrawing its Proposed Determination and accompanying administrative record and set EPA's decision aside because: (1) EPA ignored an important aspect of the problem by withdrawing its proposal without considering unacceptable adverse effects, the sole factor specified by Section 404(c) and the very standard the EPA applied when it initially issued the proposed determination; and (2) EPA's rationales are inconsistent with its regulations, and fail the APA's reasoned decisionmaking requirement.

In its Motion to Dismiss, Doc. 36, EPA invokes a narrow and disfavored exception to the APA's presumption of judicial review to shield its flawed reasoning and disregard for record evidence. EPA argues that its decision to withdraw a Proposed Determination is wholly discretionary because: (1) EPA's action was akin to an exercise of unreviewable prosecutorial discretion; (2) there is nothing in the Clean Water Act or its implementing regulations that provide law for the court to apply; and (3) EPA's decision purportedly involved a complicated balancing of factors that the Court cannot evaluate. Doc. 36 at 13.

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                        Page 2
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

EPA's arguments are mistaken. *First*, EPA's decision to abandon its existing Section 404(c) action is an exercise of regulatory authority that is presumptively reviewable. Indeed, EPA's published notices and voluminous administrative record bely its argument that its decision is akin to a decision not to take an ad hoc enforcement action. Once EPA has initiated proceedings pursuant to Section 404(c), it does not then have discretion to reverse itself without adequate explanation. *Second*, the Clean Water Act expressly conditions EPA's exercise of Section 404(c) authority upon a finding that dumping material in a body of water would have an "unacceptable adverse effect" on fisheries, wildlife, or recreational areas. The Court can decide whether EPA improperly disregarded that standard (and the accompanying scientific analysis) by looking to Section 404(c), EPA's regulations, and other provisions of the Clean Water Act. Those statutes and regulations also supply legal rules to review the legality of EPA's rationales for withdrawing the Proposed Determination. And *third*, the Court need not second-guess EPA's "balancing" of priorities to determine that the agency abandoned protections for Bristol Bay without giving any good reason, and without examining its own extensive evidence warranting the protections it now seeks to withdraw.

Because EPA's action did not involve an unreviewable exercise of authority, the Court should deny EPA's motion.

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                             Page 3
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 16 of 56

## BACKGROUND

**I.     Congress gave EPA regulatory authority to protect fisheries, wildlife, or recreational areas from unacceptable adverse effects**

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, Congress requires permits for the discharge of most pollutants into navigable waters. *See* 33 U.S.C. §§ 1311(a), 1344(a). For displaced soil and rock (fill material) that mining and construction projects dump into a stream or a body of water, and material removed from a stream or a body of water (dredged material), Congress divided regulatory responsibility between EPA and the Corps. *See id.* § 1344(a)–(c); 33 C.F.R. § 323.2(c), (e). This system reflects Congress's judgment that the "administrative expertise" of the Corps is valuable when it comes to assessing projects, but that EPA must be "the 'environmental conscience' of the Clean Water Act." 44 Fed. Reg. 58,076, 58,081 (Oct. 9, 1979).

Congress authorized the Corps to issue permits for the discharge of dredged and fill material and specify disposal sites for dumping fill material. 33 U.S.C. § 1344(a)–(b). The Corps must evaluate the environmental effects of its permits using guidelines developed jointly by the Corps and EPA (the 404(b)(1) Guidelines). *See* 33 U.S.C. § 1344(b)(1); 40 C.F.R. pt. 230. The 404(b)(1) Guidelines generally prohibit the permitting of any discharge of dredged or fill material if, among other factors, the

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                          Page 4
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

discharge will cause or contribute to "significant degradation" of the environment. 40 C.F.R. § 230.10(c).

Although the Corps regulates specific projects, Congress gave EPA a powerful tool. Pursuant to Section 404(c) of the Clean Water Act, EPA may deny or restrict a disposal site "whenever [the EPA Administrator] determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . wildlife, or recreational areas." 33 U.S.C. § 1344(c). This authority allows EPA to withdraw disposal sites in pending or issued Corps permits; it also allows EPA to protect ecologically sensitive and valuable areas from future projects by withdrawing areas as disposal sites. *See* 44 Fed. Reg. at 58,077; *see also Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 612–14 & n.2 (D.C. Cir. 2013) (describing flexibility afforded by the Clean Water Act regarding when EPA can exercise its Section 404(c) powers). EPA may exercise this authority only "after notice and opportunity for public hearing" and consulting with the Corps and must "set forth in writing" its reasoning. 33 U.S.C. § 1344(c).

EPA's regulations define "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of" or "significant loss of or damage to" the resources named in the statute. 40 C.F.R.

§ 231.2(e). "In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(l) guidelines." *Id.*

These regulations also establish a process for receiving public input and consultation. A Regional Administrator can begin the Section 404(c) process when she finds "reason to believe" that an "'unacceptable adverse effect' could result" if the Corps specifies an area as a disposal site. *Id.* § 231.3(a). The Regional Administrator then confers with the Corps. Consistent with EPA having the "*final* say," *Mingo Logan*, 714 F.3d at 614, the Corps cannot issue a permit once it receives notice about a proposed determination, although it must "continue to complete the administrative processing of the application." 33 C.F.R. § 323.6(b); 40 C.F.R. § 231.3(a)(2).

If meetings with the Corps do not satisfy the Regional Administrator's concerns, EPA publishes a notice of the proposed determination in the Federal Register. 40 C.F.R. § 231.3(a)(1)–(2). A public comment period follows, and EPA may hold public hearings. *Id.* § 231.4(a)–(b). Comments must "be directed to whether the proposed determination should become the final determination and corrective action that could be taken to reduce the adverse impact of the discharge." *Id.* § 231.4(a).

After the public comment period closes, the Regional Administrator "shall . . . either withdraw the proposed determination or prepare a recommended determination . . . because the discharge of dredged or fill material at such site would be likely to have an

unacceptable adverse effect." *Id.* § 231.5(a). A recommended determination goes to the EPA Administrator who makes a final decision based on whether specification would have unacceptable adverse effect. *Id.* §§ 231.5(b), 231.6. If the Regional Administrator decides to withdraw a proposed determination, notice of that withdrawal is forwarded to the EPA Administrator, who decides whether to review that decision. *Id.* § 231.5(c). Notice of a proposal to withdraw must also be given to anyone who commented on the proposed determination. *Id.* If the EPA Administrator opts against review, the Regional Administrator's decision becomes a final agency action upon EPA's completion of several notice requirements, including publication in the Federal Register. *Id.* §§ 231.3(d), 231.5(c)(1).

In addition to its Section 404(c) authority, EPA has entered into a memorandum of agreement with the Corps establishing procedures governing EPA's consultation on pending permit applications. *See* 33 U.S.C. § 1344(q); Memorandum of Agreement Between the EPA and the Department of the Army (Aug. 11, 1992) (404(q) Memorandum). EPA can review Corps permits to determine if they "*may* result in substantial and unacceptable impacts" and trigger consultation requirements if it believes a "discharge *will* have" such impacts — damages "similar in magnitude to cases evaluated under Section 404(c)." 404(q) Memorandum at 6–7. Although EPA may

elevate concerns, the Corps may issue a permit over EPA's objections unless EPA

exercises its separate Section 404(c) authority. *Id.* at 9–10.

## II. EPA proposed, and then withdrew, restrictions that would have protected fisheries, wildlife, and recreational areas in Bristol Bay

### A. EPA has found that mining the Pebble deposit could have unacceptable adverse effect on Bristol Bay

Salmon are the lifeblood of southwest Alaska's Bristol Bay watershed, an area

approximately the size of Ohio, and of unparalleled ecological value. Compl. ¶ 1, *Bristol*

*Bay Econ. Dev. Corp. et al. v. Hladick, et al.*, No. 3:19-cv-265(SLG), Doc. 1 (BBEDC

Compl.); Compl. ¶ 2, *SalmonState, et al. v. Hladick, et al.*, No. 3:19-cv-267(SLG), Doc. 1

(SalmonState Compl.); Compl. ¶ 2, *Trout Unlimited v. EPA, et al.*, No. 3:19-cv-

268(SLG), Doc. 1 (TU Compl.). Many people in the Bristol Bay region lead a subsistence

way of life that depends on its fisheries and wildlife. BBEDC Compl. ¶ 45. Salmon have

sustained Alaska Native communities in Bristol Bay for thousands of years, and Bristol

Bay is home to some of the last intact wild salmon-based cultures in the world. *Id.* ¶ 1.

Bristol Bay is also one of the largest commercial fisheries in the world, generating

$1.5 billion annually. BBEDC Compl. ¶ 1; SalmonState Compl. ¶ 2; TU Compl. ¶ 2.

Many families have fished commercially in Bristol Bay for generations. TU Compl. ¶ 56.

Salmon also support wildlife higher on the food chain, including brown bears, wolves,

and bald eagles. *Id.* ¶ 70. A prolific recreational industry exists in the region built around

Pls.' Joint Opp. to Defs.' Mot. to Dismiss Page 8
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

wildlife viewing as well as fishing. BBEDC Compl. ¶ 46; SalmonState Compl. ¶ 63; TU
Compl. ¶ 57.

Bristol Bay's fisheries, wildlife, and recreational areas thrive on account of its
pristine environment. As EPA has recognized, the watershed "provides intact, connected
habitats — from headwaters to ocean — that support abundant, genetically diverse wild
Pacific salmon populations," which, in turn, "maintain the productivity of the entire
ecosystem, including numerous other fish and wildlife species." EPA, Proposed
Determination of the U.S. Environmental Protection Agency Region 10 Pursuant to
Section 404(c) of the Clean Water Act Pebble Deposit Area, Southwest Alaska, at ES-1
(July 2014) (Proposed Determination) (cited in, e.g., BBEDC Compl. ¶ 5) (AR 200244).[1]
Bristol Bay's productivity is "unrivaled anywhere in North America" and "is a globally
significant resource." *Id.*

---

[1] On a motion to dismiss, "[a] court may [] consider certain materials," including
"documents incorporated by reference in the complaint . . . without converting the motion
to dismiss into a motion for summary judgment." *Goldman v. BP P.L.C.*, No. 3:06-CV-
00260 JWS, 2007 WL 9718420, at *3 (D. Alaska Sept. 19, 2007) (quoting *United States
v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). Plaintiffs have included citations
explaining where documents have been incorporated by reference in their complaints and
the first page of the document in the Administrative Record.

To protect these resources and the region they support, in 2010, numerous groups petitioned EPA to exercise its Section 404(c) authority to restrict the use of Bristol Bay as a disposal site for discharges associated with mining of the Pebble deposit. BBEDC Compl. ¶ 47. At the time, no permit applications were pending, but, in 2011, mining proponents had outlined plans in filings with the Securities and Exchange Commission. TU Compl. ¶ 64.

EPA began reviewing the effect of large-scale mining operations on the Bristol Bay watershed. Following public comment and two rounds of independent external peer review, EPA published an assessment in 2014 describing how mining could affect Bristol Bay under various assumptions about the size of the mine. U.S. EPA Region 10, An Assessment of Potential Mining Impacts on Salmon Ecosystems in Bristol Bay, Alaska Volume 1 – Main Report at xxv (2014) (Watershed Assessment) (cited in, e.g., BBEDC Compl. ¶ 44) (AR 193673). EPA labeled the three scenarios according to the amount of ore processed in each: "Pebble 0.25" (approximately 0.25 billion tons of ore over 20 years), "Pebble 2.0" (approximately 2.0 billion tons of ore over 25 years), and "Pebble 6.5" (approximately 6.5 billion tons of ore over 78 years). *Id.* at ES-11. EPA based these scenarios on preliminary plans, consultation with experts, and baseline data collected. *Id.* at ES-10.

Based on the Watershed Assessment, Region 10 issued a Proposed Determination in 2014 that would restrict the disposal of dredged or fill material in the Bristol Bay watershed. Proposed Determination at ES-5. Region 10 explained that even the 0.25 billion-ton mine could "result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." *Id.*

The Proposed Determination would restrict the disposal of dredged or fill material in the area of the Pebble deposit if it could result in any one of three consequences: (1) the loss of five miles of streams with anadromous fish, or the loss of 19 miles of streams that feed into streams with anadromous fish;[2] (2) the loss of 1,100 or more acres of wetlands, lakes, and ponds contiguous with streams that have anadromous fish, or that feed into streams that have anadromous fish; and (3) changes to the flow of a stream "greater than 20% of daily flow in 9 or more linear miles of streams." *Id.* at ES-5 to ES-6. EPA based each of these thresholds on impacts associated with the 0.25 mine scenario that it found could be unacceptable, which means any mine larger than 0.25 billion tons would exceed these thresholds. *Id.*

---

[2] "Anadromous" refers to fish that are born in freshwater, migrate to the ocean as they grow, and then return to freshwater to spawn. Salmon are a good example.

**B.** **EPA withdraws the Proposed Determination without considering unacceptable adverse effects**

EPA, however, could not issue a recommended determination due to three lawsuits filed in 2014 by the mine's proponent, PLP. One of the cases was quickly dismissed. *See Pebble Ltd. P'ship v. EPA*, 155 F. Supp. 3d 1000 (D. Alaska 2014), *aff'd*, 604 F. App'x 623 (9th Cir. 2015). But on May 11, 2017, EPA entered into a settlement agreement with PLP to resolve the other two cases. The settlement precluded EPA from issuing a recommended determination until one of two triggering events occurred: (1) the Corps issued a Final Environmental Impact Statement (EIS) under the National Environmental Policy Act regarding PLP's permit application; or (2) 48 months from the effective date of the settlement, whichever came first. Settlement Agreement between EPA and Pebble Limited Partnership ¶ III.A.1 (May 11, 2017) (cited in, e.g., BBEDC Compl. ¶ 71) (AR 193026).

EPA also committed in the settlement agreement to "propose to withdraw the Proposed Determination." *Id.* ¶ III.A.5. In 2017, Region 10 published a notice seeking comment on withdrawing the proposed determination based on several rationales: to provide PLP more time to file an application for a Section 404 permit, to "remove any uncertainty, real or perceived, about PLP's ability to submit a permit application and have that permit application reviewed" by the Corps, and to "allow[] the factual record

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page 12
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

regarding any forthcoming permit application to develop." 82 Fed. Reg. 33,123, 33,124 (July 19, 2017) (AR 1).

While the withdrawal proposal was pending, PLP submitted an application for a Section 404 permit to the Corps. BBEDC Compl. ¶ 79; SalmonState Compl. ¶ 86; TU Compl. ¶ 92. In the meantime, EPA received over one million public comments on the proposal, the "overwhelming majority" in favor of keeping the Proposed Determination in place. 83 Fed. Reg. 8668, 8668 (Feb. 28, 2018) (AR 193222).

In 2018, Region 10 Administrator Chris Hladick announced that EPA would leave the Proposed Determination "in place pending consideration of any other information that is relevant to the protection of the world-class fisheries contained in the Bristol Bay watershed in light of the permit application that has now been submitted to the Corps." *Id.* at 8670 (2018 Decision Not to Withdraw). EPA noted that PLP's decision to submit a permit application obviated much of the rationale for withdrawing the Proposed Determination. *Id.* Region 10's other rationale — that it should withdraw the Proposed Determination to consider the factual record from the permit application — "d[id] not support withdrawal" because the agency "conclude[d] that the factual record regarding the permit application can develop notwithstanding the Proposed Determination." *Id.* When deciding whether to finalize the Proposed Determination, Region 10 could consider and incorporate the record from the Corps' permit proceeding. *Id.* Then-

Administrator Scott Pruitt issued a statement supporting Region 10's decision. News Release, EPA, EPA Administrator Scott Pruitt Suspends Withdrawal of Proposed Determination in Bristol Bay Watershed, Will Solicit Additional Comments (Jan. 26, 2018) (2018 Statement) (cited in, e.g., BBEDC Compl. ¶ 82) (AR 200461). EPA also declared that it would "solicit public comment on what further steps, if any, the Agency should take in the section 404(c) process in order to prevent unacceptable adverse effects." 83 Fed. Reg. at 8671.

Following EPA's announcement, the Corps' process continued. The Corps issued a draft EIS in February 2019 analyzing PLP's application for a mine nearly six times the size that the Proposed Determination found could have unacceptable adverse effects. BBEDC Compl. ¶ 101; SalmonState Compl. ¶ 96 (AR 197029). EPA submitted comments in July 2019 expressing concerns that the proposed project "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds" and whether the project would meet the Section 404(b)(1) Guidelines. BBEDC Compl. ¶¶ 104-09; SalmonState Compl. ¶ 102; TU Compl. ¶ 120 (AR 195120).

Yet, after leadership changes at EPA and the State of Alaska,[3] the agency abruptly changed course. In the summer of 2019, EPA announced that it was withdrawing the Proposed Determination, stating two reasons. 84 Fed. Reg. 45,749 (Aug. 30, 2019) (Withdrawal Decision) (AR 193398). First, EPA cited "new information that has been generated since 2014, including information and preliminary conclusions in the Corps' DEIS." *Id.* at 45,753. Second, EPA "determined that given the record developments, as well as the language and structure of the 404(c) regulations" that "the appropriate sequencing" was to engage in consultation with the Corps before invoking Section 404(c). *Id.* at 45,754. The Withdrawal Decision did not explain how it was consistent with EPA's 2018 statement that its regulations allowed the Section 404(c) and Corps processes to work in tandem.

EPA admitted that it was not basing its Withdrawal Decision on "technical consideration or judgments about whether the mine proposal will ultimately be found to

_____

[3] Andrew Wheeler replaced Scott Pruitt as EPA administrator in February 2019. Administrator Wheeler recused himself from all Pebble Mine matters and delegated his authority to EPA General Counsel Matthew Leopold. *See* BBEDC Compl. ¶ 89. Mike Dunleavy replaced Bill Walker as Alaska Governor in December 2018. The Dunleavy Administration contacted Mr. Leopold on May 15, 2019, stating it was considering suing EPA if it did not withdraw the Proposed Determination. *See* Letter from Kevin G. Clarkson, Attorney Gen., Alaska, to Matthew Z. Leopold, Gen. Counsel, EPA (May 15, 2019), Ex. A. This letter does not yet appear in the agency record filed with this Court, but EPA has agreed to add it with a revised index.

meet the requirements of the 404(b)(1) Guidelines or results in 'unacceptable adverse effects' under CWA section 404(c)." *Id.* at 45,756. Contrary to the 2018 Decision Not to Withdraw, EPA stated it believed further comments were unnecessary due to the comments on the 2017 withdrawal proposal and comment periods for the Corps' documents. *Id.*

The Withdrawal Decision terminated the Section 404(c) process, and EPA's regulations provide that such a decision constitutes final agency action. *See* 40 C.F.R. § 231.5(c)(1). EPA cannot restrict the discharge of material into the Bristol Bay watershed without beginning an entirely new proceeding. In the meantime, the Corps can issue a permit that would allow discharges of mining waste that could irreparably harm the fish, wildlife, and people of Bristol Bay.

## ARGUMENT

## I.  EPA's withdrawal of its Proposed Determination is presumptively reviewable

The APA requires that courts "shall hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This command "embodies a 'basic presumption of judicial review,'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)), that agencies bear a "heavy burden" to overcome. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Dunlop v.*

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page 16
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*Bachowski*, 421 U.S. 560, 567 (1975)). "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," and judicial review of agency action is critical because "legal lapses and violations" are more likely to occur "when they have no consequence." *Id.* at 486, 489.

EPA asserts that its Withdrawal Decision is an agency action "committed to agency discretion by law," Doc. 36 at 31 (quoting 5 U.S.C. § 701(a)(2)), but courts read that exception to judicial review "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). An agency cannot rely on that exception simply because a statute uses discretionary language. *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 720 (9th Cir. 2011) ("Just because a statute calls on the agency to exercise its 'judgment' in making its determination does not necessarily make an agency's action unreviewable."). "[T]o honor the presumption of judicial review," the Supreme Court has generally limited Section 701(a)(2)'s exception to decisions that have been "traditionally" committed to agency discretion and to preclude judicial review only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce*, 139 S. Ct. at 2568.

EPA's Withdrawal Decision is not a decision committed to its discretion by law. EPA's use of its regulatory authority to withdraw disposal sites is not a decision that

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                      Page 17
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

courts have "traditionally" found to be beyond judicial review. Further, whatever discretionary authority the Clean Water Act may give EPA in Section 404(c), the statute provides a standard by which to judge EPA's decision-making: whether disposal of dredged and fill material will have an unacceptable adverse effect on fisheries, wildlife, or recreational areas. EPA also posits that agency decisions requiring a balancing of factors and regulatory flexibility are committed to agency discretion by law. Doc. 36 at 32. But the Supreme Court and Ninth Circuit do not stretch Section 701(a)(2)'s exception to judicial review to cover every such decision, and, in any event, the Withdrawal Decision does not implicate EPA's balancing of priorities.

## II. EPA's Withdrawal Decision is not an administrative decision traditionally committed to agency discretion

Relying on *Heckler v. Chaney*, 470 U.S. 821 (1985), EPA makes the inapt analogy that its Withdrawal Decision is unreviewable because it is akin to a "discretionary agency enforcement decision[]." Doc. 36 at 42. Although "a decision not to institute enforcement proceedings" is one type of decision that courts have traditionally regarded as committed to agency discretion, *Dep't of Commerce*, 139 S. Ct. at 2568, EPA's authority to withdraw disposal sites is *regulatory authority*, and a decision not to exercise regulatory authority differs significantly from a decision not to institute enforcement proceedings.

In *Chaney*, the Supreme Court explained that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page 18
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

committed to an agency's absolute discretion." 470 U.S. at 831. But courts have generally confined *Chaney*'s presumption to its specific context. *See, e.g.*, *Sierra Club v. Whitman*, 268 F.3d 898, 902 (9th Cir. 2001) ("[A]n agency's refusal to *investigate or enforce* is within the agency's discretion, unless Congress has indicated otherwise." (emphasis added)). On the other hand, courts regularly have reviewed agency decisions *to withdraw proposed rules or to deny petitions for rulemaking* and have set them aside when the record of those proceedings demonstrates the decision was arbitrary.

There are several "key differences between a denial of a petition for rulemaking and an agency's decision not to initiate an enforcement action." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007); *accord Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 632 F. App'x 905, 907–08 (9th Cir. 2015) (citing *Massachusetts* and reversing district court decision applying *Chaney* to petition denial). Like a rulemaking, a petition denial is "subject to special formalities, including a public explanation." *Massachusetts*, 549 U.S. at 527 (quoting *Am. Horse Protection Ass'n, v. Lyng*, 812 F.2d 1, 3–4 (D.C. Cir. 1987)). This legally required public explanation provides a "focal point" for review in the same way as an exercise of regulatory power. *Am. Horse*, 812 F.2d at 4. And unlike decisions not to enforce, which are typically "constant[]" and "numerous," petition denials are "less frequent" and are "more apt to involve legal as opposed to factual analysis." *Id.*; *accord Massachusetts*, 549 U.S. at 527. Moreover, unlike enforcement decisions "which are

typically focused on past breaches of existing laws and regulations," decisions not to regulate "have only future effect." *Animal Legal Def. Fund*, 632 F. App'x at 907.

Further, an agency decision to withdraw a proposed rule after notice and comment is subject to judicial review, even when the agency's initial decision to promulgate that rule is discretionary. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 43–44 (D.C. Cir. 2004); *Williams Nat. Gas Co. v. FERC*, 872 F.2d 438, 443 (D.C. Cir. 1989); *Envtl. Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 38–39 (D.D.C. 2015).[4] As with a final rule, the agency "issued a lengthy document expressing its tentative conclusion," and "received numerous comments on the issue from interested parties." *Williams*, 872 F.2d at 443. An agency's withdrawal explanation also provides a focal point of review in the same manner as the "public explanation" provided for in a petition denial. *See Am. Horse*, 812 F.2d at 4. "Under these circumstances, a court generally will have a sufficient evidentiary basis for determining whether the [agency's] ultimate decision was arbitrary and capricious." *Id.* Thus, even if the decision to regulate

---

[4] The Ninth Circuit does not have precedential authority holding that courts may review an agency's decision to withdraw a voluntarily proposed rule. A panel adopted the D.C. Circuit's reasoning in *Animal Legal Defense Fund v. Veneman*, but the case settled after the court granted a petition for rehearing, and the opinion was vacated. *See* 469 F.3d 826, 841 (9th Cir. 2006), *vacated on reh'g en banc*, 490 F.3d 725 (9th Cir. 2007). The panel decision, moreover, predated *Massachusetts*.

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page 20
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

is discretionary, the agency is "not free to terminate the rulemaking for no reason whatsoever." *Int'l Union*, 358 F.3d at 44 (quoting *Williams*, 872 F.2d at 446).

EPA's Withdrawal Decision is no different. Rather than punishing violations, EPA invokes Section 404(c) proactively to protect municipal water supplies, fisheries, wildlife, or recreational areas. *See supra* pp. 5–7. Moreover, EPA's Section 404(c) regulations subject any decision to withdraw a proposed determination to "special formalities," including public input, the development of a supporting record, and a published explanation that provides a "focal point" for judicial review. *See Am. Horse*, 812 F.2d at 4; *supra* pp. 5–7 (describing Clean Water Act and regulatory requirements).

EPA's actions in this case created a substantial record to review. Consistent with Section 404(c) and its implementing regulations, EPA in 2014 issued a "lengthy document" (214 pages, not including the Watershed Assessment, which is over 1000 pages) presenting its findings and then solicited public input on the Proposed Determination. *See Williams*, 872 F.2d at 443. EPA also "received numerous comments" before withdrawing the Proposed Determination and published its explanation for withdrawing the Proposed Determination in the Federal Register. *See id.*; *supra* pp. 10–16 (describing EPA's process).

Section 404(c) withdrawal decisions have several other characteristics that make them amenable to judicial review. Chiefly, a withdrawal is based on EPA's earlier

decision to initiate regulatory proceedings, and reversals of a proposed determination are "less frequent" than non-enforcement decisions. *Massachusetts*, 549 U.S. at 527. Indeed, Plaintiffs' research has found only one other published Federal Register notice withdrawing a proposed determination. *See* 56 Fed. Reg. 58,247 (Nov. 18, 1991) (explaining that Corps addressed EPA's concerns about unacceptable adverse effects). And as explained below, Plaintiffs' claims "involve legal as opposed to factual analysis." *Massachusetts*, 549 U.S. at 527. EPA's Section 404(c) determination thus has the hallmarks of reviewable regulatory authority rather than an ad hoc enforcement decision.

Nevertheless, EPA cites the Ninth Circuit's decision in *City and County of San Francisco v. U.S. Department of Transportation* to argue that its Withdrawal Decision is similar to a non-enforcement decision. Doc. 36 at 35. In *San Francisco*, the Ninth Circuit held that the Department of Transportation's "decision not to pursue rejection of [a state's] certification" is a "close analog to a decision not to enforce." 796 F.3d 993, 1004 (9th Cir. 2015). But under the Pipeline Safety Act, the Department of Transportation can reject a state's certification, assume jurisdiction, or take other appropriate actions "to achieve adequate *enforcement*." 49 U.S.C. § 60105(f) (emphasis added). By the statute's plain terms, the rejection of a state's certification and the assumption of federal jurisdiction are forms of enforcement, a fact *San Francisco* acknowledged. *See* 796 F.3d at 1002 (noting that Department of Transportation ultimately "assum[ed] responsibility

for enforcement"). Moreover, like an enforcement decision, the Department of Transportation's decision went through an adjudicatory process in which success was uncertain — in both situations the agency must "predict[] [the] outcome of any hearing" before deciding whether to act. *Id.* at 1002. There was also no record or decision to focus the court's review — plaintiffs simply challenged the agency's inaction following a report expressing concerns about California's pipeline management. *See id.* at 997–98. Finally, the court acknowledged that the statute "favor[ed] state assumption of jurisdiction" with minimal federal intervention that courts were ill-equipped to review. *See id.* at 996, 1002.

In contrast, here, although the Corps has primary permitting authority under Section 404 of the Clean Water Act, EPA is not a mere monitor whose involvement the statute disfavors: EPA can exercise its authority "whenever" it makes an unacceptable adverse effect finding. 33 U.S.C. § 1344(c). This independent regulatory authority is markedly different from the backward-looking, cooperative-federalism-based monitoring role the Ninth Circuit declined to review in *San Francisco*. And as previously discussed, EPA's decision to withdraw its proposed determination is final agency action published in the Federal Register with a full administrative record, all of which was absent in *San Francisco*.

EPA also relies on *Cascade Conservation League v. M.A. Seagle, Inc.*, but that case did not involve an agency record or the termination of a Section 404(c) process. 921 F. Supp. 692, 699 (W.D. Wash. 1996); *see* Doc. 36 at 36. Although the court in *Cascade* characterized EPA's failure to review the Corps' application of a Clean Water Act exemption as a "decision not to take enforcement action," it involved the materially different case of EPA's *failing to start* a Section 404(c) process. 921 F. Supp. at 695, 699. Indeed, the court concluded neither the Corps nor EPA took final agency action. *See id.* at 700. The decision also predated *Massachusetts*, which reinforced the distinction between regulatory and enforcement action, and it contradicts at least one other district court decision. *See All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 8–9 (D.D.C. 2007) (reviewing EPA's decision not to initiate Section 404(c) process after expressing concerns about permit).

Finally, EPA cites several cases involving non-enforcement decisions in support of its argument, *see* Doc. 36 at 32, but they each involve decisions traditionally committed to agency discretion that do not concern exercises of regulatory authority. *See Dep't of Commerce*, 139 S. Ct. at 2568 (describing *Webster v. Doe*, 486 U.S. 592 (1988), as involving a traditionally unreviewable decision concerning national security); *ICC v. Bhd. Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (noting the "tradition of nonreviewability [that] exists with regard to refusals to reconsider for material error" by

courts and agencies for final orders). Thus, these cases do not bear on the reviewability of EPA's Withdrawal Decision.

## III.    The Clean Water Act and EPA's regulations provide law to apply

EPA's argument that there is no law to apply to Plaintiffs' claims is also incorrect. EPA claims that "[t]he substantive portions of section 404(c) are drafted in terms of discretion" because EPA is "authorized" but not required to prohibit disposal of dredged and fill material at a site. Doc. 36 at 37. This argument is misconceived because "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994). If that were so, "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhaeuser*, 139 S. Ct. at 370. Thus, Section 701(a)(2) "applies not simply when an agency is vested with discretion as to particular actions or decisions, but rather in the rare occasion when the decision-making has been committed 'to the agency's judgment *absolutely*.'" *Mattaponi*, 515 F. Supp. 2d at 8 n.5 (emphasis added by *Mattaponi*) (quoting *Chaney*, 470 U.S. at 830).

EPA's focus on the absence of mandatory language in Section 404(c) is a red herring. Doc. 36 at 37–40. Judicial review is precluded only when a statute provides *no criteria* whatsoever to evaluate an agency's action — not merely when a statute grants an agency some measure of discretion. *See Dep't of Commerce*, 139 S. Ct. at 2568. To

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                                    Page 25
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

determine whether there is law to apply, the Ninth Circuit "consider[s] 'the language of the statute and whether the general purposes of the statute would be endangered by judicial review.'" *Pinnacle*, 648 F.3d at 719 (quoting *County of Esmeralda v. Dep't of Energy*, 925 F.2d 1216, 1218 (9th Cir. 1991)).

### A.    There is law to apply to Plaintiffs' claims

The text of the Clean Water Act sets forth a factor that EPA must consider, and thus "Congress has not left *everything* to the [EPA]." *Mach Mining*, 575 U.S. at 488. Section 404(c) authorizes EPA "to deny or restrict" the use of an area as a disposal site whenever it determines that "the discharge of such materials into such area will have unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreation areas." 33 U.S.C. § 1344(c); *see also* 40 C.F.R. § 231.2(e) (defining "unacceptable adverse effect"). As EPA acknowledges, courts can review final decisions adopting restrictions on disposal of dredged or fill material. Doc. 36 at 39; *see Mingo Logan*, 829 F.3d at 725–26. Whether an agency has properly based its conclusions on factors that Congress mandated it to consider — here "unacceptable adverse effect[s]" — is a fundamental APA inquiry.

It follows that where EPA has proposed to restrict a site based on a record of scientific evidence demonstrating potential unacceptable adverse effects (as here), EPA's withdrawal of that proposal must also address that factor. Plaintiffs' claim that EPA

failed to consider an important aspect of the problem by withdrawing the Proposed Determination without considering the potential unacceptable adverse effects on Bristol Bay is a legal inquiry guided by the statute and EPA's regulations. At least one district court has already held as much in reviewing EPA's decision not to even exercise its Section 404(c) authority despite raising significant concerns about a permit. *See Mattaponi*, 515 F. Supp. 2d at 8 (holding Section 404(c)'s "unacceptable adverse effect" standard provides courts with law to apply to decision not to exercise Section 404(c) authority).

The Section 404(c) regulations and Section 404(b)(1) Guidelines reinforce this conclusion. It is well established that "an agency's regulations" may also "provide the Court with law to apply." *Greater L.A. Council on Deafness, Inc. v. Baldrige*, 827 F.2d 1353, 1361 (9th Cir. 1987). The unacceptable adverse effect standard appears throughout the regulations as a consideration for EPA's process. *See, e.g.*, 40 C.F.R. § 231.3(a) (Section 404(c) process begins when Regional Administrator "has reason to believe . . . that an 'unacceptable adverse effect' could result"); *id.* § 231.4(a) (comments on proposed determination should focus on whether a final determination should be issued and what actions could "reduce the adverse impact of the discharge"); *id.* § 231.5(a) (recommended determination issued when discharge "would be likely to have an

unacceptable adverse effect"). In addition, the Section 404(b)(1) Guidelines generally

prohibit permits that result in "[s]ignificant[] adverse effects." 40 C.F.R. § 230.10(c).

The Clean Water Act, Section 404(c), and EPA's regulations also provide law to

apply to Plaintiffs' claims that EPA failed to provide a rational explanation for its

Withdrawal Decision. EPA offered two explanations for withdrawing the Proposed

Determination: to incorporate new information and to participate in parallel processes

with the Corps. Determining whether the Clean Water Act and its regulations allow EPA

to incorporate new information and run its Section 404(c) process in parallel with the

Corps' — and thus whether EPA could have left the Proposed Determination in place

while still achieving its stated objectives — are legal questions well within this Court's

expertise. *See, e.g.*, 33 C.F.R. § 323.6(b) ("The Corps will continue to complete the

administrative processing of the application while the section 404(c) procedures are

underway including completion of final coordination with EPA"); 40 C.F.R. § 231.1(a)

("In making [an unacceptable adverse effect] determination, the Administrator will take

into account all information available to him, including any written determination of

compliance with the section 404(b)(1) Guidelines"). Indeed, EPA's decision to offer

published explanations of both the 2018 Decision Not to Withdraw and the Withdrawal

Decision suggests that even EPA does not believe it can withdraw the Proposed

Determination for any reason or for no reason at all.

More generally, because the Clean Water Act "do[es] not leave [EPA's] discretion unbounded," the Court may review the Withdrawal Decision "for compliance with [the statute], according to the general requirements of reasoned agency decisionmaking." *Dep't of Commerce*, 139 S. Ct. at 2568–69. In addition to conditioning EPA's exercise of its Section 404(c) authority on an "unacceptable adverse effect" finding, the Clean Water Act is a statute with an express purpose: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Through these parameters, Congress demonstrated that it did not intend EPA's discretion to be "absolute[]." *Chaney*, 470 U.S. at 831.

"Reasoned decisionmaking under the Administrative Procedure Act calls for *an explanation* for agency action." *Dep't of Commerce*, 139 S. Ct. at 2576 (emphasis added). An explanation that has no basis in the underlying statute cannot suffice. *Cf. Judulang v. Holder*, 565 U.S. 42, 55 (2011) (explaining that it would be arbitrary for an agency to make immigration decisions by coin flip because any decision "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system"). Indeed, the Ninth Circuit has held that agency decisions pursuant to statutes that do not specify factors to consider can be subject to arbitrary and capricious review. *See, e.g.*, *County of Esmeralda*, 925 F.2d at 1218–19 (holding that court could review decision made under statute granting Secretary of Energy "discretion"

to fund "units of local government that are contiguous with" a proposed nuclear waste site and noting that "a judicially manageable standard . . . readily present[ed] itself: Did the Secretary meaningfully consider the possibility and extent of the suggested impacts of [the site] upon the counties at issue and make a reasoned decision based upon such consideration?").

Here, Section 404(c) and the Clean Water Act provide standards that "allow a court to determine whether [EPA] is doing what it is supposed to be doing," *see Pinnacle*, 648 F.3d at 720: restricting disposal sites whose use would cause "unacceptable adverse effect" to fisheries, wildlife, or recreational areas, and "to restore and maintain" the Nation's waters. By providing a legally incoherent rationale that contradicted its prior statements regarding its Proposed Determination, EPA failed to make a decision that was "tied, even if loosely, to the purposes" of Section 404(c) or the Clean Water Act. *See Judulang*, 565 U.S. at 53 (agency acted arbitrarily by basing deportation decisions on "irrelevant comparison between statutory provisions" rather than on "factors that might be thought germane to the deportation decision"). Interpreting a statute's conferral of "discretion" to mean that an "agency may justify its choice on specious grounds" would "disregard entirely the value of political accountability, which itself is the very premise of

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                        Page 30
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 43 of 56

administrative discretion in all its forms." *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000).[5]

## B.     EPA's cases are inapposite

EPA mischaracterizes the law when it claims that "[o]ther cases . . . are nearly uniform in upholding the United States' longstanding position that EPA's discretionary decisions under section 404(c) are not reviewable." Doc. 36 at 38 n.13. Some simply concluded that EPA lacked any non-discretionary duty under Section 404(c) that would allow the plaintiffs to challenge EPA's refusal to review a Corps permit through the Clean Water Act's citizen suit provision — an argument that Plaintiffs are not making. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 915 F. Supp. 378, 381 (N.D. Ga. 1995) ("The plain language of the citizen's suit provision of the statute makes it clear that the EPA Administrator cannot be sued for misfeasance or nonfeasance in regard to a *discretionary* function."), *aff'd*, 87 F.3d 1242,

_____

[5] EPA argues that its interpretation of its regulations as providing no law for the Court to apply to withdrawing a proposed determination is entitled to deference. Doc. 36 at 41 n.15. EPA cites no documents suggesting that EPA's views on the standard for withdrawing are a product of its "fair and considered judgment" rather than a "convenient litigating position." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). Moreover, EPA's regulations have the same structure as Section 404(c) — i.e., they condition the issuance of a final determination on a finding of unacceptable adverse effect after notice and comment. Whether this structure constrains EPA's discretion is a merits question that does not "implicate [the agency's] substantive expertise. *Id.*

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page 31
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 44 of 56

1249 (11th Cir. 1996); *City of Olmstead Falls v. EPA*, 266 F. Supp. 2d 718, 722–23 (N.D. Ohio 2003) (observing that "this Court must determine whether either Section 404(c) or the 404(b)(1) Guidelines sets forth a nondiscretionary duty," and concluding that the challenged action was discretionary); *see also* 33 U.S.C. § 1365(a)(2) (authorizing citizen suits "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary"). These cases are also distinct because, like *Cascade*, they involved decisions not to initiate Section 404(c) proceedings. *See supra* p. 24.

Another case EPA cites acknowledged that EPA had broad discretion to initiate a Section 404(c) action and declined to review a challenge to a proposed determination that EPA neither withdrew nor finalized. *Newport Galleria Grp. v. Deland*, 618 F. Supp. 1179, 1181–85 (D.D.C. 1985). And one case interpreted a different statutory provision. *See Menominee Indian Tribe of Wis. v. EPA*, 360 F. Supp. 3d 847, 854–55 (E.D. Wis. 2018) (court could not review EPA's withdrawal of objections to state issuance of permit pursuant to EPA's oversight role under *Section 404(j)*). The Section 404(c) case most analogous to this one (reviewing an APA challenge) found law to apply, as EPA acknowledges. *See* Doc. 36 at 38 n.13 (citing *Mattaponi*, 515 F. Supp. 2d at 7–8).

EPA also improperly relies on cases interpreting statutes that contained no factors for the agency to consider or statutory purposes for the agency to serve when exercising

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                                     Page 32
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 45 of 56

its discretion, in arguing that it is significant that Section 404(c) lacks mandatory language. *See* Doc. 36 at 39–40. This Court's decision in *Alaska v. Kerry* is a good example. 972 F. Supp. 2d 1111 (D. Alaska 2013). The statute at issue stated that the Secretary of State "may" take "appropriate action on behalf of the United States" to implement amendments to an already-ratified treaty. 33 U.S.C. § 1909(b). The problem with such "may" language, as this Court recognized, was that it "neither indicate[d] that such authority should be used universally nor provid[ed] any basis for distinguishing between the instances" in which the authority should or should not be used. *Alaska*, 972 F. Supp. 2d at 1132 (quoting *Hinck v. United States*, 550 U.S. 501, 504 (2007)). It was the treaty provision's "failure to constrain *or guide* the Secretary of State's action" that the Court found dispositive, contrasting the provision under which the *Alaska* plaintiffs sued with "other sections" of the statute that "use mandatory rather than permissive language and specify factors the agency should consider when taking action." *Id.* at 1134 (emphasis added).

*Argabright v. United States* involved a similarly open-ended statute that merely stated that the Secretary of the Treasury "may abate the assessment of all or any part" of accrued interest on unpaid taxes without explaining when abatement may or may not be appropriate. 35 F.3d 472, 474–76 (9th Cir. 1994) (quoting 26 U.S.C. § 6404(e)(1)), *superseded by statute as recognized in Hinck*, 550 U.S. at 503–04, 507. The court

concluded that the statute contained no standards for the exercise of abatement authority. *Id.* at 476; *see also Hinck*, 550 U.S. at 503–04. EPA's reliance on *Argabright* is therefore inapposite for the same reasons as its reliance on *Alaska*. Doc. 36 at 40.

And in *Southern Railway Co. v. Seaboard Allied Milling Corp.*, the Supreme Court started by noting that "on the face of the statute there is simply 'no law to apply'" to an agency's refusal to hold a hearing to investigate the lawfulness of a railway rate increase. 442 U.S. 444, 455 (1979). In looking at the statute's structure, the Court noted that other provisions "used mandatory language" and "typically included standards to guide both the [agency] in exercising its authority and the courts in reviewing that exercise." *Id.* at 456; *see also id.* at 455 ("The statute is silent on what factors should guide the Commission's decision.").[6] In short, mandatory language may be significant in the context of open-ended statutes that contain no factors, but it is hardly dispositive.

---

[6] EPA also cites *San Francisco* in support of its argument that a statute's use of "shall" and "may" is relevant to determining whether a statute provides law to apply. *See* Doc. 36 at 40; *San Francisco*, 796 F.3d at 1002–03 (comparing 49 U.S.C. § 60105). But the agency decision at issue in *San Francisco* closely resembled a non-enforcement decision, *see supra* pp. 22–23, in which case a mandatory duty to enforce would overcome the presumption against judicial review, *see Chaney*, 470 U.S. at 833–34; Doc. 36 at 37 n.12 (describing *Chaney*). The court also acknowledged the use of discretionary language was not dispositive for assessing reviewability. *San Francisco*, 796 F.3d at 1002–03.

Finally, EPA cites several cases applying Section 701(a)(2)'s exception without any explanation of how the statutes at issue are similar to Section 404(c). *See* Doc. 36 at 32–33. Unlike Section 404(c), those statutes expressly delegated unreviewable discretion to the agency or provided no standard in the text. *See Adams v. FAA*, 1 F.3d 955, 956 (9th Cir. 1993) (per curiam) (statute authorizing Secretary of Transportation to "rescind any delegation made by him pursuant to this subsection *at any time and for any reason* which he deems appropriate" provided no law to apply (emphasis added) (quoting former 49 U.S.C. App. § 1355(a))); *E.J. Friedman Co. v. United States*, 6 F.3d 1355, 1359–60 (9th Cir. 1993) (stating that 26 U.S.C. § 6325(b)(2)(B) authorizing discharge of tax lien "if [the IRS] determines that the interest of the United States in the [property] to be [so] discharged has no value" provided "no standard against which to judge the IRS's exercise of discretion"); *Ruff v. Hodel*, 770 F.2d 839, 840 (9th Cir. 1985) (per curiam) (statute stating that agency's "findings and determinations upon [the contested issue] *shall be final and conclusive*" was a "statutory proscription on judicial review [that] scarcely could be more explicit" (emphasis added) (quoting former 25 U.S.C. § 565a(b)); *Rank v. Nimmo*, 677 F.2d 692, 699–700 (9th Cir. 1982) (statute stating that "Administrator may, *at the Administrator's option*" accept assignment of veteran's loan in default provided no law to apply (emphasis added) (quoting former 38 U.S.C. § 1816)). Because Section

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                    Page 35
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 48 of 56

404(c) does not give EPA "complete discretion," there is law to apply. *See Alaska*, 972 F. Supp. 2d at 1132 (quoting *Hinck*, 550 U.S. at 504).

**IV.    Balancing factors does not render a decision unreviewable, and EPA did not balance any factors when withdrawing the Proposed Determination**

Lastly, EPA argues that judicial review is improper because its decision to withdraw the Proposed Determination "involves a complicated balancing of a number of factors." Doc. 36 at 41 (quoting *San Francisco*, 796 F.3d at 1001–02); *see Chaney*, 470 U.S. at 831. Although the need for such balancing was *a* reason *Chaney* found an agency's exercise of discretion not to prosecute or enforce generally inappropriate for judicial review, it was not dispositive. *See Chaney*, 470 U.S. at 831–32. A mechanical application of this factor would entirely thwart abuse-of-discretion review, and this Court has acknowledged the factor's limited reach. *See Alaska*, 972 F. Supp. 2d at 1134–35 (citing *Port of Seattle v. FERC*, 499 F.3d 1016, 1027 (9th Cir. 2007)). Moreover, EPA's discretion to balance priorities has little bearing on Plaintiffs' challenge to the Withdrawal Decision. EPA provided *no* rational explanation for the Withdrawal Decision, let alone one based on any complicated balancing of factors.

EPA relies on *Chaney* as support for this exception, but more recent authority, including the Supreme Court's decision in *Massachusetts* finding that a denial of a petition for rulemaking is reviewable, limits that decision. *See supra* pp. 18–22 (explaining both petition denials and withdrawals of proposed rules are reviewable); *see*

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                                     Page 36
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*also Dep't of Commerce*, 139 S. Ct. at 2568 (Courts have "read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly' . . . [a]nd we have generally limited the exception to 'certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,' such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." (citations omitted)). Almost all discretionary decisions require some level of "regulatory flexibility," so that cannot be the test for justiciability if abuse of discretion review is to have any meaning. *Contra* Doc. 36 at 44.

Indeed, this Court and the Ninth Circuit have held that a complicated balancing of factors precludes judicial review only when "[1] there is no meaningful standard against which to judge [2] an agency's decision not to act." *Alaska*, 972 F. Supp. 2d at 1135 (quoting *Port of Seattle*, 499 F.3d at 1027). Both *Lincoln v. Vigil* and *San Francisco* (as well as *Chaney*) fit this mold. *See* Doc. 36 at 42. *Lincoln* involved an agency's decision not to allocate a lump-sum appropriation, "another administrative decision traditionally regarded as committed to agency discretion" because "the point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." 508 U.S. 182, 192–93 (1993). The statute also lacked any meaningful standards to apply

and involved a decision with no required record. *See id.* at 193–94. *San Francisco* also involved agency inaction that turned on balancing resources rather than statutory standards. 796 F.3d at 1002.

In contrast, Section 404(c), the Clean Water Act, and EPA's implementing regulations provide meaningful standards to review EPA's Withdrawal Decision. *See supra* pp. 25–31. And rather than failing to act, EPA made an "affirmative decision" — that its own regulations define as final agency action — to withdraw the proposed determination, published a notice in the Federal Register, and developed an administrative record as required by its regulations. *See Alaska*, 972. F. Supp. 2d at 1134–35; 40 C.F.R. § 231.5(c)(1). *Compare Williams*, 872 F.2d at 446 (explaining that when "[t]he agency has issued a lengthy document expressing its tentative conclusion" and "received numerous comments," the court is "confronted with no mere failure to act"), *and* 40 C.F.R. § 231.5(c)(1) (withdrawal of proposed determination is final agency action), *with Cascade*, 921 F. Supp. at 699 (case cited by EPA involving failure to start Section 404(c) process).

Moreover, this case does not implicate the discretionary balancing of complex policy factors. Simply put, neither of Plaintiffs' claims requires the Court to consider EPA's allocation of resources or ordering of priorities. Both involve straightforward legal questions that are well within the Court's expertise to resolve. *See supra* pp. 25–31; Doc.

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                        Page 38
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

36 at 32 (quoting Ninth Circuit case law stating whether there is law to apply should not be viewed in the abstract but whether a statute "limits the agency's discretion to act in the manner which is challenged" (quoting *County of Santa Clara v. Andrus*, 572 F.2d 660, 666 (9th Cir. 1978))).

EPA claims that its Withdrawal Decision involved a complicated balancing of factors because, after considering the existence of the Corps' analysis and availability of additional procedures, it wanted "to prioritize its work on the current, permit-related processes." Doc. 36 at 42–44. But it is unclear what exactly EPA is balancing. The Section 404(c) regulations require EPA to incorporate information from the Corps permitting process and the inter-agency Section 404(q) process into a final determination, if such information is available. *See* 40 C.F.R. § 231.1(a). The agency's regulations thus contemplate that the Section 404(c) process will in some instances be a parallel process to the Corps' permit decisions — not a mutually exclusive one. If anything, withdrawing an existing proposed determination and restarting the Section 404(c) process if the Corps ignores EPA's concerns would be a more resource-intensive decision given the Section 404(c) regulations' numerous procedural steps. EPA acknowledged this reality in 2018 by keeping the Proposed Determination in place. *See* 2018 Statement ("Until [EPA] know[s] the full extent of [the proposed Pebble Mine's] risk, [Bristol Bay's] natural resources and world-class fisheries deserve the utmost protection. [The Decision Not to

Withdraw] allows EPA to get the information needed to determine what specific impacts the proposed mining project will have on those critical resources."). The Withdrawal Decision does not explain how abandoning EPA's extensive prior analysis helps the agency prioritize its goals for the proposed Pebble Mine specifically or the Clean Water Act more generally.[7]

The Court need not examine EPA's resource allocation decisions to review Plaintiffs' claims; the Clean Water Act and its implementing regulations provide the law governing both claims and what EPA can and should consider when exercising its Section 404(c) authority. Even if a ruling in Plaintiffs' favor diverted some of EPA's resources, that is by design (and EPA's own doing). By requiring EPA to properly follow the Clean Water Act's and APA's requirements, the court is not "micromanag[ing]" EPA but honoring Congress's intent. *Contra* Doc. 36 at 45 (quoting *San Francisco*, 796 F.3d at 1002). EPA cannot ring the alarm that the proposed Pebble Mine could have unacceptable adverse effects (as it did as recently as July 2019), but then suddenly

---

[7]  EPA's position is that the Withdrawal Decision cannot be judicially reviewed, but also that the agency could seek to reinstate a proposed determination at a later date. However, EPA would likely argue the decision not to issue a proposed determination at some later date is also not judicially reviewable. EPA's effort to shield the analysis contained in the Proposed Determination from review is fundamentally incompatible with the intent and purpose of the APA to ensure judicial review of agency actions.

abandon its concerns without any rational explanation, let alone one acknowledging the statutory criterion that Congress tasked EPA with implementing.

## **CONCLUSION**

For the foregoing reasons, the Court should deny EPA's Motion to Dismiss.

Respectfully submitted this 6th day of January, 2020.

*s/ Jeffrey M. Feldman*
Jeffrey M. Feldman (AK Bar No. 7605029)
SUMMIT LAW GROUP PLLC

Ralph H. Palumbo (*Pro Hac Vice*)
Lynn M. Engel (*Pro Hac Vice*)
YARMUTH LLP

*Attorneys for Bristol Bay Economic Development Corporation, Bristol Bay Native Association, Inc., and Bristol Bay Reserve Association*

*s/ Megan R. Condon*
Megan R. Condon (AK Bar No. 1810096)
Matthew N. Newman (AK Bar No. 1305023)
NATIVE AMERICAN RIGHTS FUND

*Attorneys for United Tribes of Bristol Bay*

*s/ Scott Kendall*
Scott Kendall (AK Bar No. 0405019)
HOLMES, WEDDLE & BARCOTT

*Attorney for Bristol Bay Regional Seafood Development Association, Inc.*

*s/ Brian Litmans*

Brian Litmans (AK Bar No. 0111068)
Katherine Strong (AK Bar No. 1105033)
TRUSTEES FOR ALASKA

*Attorneys for SalmonState, Alaska Center, Alaska Community
Action on Toxics, Alaska Wilderness League, Cook
Inletkeeper, Defenders of Wildlife, Friends of McNeil River,
McNeil River Alliance, National Parks Conservation
Association, National Wildlife Federation, Sierra Club, and
Wild Salmon Center*

*s/ Jacqueline M. Iwata*

Jacqueline M. Iwata (*Pro Hac Vice*)
Thomas D. Zimpleman (*Pro Hac Vice*)
Joel R. Reynolds (*Pro Hac Vice*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Natural Resources Defense Council*

*s/ Thomas S. Waldo*

Thomas S. Waldo (AK Bar No. 9007047)
Erin Whalen (AK Bar No. 1508067)
EARTHJUSTICE

*Attorneys for Earthworks*

*s/ Austin Williams*

Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED

Paul A. Werner (*Pro Hac Vice*)
Steven P. Hollman (*Pro Hac Vice*)
Abraham J. Shanedling (*Pro Hac Vice*)
Rachelle P. Bishop (*Pro Hac Vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*Attorneys for Trout Unlimited*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I certify that this brief contains 9,579 words, excluding items exempted by Local

Civil Rule 7.4(a)(4), and complies with the word limit of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 6th day of January, 2020.

*s/ Thomas S. Waldo*
Thomas S. Waldo

Pls.' Joint Opp. to Defs.' Mot. to Dismiss                                                Page 43
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Case 3:19-cv-00265-SLG   Document 38   Filed 01/06/20   Page 56 of 56