Jeffrey M. Feldman (AK Bar No. 7605029)
SUMMIT LAW GROUP PLLC
315 Fifth Avenue South, Suite 1000
Seattle, WA 98104-2682
Phone: (206) 676-7000
jeff@summitlaw.com

Ralph H. Palumbo (*Pro Hac Vice*)
Lynn M. Engel (*Pro Hac Vice*)
YARMUTH LLP
1420 Fifth Avenue, Suite 1400
Seattle, WA 98101
Phone: (206) 516-3800
rpalumbo@yarmuth.com
lengel@yarmuth.com

*Attorneys for Bristol Bay Economic Development Corporation, Bristol Bay Native Association, Inc., and Bristol Bay Reserve Association*

Megan R. Condon (AK Bar No. 1810096)
Matthew N. Newman (AK Bar No. 1305023)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: (907) 276-0680
mcondon@narf.org
mnewman@narf.org

*Attorneys for United Tribes of Bristol Bay*

Scott Kendall (AK Bar No. 0405019)
HOLMES, WEDDLE & BARCOTT
701 W. 8th Avenue, #700
Anchorage, AK 99501
Phone: (907) 274-0666
smkendall@hwb-law.com

*Attorney for Bristol Bay Regional Seafood Development Association, Inc.*

Brian Litmans (AK Bar No. 0111068)
Katherine Strong (AK Bar No. 1105033)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Email:   blitmans@trustees.org
         kstrong@trustees.org

*Attorneys for SalmonState, Alaska Center, Alaska Community Action on Toxics, Alaska Wilderness League, Cook Inletkeeper, Defenders of Wildlife, Friends of McNeil River, McNeil River Alliance, National Parks Conservation Association, National Wildlife Federation, Sierra Club, and Wild Salmon Center*

Jacqueline M. Iwata (*Pro Hac Vice*)
Thomas D. Zimpleman (*Pro Hac Vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street, N.W., Suite 300
Washington, DC 20005
Phone: (202) 289-2377
Email: jiwata@nrdc.org
       tzimpleman@nrdc.org

Joel R. Reynolds (*Pro Hac Vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1314 2nd Street
Santa Monica, CA 90401
Phone: (310) 434-2300
Email:   jreynolds@nrdc.org

*Attorneys for Natural Resources Defense Council*

Thomas S. Waldo (AK Bar No. 9007047)
Erin Whalen (AK Bar No. 1508067)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Phone: (907) 586-2751
Email:   twaldo@earthjustice.org
         ewhalen@earthjustice.org

*Attorneys for Earthworks*

Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED
3105 Lake Shore Drive, Suite 102B
Anchorage, AK 99517
Tel.:   907.277.1590
Austin.Williams@tu.org

Paul A. Werner (*Pro Hac Vice*)
Steven P. Hollman (*Pro Hac Vice*)
Abraham J. Shanedling (*Pro Hac Vice*)
Rachelle P. Bishop (*Pro Hac Vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTION LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel.:   202.747.1900
pwerner@sheppardmullin.com
shollman@sheppardmullin.com
ashanedling@sheppardmullin.com
rbishop@sheppardmullin.com

*Attorneys for Trout Unlimited*

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION *et al.*,<br><br>          Plaintiffs,<br><br>    v.<br><br>CHRIS HLADICK *et al.*,<br><br>          Defendants. | Case No. 3:19-cv-00265-SLG |
| SALMON STATE, *et al.*,<br><br>          Plaintiffs,<br><br>    v.<br><br>CHRIS HLADICK *et al.*,<br><br>          Defendants. | Case No. 3:19-cv-00267-SLG |
| TROUT UNLIMITED,<br><br>          Plaintiff,<br><br>    v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*<br><br>          Defendants. | Case No. 3:19-cv-00268-SLG |

## PLAINTIFFS' JOINT OPENING BRIEF
## ORAL ARGUMENT REQUESTED
## (LOCAL CIVIL RULE 16.3)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

LIST OF SHORT NAMES AND ACRONYMS ........................................................... viii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 5

    I.      The Clean Water Act and its implementing regulations. ............................. 5

    II.     Bristol Bay is an area of unparalleled ecological value. ............................... 8

    III.    EPA's Watershed Assessment analyzes impacts of the proposed Pebble Mine.............................................................................................................. 9

    IV.    EPA issues a Proposed Determination because of potential "unacceptable adverse effects" to Bristol Bay. ................................................................... 12

    V.     PLP's efforts to remove the Proposed Determination................................. 15

    VI.    EPA leaves the Proposed Determination in place. ...................................... 17

    VII.   EPA finds that the Proposed Mine may result in substantial impacts to the Bristol Bay and Cook Inlet watersheds. ....................................................... 19

    VIII.  EPA reverses course and withdraws the Proposed Determination ............. 21

PLAINTIFFS HAVE STANDING .................................................................................. 22

STANDARD OF REVIEW ............................................................................................ 25

ARGUMENT................................................................................................................ 26

    I.      EPA wrongfully withdrew the Proposed Determination without considering unacceptable adverse effects. ....................................................................... 26

Pls.' Joint Opening Br.                                      Page ii
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

II.     EPA failed to provide a rational explanation for withdrawing the Proposed Determination. ........................................................................................... 30

       A.    EPA's decision to withdraw the Proposed Determination based on the availability of new information is arbitrary ................................. 32

       B.    EPA's decision to withdraw the Proposed Determination because of other opportunities to comment on potential impacts is arbitrary ... 34

III.    The Court should vacate the Withdrawal ..................................................... 39

CONCLUSION ............................................................................................................. 41

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ............................................ 44

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. U.S. Forest Service*,
   907 F.3d 1105 (9th Cir. 2018) ................................................... 39

*Alliance to Save the Mattaponi v. U.S. Army Corps of Engineers*,
   606 F. Supp. 2d 121 (D.D.C. 2009) ........................................... 28

*American Wild Horse Preservation Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ................................................... 30

*California Communities Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) ..................................................... 40

*Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .............................................................. 39

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .................................................................. 31

*Friends of Alaska National Wildlife Refuges v. Bernhardt*,
   381 F. Supp. 3d 1127 (D. Alaska 2019) ................................... 23

*Her Majesty the Queen in Right of Ontario v. EPA*,
   912 F.2d 1525 (D.C. Cir. 1990) ................................................ 28

*Humane Society of U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ................................................... 40

*Hunt v. Washington. State Apple Advertising Commission*,
   432 U.S. 333 (1977) .................................................................. 22

*Idaho Farm Bureau Federation v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ..................................................... 34

*International Union, United Mine Workers of America v. U.S. Department of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) .............................................. 25, 34

*Kern County Farm Bureau v. Allen*,
   450 F.3d 1072 (9th Cir. 2006) ................................................... 34

Pls.' Joint Opening Br.                        Page iv
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ............................................................................................ 28

*Mingo Logan Coal Co. v. EPA*,
    714 F.3d 608 (D.C. Cir. 2013) ............................................................................ 5, 7

*Motor Vehicle Manufacturers Association of U.S. v. State Farm Mutual Automobile
    Insurance Co.*,
    463 U.S. 29 (1983) ................................................................................... 25, 26, 31

*National Wildlife Federation v. EPA*,
    980 F.2d 765 (D.C. Cir. 1992) ............................................................................. 29

*Organized Village of Kake v. U.S. Department of Agriculture*,
    795 F.3d 956 (9th Cir. 2015) ............................................................................... 31

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ............................................................................... 40

*Pebble Limited Partnership v. EPA*,
    155 F. Supp. 3d 1000 (D. Alaska 2014) ............................................................. 15

*Pebble Limited Partnership v. EPA*,
    310 F.R.D. 575 (D. Alaska 2015) ........................................................................ 15

*Pebble Limited Partnership v. EPA*,
    No. 3:14-CV-0199-HRH, 2016 WL 128088 (D. Alaska Jan. 12, 2016) ................... 15

*Pinto v. Massanari*,
    249 F.3d 840 (9th Cir. 2001) ............................................................................... 39

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) ......................................................................... 39, 40

*Public Citizen v. Federal Motor Carrier Safety Administration*,
    374 F.3d 1209 (D.C. Cir. 2004) ........................................................................... 27

*Rancheria v. Jewell*,
    776 F.3d 706 (9th Cir. 2015) ............................................................................... 30

Pls.' Joint Opening Br.                                                        Page v
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................................. 26

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    255 F. Supp. 3d 101 (D.D.C. 2017) ......................................................... 31

*Western Oil & Gas Association v. EPA*,
    633 F.2d 803 (9th Cir. 1980) ................................................................... 40

*Williams Natural Gas Co. v. FERC*,
    872 F.2d 438 (D.C. Cir. 1989) ................................................................. 34

## STATUTES

5 U.S.C. § 706(2)(A) ................................................................... 25, 39

33 U.S.C. § 1251(a) ............................................................................. 5

33 U.S.C. § 1311(a) ............................................................................. 5

33 U.S.C. § 1344 ................................................................................. 5

33 U.S.C. § 1344(c) ...................................................................... 26, 28

## REGULATIONS

33 C.F.R. § 323.6(b) .......................................................... 7, 22, 35, 40

40 C.F.R. § 230.10(c) ......................................................................... 5

40 C.F.R. § 231.1(a) ............................................................... 7, 33, 35

40 C.F.R. § 231.1(b) ......................................................................... 35

40 C.F.R. § 231.1(c) ......................................................................... 35

40 C.F.R. § 231.2(e) ........................................................................... 6

40 C.F.R. § 231.3 ............................................................................. 27

40 C.F.R. § 231.3(a) .......................................... 6, 7, 27, 28, 32, 35

40 C.F.R. § 231.4 ............................................................................. 32

Pls.' Joint Opening Br.                                         Page vi
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

40 C.F.R. § 231.4(a) ....................................................................... 6, 27, 28

40 C.F.R. § 231.5(a) .......................................................................... 6, 27

40 C.F.R. § 231.5(c)(1) ....................................................................... 7, 25

40 C.F.R. § 231.5(e) .......................................................................... 32, 33

40 C.F.R. § 231.6 ............................................................................ 7, 27, 33

40 C.F.R. § 231.8 ............................................................................ 6, 22, 37

## FEDERAL REGISTER

54 Fed. Reg. 30,599 (July 21, 1989) ...................................................... 33, 37

56 Fed. Reg. 58,247 (Nov. 18, 1991) ........................................................... 29

## RULES

Fed. R. Civ. P. 56(a) ................................................................................ 25

Local Civ. R. 16.3 .................................................................................. 25

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| Corps | U.S. Army Corps of Engineers |
| DEIS | Draft Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| PLP | Pebble Limited Partnership |
| Proposed Determination | *Proposed Determination of the U.S. Environmental Protection Agency Region 10 Pursuant to Section 404(c) of the Clean Water Act, Pebble Deposit Area, Southwest Alaska* (July 2014) |
| Watershed Assessment | *An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska* |
| Withdrawal Decision | *Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska*, 84 Fed. Reg. 45,749 (Aug. 30, 2019) |
| 2018 Decision Not to Withdraw | *Notification of Decision Not To Withdraw Proposed Determination To Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska*, 83 Fed. Reg. 8668 (Feb. 28, 2018) |
| Section 404(b)(1) Guidelines | *Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material*, 40 C.F.R. Part 230 |
| 404(q) Memorandum | Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army (Aug. 11, 1992) |

# INTRODUCTION

This case challenges the Environmental Protection Agency's (EPA's) abrupt and unjustified reversal of longstanding policy about the disposal of mining waste in Alaska's Bristol Bay region. EPA's about-face clears the way for the U.S. Army Corps of Engineers (Corps) to issue a permit for unprecedented mining operations, threatening the natural habitats and resources of the watershed. This Court should vacate the agency's decision because EPA's actions are inconsistent with the Clean Water Act and unsupported by any rational explanation.

The Bristol Bay watershed "is an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America." AR 200255. The watershed is "home to the world's largest sockeye fishery . . . provid[ing] 45 percent of the world's sockeye harvest." AR 198262. The region supports "one of the last intact wild salmon-based cultures in the world," AR 200339, a commercial fishing industry that generates billions in annual economic output, AR 198957, and world-class sport fisheries, AR 200331. These natural resources are of "global cultural significance" and have "supported Alaska Native cultures in the region for at least 4,000 years." AR 200339.

The Pebble Limited Partnership (PLP) has long sought to exploit the Pebble deposit — a porphyry copper-gold-molybdenum deposit located in the Bristol Bay watershed — by opening what could become the largest mining pit in North America. PLP's plans have faced widespread opposition because of the irreparable damage mining

Pls.' Joint Opening Br.                                                          Page 1
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

would cause to the region's pristine natural resources and the related ways of life practiced by local residents for thousands of years.

To protect the Bristol Bay watershed from the unacceptable adverse effects that such a mine would cause, EPA proposed to withdraw Bristol Bay as a disposal site for mining waste, using its authority under Section 404(c) of the Clean Water Act. Through this statutory provision, Congress entrusted EPA with the power to protect ecologically sensitive and valuable areas from future projects and override the U.S. Army Corps of Engineers' permitting decisions for such projects if EPA determines a proposed project would "have an unacceptable adverse effect" on fisheries, wildlife, or recreational areas. 33 U.S.C. § 1344(c).

In acting to restrict development of the Pebble Mine, EPA described the region as "a globally significant resource with outstanding value" and "one of the last places on Earth with such bountiful and sustainable harvests of wild salmon." AR 200255. Based on years of study, EPA concluded that, even under the most conservative scenario, mining the Pebble deposit would result in the loss of streams, wetlands, lakes, and ponds that could have unacceptable adverse effects on the Bristol Bay fishery. AR 200259, 200261. Because of "the assessed unacceptable environmental effects" from such mining, EPA issued its Proposed Determination in 2014, with proposed restrictions on the discharge of fill. AR 200255, 200258–60, 200410–12.

EPA revisited this conclusion in 2018, opting to leave the Proposed Determination in place based on the agency's evaluation of the relevant statutory authority and regulations, input from tribes in Bristol Bay, and more than one million public comments. *See* AR 200461–62. Then-Administrator Scott Pruitt explained that "any mining projects in the region likely pose a risk to the abundant natural resources that exist there" and that "[u]ntil we know the full extent of that risk, those natural resources and world-class fisheries deserve the utmost protection." AR 200462. And he acknowledged that, in light of the potential for significant harm to Bristol Bay, "for EPA not to express an environmental position at this stage would be disingenuous." *Id*.

In July 2019, EPA reiterated its position and expressed concerns regarding the robustness of the Corps' analysis of PLP's permit application — an application for a mine almost *six times larger* than the smallest scenario evaluated by EPA in 2014. EPA explained that, far from supporting a conclusion that the proposed discharges could comply with governing regulations, the evidence supported the opposite conclusion: that PLP's proposed mining "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance." AR 195122, 195178.

Despite its consistent judgments that the Pebble Mine could cause unacceptable adverse impacts to the resources in Bristol Bay, EPA abruptly reversed course and withdrew the Proposed Determination (Withdrawal Decision) on August 30, 2019.

Pls.' Joint Opening Br.                                                      Page 3
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

AR 193398–405. That decision is arbitrary, capricious, and not in accordance with the Clean Water Act. First, EPA ignored and failed to consider the one statutory factor under Section 404(c), repeated throughout EPA's regulations, and upon which every prior EPA decision related to Pebble Mine was founded: the proposed mine's potentially unacceptable adverse effects. In failing to consider any technical or scientific evidence bearing on that statutory requirement, EPA's Withdrawal Decision violates the Clean Water Act, ignores an important aspect of the problem, and is otherwise unexplained and unreasonable. Second, EPA failed to supply any rational explanation for withdrawing the Proposed Determination. EPA said it did so to allow the factual record to develop based on project-specific information obtained through the permit process and to work cooperatively with the Corps. AR193401–02. But EPA rejected those same rationales when it refused to withdraw the Proposed Determination in 2018. Then, EPA found that factual development "[did] not support withdrawal of the Proposed Determination," because the Clean Water Act and its implementing regulations allow EPA to update the record to accommodate any new information. AR 193224. EPA's and the Corps' processes can and indeed have run in parallel.

In sum, EPA has eschewed its statutory obligation to consider unacceptable adverse effects of mining on the Bristol Bay region. In doing so, the agency has disregarded years of scientific studies and its own findings to clear the way for the Corps to permit the mine. The Court should vacate EPA's decision.

Pls.' Joint Opening Br.                                                                Page 4
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

## BACKGROUND

**I.      The Clean Water Act and its implementing regulations.**

Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress's aim was in part to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(2). To meet this goal, the statute prohibits "the discharge of any pollutant" into waters of the United States without a permit. *See id.* § 1311(a).

Section 404 of the Clean Water Act delegates to the Corps the authority to review and issue permits for discharge of dredged or fill material into navigable waters, subject to conditions outlined in Section 404 and binding guidelines developed by EPA in conjunction with the Corps (Section 404(b)(1) Guidelines), codified at 40 C.F.R. pt. 230. *Id.* § 1344. The Section 404(b)(1) Guidelines generally prohibit the permitting of any discharge of dredged or fill material if, among other factors, the discharge will cause or contribute to "significant degradation" of the environment. 40 C.F.R. § 230.10(c).

Section 404 also empowers EPA to protect ecologically sensitive and valuable areas from future projects and to override permitting decisions by the Corps. *See Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 612–14 & n.2 (D.C. Cir. 2013) (describing flexibility afforded by the Clean Water Act regarding when EPA can exercise its Section 404(c) powers).

Through Section 404(c), EPA may override the Corps' ultimate permitting decision. But, as EPA explained in enacting the Section 404(b)(1) Guidelines, "it is much preferable to exercise this authority before the Corps . . . has issued a permit . . . based on both a concern for the plight of the applicant, and a desire to protect the site before any adverse impacts occur." AR 196527. "[A]dvance prohibition will facilitate comprehensive rather than piecemeal protection of wetlands." *Id.*

EPA's regulations define "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). EPA's regulations further instruct that, "[i]n evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(l) guidelines." *Id.*

EPA may initiate a Section 404(c) process whenever it "has reason to believe after evaluating the information available . . . that an 'unacceptable adverse effect' could result." *Id.* § 231.3(a). Following public notice of a proposed determination, EPA must provide for a comment period. *Id.* § 231.4(a). Then, EPA withdraws the proposed determination or prepares a recommended determination. *Id.* § 231.5(a). EPA's regulations set deadlines for choosing one of these options, but EPA may extend them for "good cause." *Id.* §§ 231.5(a), 231.8. Withdrawing a proposed determination is final

Pls.' Joint Opening Br.                                                    Page 6
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

agency action. *Id.* § 231.5(c)(1). Any recommended determination is finalized by the EPA Administrator, who has authority to "affirm[], modify[], or rescind[]." *Id.* § 231.6.

The Corps and EPA may concurrently undertake their respective processes, but EPA retains "the *final* say" under Section 404(c). *Mingo Logan*, 714 F.3d at 614. Once the Corps receives EPA's notice that EPA intends to issue a proposed determination, the Corps cannot issue permits in the defined area until EPA completes its process. 40 C.F.R. § 231.3(a); 33 C.F.R. § 323.6(b). Nothing, however, prohibits the Corps from receiving and processing applications for permits during this period, and EPA must consider "all information available . . . including any written determination of compliance with the section 404(b)(1) Guidelines" made by the Corps before making a final decision. 40 C.F.R. § 231.1(a).

EPA may also participate in the Corps' permitting processes pursuant to a 1992 Memorandum of Agreement (404(q) Memorandum) the two agencies executed under Clean Water Act Section 404(q), 33 U.S.C. § 1344(q). AR 193462-71. If EPA determines a permit "*may* result in substantial and unacceptable impacts to aquatic resources of national importance," it must send the Corps a letter during the public comment period for the draft permit. AR 193468. EPA then determines whether a "discharge *will* have a substantial and unacceptable adverse impact" — damages "similar in magnitude to cases evaluated under Section 404(c)" — and notifies the Corps. *Id.* If EPA concludes that a discharge will have a substantial and unacceptable adverse impact, EPA and the Corps

Pls.' Joint Opening Br.                                                                 Page 7
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

engage in consultation. AR 193466-67. In the 404(q) process, the Corps retains final decision-making authority. AR 193469–71. If consultation with the Corps does not change EPA's determination that there will be unacceptable adverse effects, Section 404(c) is the exclusive means through which EPA may prohibit discharges.

## II.    Bristol Bay is an area of unparalleled ecological value.

The Bristol Bay watershed is an "intact" system with "untouched and pristine" aquatic habitat. AR 200255. In EPA's words, the watershed is "an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America." *Id*. It "support[s] abundant, genetically diverse wild Pacific salmon populations," which "maintain the productivity of the entire ecosystem, including numerous other fish and wildlife species." *Id.* All five species of wild, North American Pacific salmon inhabit the rivers, streams, and lakes that feed into Bristol Bay. *See* AR 200299. "Each year Bristol Bay supports the world's largest runs of sockeye salmon, producing approximately half of the world's sockeye salmon." AR 200255. Put simply, "Bristol Bay is remarkable as one of the last places on Earth with such bountiful and sustainable harvests of wild salmon." *Id.*

Salmon are the lifeblood of the region's economy and cultures. The area's "streams, wetlands, and other aquatic resources support world-class, economically important commercial and sport fisheries for salmon and other fishes, as well as a more than 4,000-year-old subsistence-based way of life for Alaska Natives." *Id.* As EPA

observed, "[t]he predominant Alaska Native cultures present in the Nushagak and Kvichak River watersheds — the Yup'ik and Dena'ina — are two of the last intact, sustainable, salmon-based cultures in the world." AR 193682. "Salmon are integral to these cultures' entire way of life via the provision of subsistence food and subsistence based livelihoods . . . ." AR 193683. The connection maintained by these cultures "is in part both due to and responsible for the continued undisturbed condition of the region's landscape and biological resources." *Id.*

The Bristol Bay watershed includes two National Parks — Katmai and Lake Clark — as well as at least 29 fish species, more than 40 terrestrial mammal species, and 190 bird species, many of which are "essential to the structure and function of the region's ecosystems and current economies." AR 193676, 80. Bristol Bay's fishery generates $1.5 billion in output value and provides employment, directly and indirectly, for almost 20,000 full- and part-time workers annually. AR 198957–58. Approximately 75% of the annual economic benefit is derived from commercial, sport, and subsistence fishing. AR 193881.

## III.  EPA's Watershed Assessment analyzes impacts of the proposed Pebble Mine.

The proposed Pebble Mine would be an open pit mine located at the headwaters of Bristol Bay. Recognizing the risks posed by large-scale mining, numerous groups petitioned EPA "to use its authorities to protect [the] fishery resources." AR 200257; *see also* 193772. In response, EPA conducted "three years of study, two rounds of public

Pls.' Joint Opening Br.                                               Page 9
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

comment, and independent, external peer review" to publish *An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska* (Watershed Assessment). AR 200257; *see also id.* at 200274, 200276–77.

The Watershed Assessment analyzed "mining-related stressors that would affect ecological resources in the watershed," based on "realistic mine scenarios that include a range of mine sizes and operating conditions." AR 193750. Specifically, EPA examined three mining scenarios based on the amount of ore processed: Pebble 0.25 (approximately 0.25 billion tons of ore over 20 years); Pebble 2.0 (approximately 2.0 billion tons of ore over 25 years); and Pebble 6.5 (approximately 6.5 billion tons of ore over 78 years). *Id.* EPA based the scenarios on PLP's preliminary plans, consultations with experts, and baseline data collected by PLP regarding the mine site, mine activities, and the surrounding environment. *Id.*

EPA recognized that "[t]he exact details of any future mine plan for the Pebble deposit or for other deposits in the watershed will differ from our mine scenarios." *Id.* While EPA did not have PLP's specific mine plan, the "mine scenarios realistically represent[ed] the type of development plan that would be anticipated for a porphyry copper deposit in the Bristol Bay watershed." *Id.*

EPA's Watershed Assessment concluded the proposed Pebble Mine would dramatically alter Bristol Bay. EPA determined that even its most conservative scenario

would have significant impacts on the aquatic ecosystem. Specifically, EPA found that Pebble 0.25 would:

- Eliminate, block, or dewater 24 miles of streams;

- Eliminate, block, or dewater 5 miles of anadromous[1] streams;

- Alter 20% or more of streamflow in 9 miles of stream;

- Result in the loss of 1,300 acres of wetlands, lakes, and ponds from the mine footprint;

- Result in an unquantifiable loss of streams from reduced streamflow below the mine footprint; and

- Impact an additional 1,189 acres (4.81 square kilometers) of wetlands, lakes, and ponds from the access road.

AR 193754, 193758. Such stream loss "would equal a length of more than 350 football fields" and the "wetland losses would equal an area of more than 900 football fields." AR 200258.

Mining operations also pose significant threats through contamination of the area's waterways. Elevated copper levels from water leaching from the waste rock piles and tailings facilities would "cause direct effects" on fish such as salmon and trout "including rapidly induced death of many or all fish." AR 193755. Elevated copper levels also

---

[1] "Anadromous" refers to fish that are born in freshwater, migrate to the ocean as they grow, and then return to freshwater to spawn. Salmon are a good example.

Case 3:19-cv-00265-SLG   Document 48   Filed 01/31/20   Page 22 of 57

"would cause death or reduced reproduction of aquatic invertebrates in" 13 miles of streams. *Id.* Through water treatment system failures, which "would be expected to occur during operation or post-closure periods," copper concentrations would impact salmon over 17 miles. AR 193756. "Aquatic invertebrates would be killed or their reproduction reduced in . . . 48 to 62 miles . . . of streams in all three scenarios." *Id.*

The Watershed Assessment further evaluated potential effects on aquatic environments from construction of the transportation corridor needed to serve the mine, as well as potential failures and risks of the project, including ore-carrying truck accidents, a tailings dam failure, pipeline failure, and other common mode failures — each of which could increase toxicity and cause cumulative effects on salmonid and other fish populations. AR 193755–65. These effects would reverberate up the food chain, adversely affecting brown bears, wolves, bald eagles, and other wildlife that rely on salmon. AR 200336. In addition, subsistence, commercial, and sport fishing would be adversely affected. AR 193741, 193765–67.

## IV. EPA issues a Proposed Determination because of potential "unacceptable adverse effects" to Bristol Bay.

On February 28, 2014, EPA began the Section 404(c) process by sending a letter to PLP, the Corps, and the State of Alaska. AR 195111–13. EPA explained it would "review potential adverse environmental effects" of mining because "it has reason to believe that porphyry copper mining of the scale contemplated at the Pebble deposit

would result in significant and unacceptable adverse effects to important fishery areas in the watershed." AR 195111.

Prior to publishing the Proposed Determination, EPA reviewed a more than 1,500-page response from PLP, hundreds of thousands of public comments, and technical and scientific assessments of the impacts to the aquatic ecosystems. AR 200276–81. More than 99% of all public comments opposed development of the mine and supported issuing a proposed determination. AR 28492, 28500.

Based on the findings of the peer-reviewed Watershed Assessment, EPA found that "mining of the Pebble deposit at any of [the reviewed scenario] sizes, even the smallest, could result in significant and unacceptable adverse effects on ecologically important streams, wetlands, lakes, and ponds and the fishery areas they support." AR 200410.

EPA identified that "losses of the nature and magnitude associated with the Pebble 0.25 stage mine would be unprecedented for the [Clean Water Act] Section 404 regulatory program in Alaska." AR 200401; *see also* AR 200359 (noting that "the elimination, dewatering, or fragmenting of approximately 19 miles . . . of tributaries of anadromous fish streams . . . would be an unprecedented impact in Alaska"). Pebble 0.25 would also eliminate, dewater, or fragment more than 1,200 acres of wetlands, lakes, and ponds. AR 200360. With more than 90% of these waters contiguous with salmon streams, EPA found "[t]hese waters likely play a crucial role in the life cycles of anadromous

Pls.' Joint Opening Br.                                                        Page 13
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

fish." *Id.* EPA also found that the loss of habitat would have temporal effects beyond the life of the mine, reducing the overall "capacity and productivity" of Chinook and Coho salmon in the watersheds post-mining. AR 200347.

EPA found that "the discharge of dredged or fill material associated with the Pebble 0.25 stage mine could have unacceptable adverse effects on fishery areas in the [three sub-watersheds directly within the mine site area], as well as downstream fishery areas." AR 200353. Further, EPA found that while it "cannot be certain of the full extent of the implications of these losses, it is apparent that impacts of this magnitude could compromise the sustainability of fish populations within the [three sub-watersheds directly within the mine site area], as well as downstream fishery areas." *Id.*

EPA concluded that "losses of streams, wetlands, lakes, and ponds and alterations of streamflow [under the 0.25 mine scenario] each provide[d] a basis to issue . . . [a] proposed determination." AR 200259. To prevent unacceptable adverse effects, EPA proposed restrictions on Section 404 permits that would, individually or collectively, result in any of the following:

- Elimination of 5 linear miles of documented anadromous fish streams;

- Elimination of 19 linear miles of tributaries to anadromous fish streams;

- A loss of 1,100 acres of wetlands, lakes, and ponds that are contiguous with anadromous fish streams or their tributaries; or

- Drawdown that would alter streamflow by more than 20% in about 9 miles of anadromous fish streams.

AR 200259–60, 200410.

While EPA relied on this habitat loss alone to justify the Proposed Determination, EPA recognized that this approach was conservative and "underestimated potential adverse effects." AR 200260–61. EPA did not include effects resulting from the infrastructure supporting the mine or the possibility of accidents or failures of the mine's impoundments or storage facilities. *Id.*

## V.  PLP's efforts to remove the Proposed Determination.

PLP promptly began a multi-pronged legal challenge to the Proposed Determination. First, PLP challenged EPA's authority to use the Section 404(c) process prior to PLP's submission of a permit application. This case was dismissed. *See Pebble Ltd. P'ship v. EPA*, 155 F. Supp. 3d 1000 (D. Alaska 2014), *aff'd*, 604 F. App'x 623 (9th Cir. 2015).

PLP filed two other cases — one based on the Federal Advisory Committee Act and the other on the Freedom of Information Act. *See Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575 (D. Alaska 2015); *Pebble Ltd. P'ship v. EPA*, No. 3:14-CV-0199-HRH, 2016 WL 128088 (D. Alaska Jan. 12, 2016). In May 2017, PLP and EPA entered into a Settlement Agreement to resolve those cases. AR 193026–46. The settlement precluded EPA from issuing a Recommended Determination until the earlier of two triggering

Pls.' Joint Opening Br.                                                  Page 15
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

events occurred: (1) the Corps issued a final Environmental Impact Statement (EIS) under the National Environmental Policy Act regarding PLP's proposed permit application; or (2) 48 months passed from the effective date of the settlement. EPA also agreed to "commence a process to propose to withdraw the currently pending proposed determination." AR 193029. The settlement did not require EPA to withdraw the Proposed Determination; it only required EPA to initiate a process to propose withdrawal and then evaluate whether withdrawal would be appropriate.

EPA satisfied the Settlement Agreement's withdrawal obligation in July 2017, when it issued a proposal to withdraw the Proposed Determination. AR 01–02. EPA's proposal made clear that "initiation of the section 404(c) process did not prohibit PLP from filing a permit application" or the Corps from processing such a permit application. AR 01. Nevertheless, EPA asserted that withdrawal could: (1) "provide PLP with additional time to submit a permit application"; (2) "remove any uncertainty, real or perceived, about PLP's ability to . . . have [its] permit application reviewed"; and (3) "allow[] the factual record regarding any forthcoming permit application to develop." AR 02. EPA took public comment, but limited its request for comments to these three stated reasons. *Id.* In response, EPA received more than a million comments, AR 200462, an overwhelming majority of which opposed withdrawing the Proposed Determination, AR 193222.

## VI. EPA leaves the Proposed Determination in place.

In January 2018, EPA decided not to withdraw the Proposed Determination (2018 Decision Not to Withdraw), but instead to leave it "in place pending further consideration by the Agency of information that is relevant to the protection of the world-class fisheries contained in the Bristol Bay watershed." AR 193222, AR 193224. The decision acknowledged that the reasons listed in EPA's July 2017 proposal did not support withdrawing the Proposed Determination. AR 193224. Notably, EPA found it did not need to withdraw the Proposed Determination to allow for the factual record to develop because EPA could incorporate the Corps' permitting record into any final determination it made. *Id.* The decision also found "good cause" to extend its regulatory deadlines for either making a Recommended Determination or withdrawing the Proposed Determination "to allow for an additional public comment period and to align with the timeframes established in the settlement agreement." AR 193225.

In the accompanying press release, then-Administrator Pruitt gave two reasons for EPA's decision: (1) "any mining projects in the region likely pose a risk to the abundant natural resources that exist there"; and (2) "[u]ntil [EPA] know[s] the full extent of that risk, those natural resources and world-class fisheries deserve the utmost protection." AR 200462. The Administrator further observed PLP's "application must clear a high bar, because EPA believes the risk to Bristol Bay may be unacceptable" and that "for EPA not to express an environmental position at this stage would be disingenuous." *Id.*

Subsequent to leaving the Proposed Determination in place, EPA repeated that it would wait for a final EIS prior to resuming the Section 404(c) process. *See, e.g.*, AR 202107 (September 2018 letter to House members stating that EPA would "move to the next step in the section 404(c) process, if such a decision is made" after May 2021, unless a final EIS is issued sooner); AR 202150 (October 2018 letter saying the same); AR 201631 (November 2018 email confirming EPA was "[w]aiting for [the] EIS process to complete" including a "[f]inal" EIS). EPA also reiterated that any new information generated would be incorporated into future decisions, *see, e.g.*, AR 202240 (April 2018 letter to House members stating that EPA would "consider any relevant information that becomes available to inform future Section 404(c) decisions" and the Watershed Assessment would likely be "only one of several resources" used in making a Final Determination); AR 202097 (February 2018 letter to Congressman Quigley stating EPA was "leaving [the Proposed Determination] in place while the Agency receives more information"), and that its decision did not impede PLP's ability to proceed with the Corps, *see, e.g.*, AR 202152 (February 2018 letter to Senators stating that EPA's decision "neither deters nor derails the application process of [PLP's] proposed project"); *accord* AR 202238 (April 2018 letter to House members).

**VII. EPA finds that the Proposed Mine may result in substantial impacts to the Bristol Bay and Cook Inlet watersheds.**

In December 2017, while EPA was still considering withdrawing the Proposed Determination, PLP submitted a permit application to the Corps. AR 195180–243. The application, updated in December 2018, is for a mine that is almost *six times larger* than Pebble 0.25, AR 197888, which was the smallest mine that EPA evaluated and which EPA found could pose unacceptable impacts. AR 200260.

In February 2019, the Corps issued a Draft Environmental Impact Statement (DEIS) analyzing PLP's proposal. AR 200194–96. Meanwhile, in May 2019, the Alaska Attorney General sent a letter to EPA describing the Proposed Determination as "unlawful," "illegal," and without "regulatory foundation" or "any legal basis." AR 201349–50. The Alaska Attorney General warned that the State of Alaska "continues to evaluate its options concerning EPA's refusal to withdraw the Proposed Determination, including possible litigation against EPA." AR 201350. A month later, EPA General Counsel Leopold "direct[ed] Region 10 to continue its deliberations regarding whether to withdraw the 2014 Proposed Determination or, alternatively, decide to leave the 2014 Proposed Determination in place." AR 196951.

Nevertheless, on July 1, 2019, EPA submitted comments on the Corps' Public Notice for a CWA Section 404 Permit, AR 195120–79, and on the Corps' DEIS, AR 196146–260. EPA commented that the proposed Pebble Mine "may result in substantial

Pls.' Joint Opening Br.                                                        Page 19
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

impacts to waters of the United States within the Bristol Bay and Cook Inlet watersheds."

AR 195120. This includes:

> the permanent loss of approximately 3,560 acres of jurisdictional wetlands and other aquatic resources, including 3,443 acres of wetlands, 55 acres of lakes and ponds, 81 miles (50 acres) of stream channels, and 11 acres of marine waters. An additional 510 acres of streams, wetlands, lakes, ponds, and marine waters would be temporarily filled for construction access, and 2,345 acres would experience secondary impacts due to groundwater drawdown (449 acres) and fugitive dust (1,896 acres).

AR 196149. Pebble's proposed fill of wetlands and streams dwarfs the benchmarks of unacceptable adverse effects set out in EPA's Proposed Determination. The permanent loss of wetlands would be three times larger than the 1,100-acre limit established in the Proposed Determination. *See* AR 200260. The loss of salmon-bearing streams is nearly twice the limit established in the Proposed Determination. *Compare* AR 200002 (estimating loss of 8.75 miles of anadromous stream habitat), *with* AR 200260 (limiting anadromous stream losses to 5 miles). And the loss of tributaries is four times greater than the Proposed Determination's limit. *See* AR 200260.

Based on these significant impacts, EPA concluded that the proposed Pebble Mine triggered the 404(q) Memorandum's consultation process because it "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance." AR 195122. EPA also expressed concern that the Corps' Public Notice and DEIS "do not contain sufficient

Pls.' Joint Opening Br.           Page 20
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

information to support a reasonable judgment that the proposed discharges will comply

with the [Section 404(b)(1)] Guidelines." *Id.*

## VIII.  EPA reverses course and withdraws the Proposed Determination

Despite these concerns, on July 30, 2019, EPA announced its decision to withdraw

the Proposed Determination[2] — a complete about-face just 28 days after EPA found that

the Pebble application and DEIS had not demonstrated compliance with the Section

404(b)(1) Guidelines. *See* AR 195122. The notification was published in the Federal

Register on August 30, 2019. AR 193398–405.

EPA gave two reasons for its Withdrawal Decision. First, EPA cited

"developments in the record," AR 193398, asserting "the Corps' DEIS includes

significant project-specific information that was not accounted for in the 2014 Proposed

Determination," AR 193401. Second, EPA cited "the availability of processes for EPA to

address record issues with the U.S. Army Corps." AR 193398. EPA stated that "the

appropriate sequencing is to resolve technical issues during the Corps' permitting process

rather than through a separate 404(c) process," because "it is appropriate to defer to the

Corps' decision-making process to sort out the information" and the "Corps should have

the first opportunity to consider project-specific information here without having to

_____

[2] EPA, News Releases from Headquarters, Office of General Counsel, *EPA Withdraws Outdated, Preemptive Proposed Determination to Restrict Use of the Pebble Deposit Area as a Disposal Site* (July 30, 2019), https://www.epa.gov/newsreleases/epa-withdraws-outdated-preemptive-proposed-determination-restrict-use-pebble-deposit.

Pls.' Joint Opening Br.                                                                    Page 21
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

contend with a 404(c) proposal." AR 193403–04. EPA explicitly stated that it was "not basing its decision-making on technical consideration or judgments about whether the mine proposal . . . results in 'unacceptable adverse effects' under [Clean Water Act] section 404(c)." AR 193405.

EPA recognized that it could extend the Section 404(c) deadlines upon a showing of "good cause," AR 193402 (citing 40 C.F.R. § 231.8), but asserted such extensions "were not intended to allow for long-term gaps, as in this case, that could result in decision-making without the full record," *id.* The Withdrawal Decision lifted the restriction on the Corps from issuing a Section 404 permit for the proposed Pebble Mine. *See* 33 C.F.R. § 323.6(b). The Corps has stated that it anticipates issuing a decision on PLP's permit application in the fall of 2020 although it has not updated its project website. *See* Doc. 40 at 3 n.2.

## PLAINTIFFS HAVE STANDING

Plaintiffs have standing to challenge EPA's action on behalf of their members. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342–43 (1977); Exs. 1–33 (Declarations of Plaintiff organizations and members).[3] Permitting of the proposed Pebble Mine poses a "substantial risk" of harm to the diverse economic, cultural, aesthetic, recreational, scientific, and spiritual interests of Plaintiffs' members.

_____

[3] Some Plaintiffs do not have members but "possess all of the indicia" for membership-based standing. *Hunt*, 432 U.S. at 344–45; *see* Exs. 1–3, 6, 18, 28.

*See, e.g.*, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1135 (D. Alaska 2019) (Gleason, J.).

Salmon and other native fish are the linchpin of Bristol Bay. "[T]he infrastructure necessary to mine the Pebble deposit jeopardizes the long-term health and sustainability of the Bristol Bay ecosystem" and therefore jeopardizes the communities those resources support. AR 200257. Many of Plaintiffs' members rely on the sustainability and health of Bristol Bay's fisheries for food, and their health and finances would be harmed by contaminated or reduced salmon runs. *See, e.g.*, Ex. 2 at 2–3, ¶¶5–6; Ex. 3 at 5–6, ¶12; Ex. 16 at 2–3, 4, ¶¶5, 9; Ex. 23 at 2, 4, ¶¶5, 12; Ex. 27 at 3, ¶6. Other members fish commercially and have invested in vessels and permits unique to Bristol Bay. *See, e.g.*, Ex. 1 at 3–5, ¶¶7–9; Ex. 2 at 3, ¶7; Ex. 4 at 3, 4–6, ¶¶4, 10–11; Ex. 5 at 2–3, ¶¶4–7; Ex. 8 at 4, ¶9; Ex. 16 at 2, ¶¶3–4; Ex. 24 at 2–3, ¶¶2–3, 7–8. Reduced salmon runs would harm those investments, and Plaintiffs' members are reasonably concerned that the proposed mine will negatively impact consumer perception of Bristol Bay salmon, thereby reducing market value. *See* Ex. 1 at 5–6, ¶11; Ex. 4 at 6–7, ¶¶12–13; Ex. 5 at 4, ¶11; Ex. 8 at 4, ¶9; Ex. 16 at 4–5, ¶10; Ex. 23 at 3, ¶8; Ex. 24. EPA's sudden and inadequately explained reversal also creates uncertainty that discourages investment in Bristol Bay. Ex. 30 at 5, ¶12; Ex. 31 at 6, ¶12; Ex. 12 at 5, ¶13.

Bristol Bay salmon also have cultural and spiritual significance for many of Plaintiffs' members. *See* Ex. 1 at 4, ¶8; Ex. 2 at 3, ¶6; Ex. 3 at 6, 7, ¶¶11, 13, 15.

Pls.' Joint Opening Br.                                                    Page 23
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

Traditional subsistence practices have been passed from generation to generation and are "a vital mechanism for transmitting traditional knowledge and cultural values." Ex. 3 at 6, 7, ¶¶13–15; *see also* Ex. 2 at 3, ¶8. Plaintiffs' members also participate in important celebrations and ceremonies tied to the salmon fishery. *See* Ex. 2 at 3, ¶8. Reductions in the quality and quantity of salmon would harm members' subsistence and spiritual practices, erode their ability to meet their most basic nutritional needs with traditional subsistence foods, and "threaten the vitality of . . . indigenous ways of life" in the region. Ex. 3 at 5–7, ¶¶12–15; *see also* Ex. 1 at 5, ¶11; Ex. 2 at 3–4, ¶¶9, 11.

Finally, the proposed Pebble Mine and its sprawling infrastructure would harm Plaintiffs' members who hike, boat, study and view wildlife, and run tourism businesses — such as bear viewing trips and fishing expeditions — in the Bristol Bay, Lake Clark, and Cook Inlet areas. Ex. 7 at 2–3, ¶¶4–5; Ex. 9 at 3–4, ¶¶5–8; Ex. 10 at 5, ¶11; Ex. 11 at 3–4, ¶¶5–6; Ex. 12 at 4–5, ¶¶9–10; Ex. 13 at 4, ¶8; Ex. 14 at 5–6, ¶¶9–12; Ex. 15 at 8–9, ¶11; Ex. 17 at 3–6, ¶¶5–7, 9–12; Ex. 18 at 3–5, ¶¶7–9; Ex. 19 at 3, ¶¶5–7; Ex. 20 at 3, ¶6; Ex. 21 at 3, ¶7; Ex. 25 at 2, 3, ¶¶3–4, 6–8; Ex. 27 at 3–5, ¶¶5, 7–9; Ex. 28 at 4–6, ¶¶9, 11; Ex. 30 at 3, 4, ¶¶7, 9; Ex. 31 at 4, 5, ¶¶6–7, 10; Ex. 32 at 4, 5; ¶¶8–11. An order from this Court reinstating the Proposed Determination would redress these substantial harms by stopping the Corps permit's issuance and alleviating economic uncertainty, and reinstating the process for a final determination prohibiting the proposed Pebble Mine.

## <u>STANDARD OF REVIEW</u>

This case challenges a final agency action under the APA. *See* 40 C.F.R.

§ 231.5(c)(1). Under the APA, courts must "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court can resolve this

case under the summary judgment standard based on the full agency record. *See* Fed. R.

Civ. P. 56(a); Local Civ. R. 16.3.

Agency action is arbitrary and capricious where the agency "has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise," or fails to articulate a "rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of

U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). This

standard applies to final decisions to withdraw proposed regulatory actions: once an

agency starts notice and comment, it is not "free to terminate . . . for no reason

whatsoever" and must "provide an explanation that will enable the court to evaluate [its]

rationale at the time of the decision." *Int'l Union, United Mine Workers of Am. v. U.S.

Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (quotations omitted). The reviewing

court "may not supply a reasoned basis for the agency's action that the agency itself has

Pls.' Joint Opening Br.                                                    Page 25
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## ARGUMENT

**I.  EPA wrongfully withdrew the Proposed Determination without considering unacceptable adverse effects.**

EPA's Withdrawal Decision is arbitrary because the agency failed to consider the only factor explicitly stated in Section 404(c) of the Clean Water Act: whether discharges from mining the Pebble deposit would have "unacceptable adverse effect[s]" on Bristol Bay's fisheries, wildlife, or recreational areas. 33 U.S.C. § 1344(c). In its own words, EPA did not base its decision "on technical consideration or judgments about whether the mine proposal . . . results in 'unacceptable adverse effects' under [Clean Water Act] section 404(c)." AR 193405. By refusing to consider the sole statutory and regulatory factor, and ignoring its prior concerns about the Corps' ability to prevent these adverse effects, EPA mischaracterizes its regulatory framework and "entirely fail[s] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Section 404(c) and its implementing regulations make unacceptable adverse effects the touchstone for EPA's decision-making under Section 404(c). EPA must determine whether "the discharge of . . . materials . . . will have an unacceptable adverse effect." 33 U.S.C. § 1344(c). A "statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency, as it is for Congress in the

first instance to define the appropriate scope of an agency's mission." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004). It is arbitrary for EPA to fail to address this key statutory criterion in its Withdrawal Decision. Every step of the agency's decision-making process, from proposed to final determination, is guided by an analysis of the potential for unacceptable adverse effects. EPA initiates the Section 404(c) process only if the agency "has reason to believe . . . that an 'unacceptable adverse effect' could result from the specification or use for specification of a defined area for the disposal of dredged or fill material." 40 C.F.R. § 231.3(a). After that finding, EPA moves forward only if it has outstanding concerns about potential unacceptable adverse effects. *See, e.g.*, *id.* §§ 231.3 (publication of proposed determination), 231.5(a) (recommended determination). Further, the Corps, the state, the site owner, and the permit applicant (if any) are given specific opportunities to demonstrate that no unacceptable adverse effects will occur to prevent EPA, where appropriate, from either publishing a proposed determination or finalizing a decision. *See id.* §§ 231.3(a)(2), 231.6. EPA's regulations also direct it to take public comment on a proposed determination and those comments "should be directed to whether the proposed determination should become the final determination and corrective action that could be taken to reduce the adverse impact." *Id.* § 231.4(a). EPA's failure to consider the single factor that Congress specified in Section 404(c), and the single guiding factor in the agency's own regulations, is arbitrary.

Pls.' Joint Opening Br.                                                             Page 27
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*Alliance to Save the Mattaponi v. U.S. Army Corps of Engineers* is highly

instructive. 606 F. Supp. 2d 121 (D.D.C. 2009). There, the court overturned EPA's

decision not to issue a proposed determination because EPA did not consider "whether

granting the permit would have an unacceptable adverse effect," and instead based its

decision on a "whole range of other reasons completely divorced from the statutory text."

*Id.* at 140. The court emphasized that Section 404(c) "authorizes the Administrator to

veto a permit '*whenever he determines* . . . that [it] will have an unacceptable adverse

effect.'" *Id*. at 140 (quoting 33 U.S.C. § 1344(c)). And while Section 404(c) "grants the

Administrator a 'degree of discretion,'" *id.* (quoting *Her Majesty the Queen in Right of*

*Ontario v. EPA*, 912 F.2d 1525, 1533 (D.C. Cir. 1990)), the court held "this discretion 'is

not a roving license to ignore the statutory text,'" *id*. (quoting *Massachusetts v. EPA*, 549

U.S. 497, 533 (2007)). Rather, "the Administrator's exercise of discretion must relate to

whether the permit will have an unacceptable adverse effect." *Id*. (quotation marks

omitted).

That principle applies with even more force here, where EPA already issued a

Proposed Determination because it "ha[d] reason to believe . . . that an 'unacceptable

adverse effect' could result" from mining the Pebble deposit. 40 C.F.R. § 231.3(a)(2). As

its regulations require, EPA explained its reasoning in a public notice and received public

comments. *Id.* § 231.4(a). Once EPA found that mining the Pebble deposit could have

unacceptable adverse effects, it could not withdraw the Proposed Determination without

Pls.' Joint Opening Br.                                                          Page 28
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

considering the sole factor specified in Section 404(c), repeated throughout its regulations, that formed the basis for the Proposed Determination in the first place.[4] *Cf. Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 771 (D.C. Cir. 1992) (although EPA had discretion to make initial "determination" of non-compliance and change that finding in response to a hearing, EPA could not add "third point of discretion" and "decide to do nothing" after making initial determination).

Further, EPA did not merely overlook an important aspect of the problem — it ignored its own analysis of that problem. The Withdrawal Decision is in stark contrast to EPA's extensive scientific analysis and statements about unacceptable adverse effects — the Watershed Assessment, the Proposed Determination itself, the 2018 Decision Not to Withdraw, former Administrator Pruitt's statements, and EPA's July 1, 2019, Comments to the Corps, as well as the extensive public comments regarding unacceptable adverse effects. *See, e.g.*, AR 193684–705, AR 200255–61; AR 193224–25; AR 200462; AR 195120-22. The Withdrawal Decision fails to mention that a mere 28 days prior, EPA analyzed the proposed Pebble Mine's impacts under a "standard . . . similar to the Section

---

[4] EPA's Withdrawal Decision also contrasts from EPA's published notice to withdraw a proposed determination for another project, where EPA did consider scientific and technical assessments regarding unacceptable adverse effects, concluding "a significant reduction in scope" of the project made it "environmentally acceptable." 56 Fed. Reg. 58,247, 58,247 (Nov. 18, 1991).

404(c) standard" and found that it "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds." AR 195122.

It is arbitrary for EPA to withdraw the Proposed Determination without either identifying substantive information that alters its unacceptable adverse effects analysis or even considering that analysis. EPA cannot engage in reasoned decision-making when it refuses to consider any facts bearing on the sole statutory factor. *See, e.g.*, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) ("[R]ecord facts are the grist of reasoned agency decisionmaking."); *Rancheria v. Jewell*, 776 F.3d 706, 714 (9th Cir. 2015) ("An agency's decision is arbitrary and capricious if it ignores important considerations or relevant evidence on the record."). Absent any reasoned basis for altering its prior conclusions, EPA's Withdrawal Decision is arbitrary.

## II. EPA failed to provide a rational explanation for withdrawing the Proposed Determination.

In addition to ignoring an important aspect of the problem, EPA's rationales for withdrawing the Proposed Determination are arbitrary. EPA gave two reasons for its decision: (1) "new information" generated since EPA published the Proposed Determination, and (2) EPA's preference for attempting to resolve its concerns through the Corps' permitting process prior to taking any action under Section 404(c). AR 193401-02. Neither supports EPA's reversal of its 2018 Decision Not to Withdraw "pending further consideration by the Agency of information that is relevant to the

protection of the world-class fisheries contained in the Bristol Bay watershed." AR
193222; *see Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th
Cir. 2015) (noting that an agency's change in position complies with the APA if, among
other things, the agency "provides 'good reasons' for the new policy" (quoting *FCC v.
Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))); *see also Standing Rock Sioux
Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141–42 (D.D.C. 2017)
(applying *Fox* to Corps' reversal of decision not to issue easement without more
information).

EPA can — and must — incorporate the Corps' record into its decision-making,
and can advise the Corps on the permitting process, without withdrawing the Proposed
Determination. As EPA recognized in 2018, the deadlines in the Section 404(c) process
are flexible and there is no reason for EPA to withdraw the Proposed Determination now
and force itself to start its process all over again if PLP's permit application does not
clear EPA's "high bar." AR 200462. EPA did not explain how the Proposed
Determination prevents it from incorporating new information into its record, or prevent
it from consulting with the Corps, and thus its stated rationales do not support its
decision. As a result, EPA failed to provide a "rational connection between the facts
found and the choice made." *State Farm*, 463 U.S. at 41–42 (internal quotation marks
omitted).

**A.** **EPA's decision to withdraw the Proposed Determination based on the availability of new information is arbitrary.**

EPA withdrew the Proposed Determination purportedly "because there is new information that has been generated . . . that EPA will need to consider before any potential future decision-making regarding this matter." AR 193402. But that is not a valid reason. It is a well-established principle of administrative law that an agency may incorporate new information into its record, and EPA's Section 404(c) process is no different. In fact, EPA's regulations require it to (1) seek out new information throughout the regulatory process, and (2) make a decision based on all available information. Because EPA updates its analysis as it moves through the 404(c) process, the existence of new information does not support the Withdrawal Decision.

It is nonsensical for EPA to claim it must withdraw its Proposed Determination to consider new information when the agency designed a process to collect that information. For example, prior to issuing a proposed determination, EPA gives the Corps and a number of other interested parties the opportunity to demonstrate that no unacceptable adverse effects will occur. 40 C.F.R. § 231.3(a)(2). EPA then solicits public comments on a proposed determination, which EPA considers when preparing a recommended determination. *Id.* § 231.4. EPA considers those comments, along with any information gained through public hearings, from the Corps, or any other source to inform its decision of whether to prepare a recommended determination. *Id.* §§ 231.4, 231.5(e). Prior to

making a final determination, EPA gives the Corps and other interested parties another opportunity to demonstrate their intent to take corrective action to prevent an unacceptable adverse effect. *Id.* § 231.6. In short, the Section 404(c) process "provides multiple opportunities to engage with the public and involved parties." AR 195111. It is nonsensical for EPA to claim it must withdraw its Proposed Determination to consider new information when the agency designed a process to collect that information.

Moreover, EPA's regulations *require* it to base its final decision on "all information available" — not just the Proposed Determination. 40 C.F.R. § 231.1(a). Specifically, EPA's record must include any permit application and associated permitting record compiled by the Corps — the new information EPA identifies as requiring withdrawal of the Proposed Determination. 40 C.F.R. § 231.5(e)(4); AR 193402. Indeed, EPA acknowledged in its 2018 Decision Not to Withdraw that it can "consider [the Corps'] factual record after it has been further developed before Region 10 determines whether to forward a signed Recommended Determination to EPA Headquarters," AR 192334; *see also* AR 202238 (stating EPA would "consider any relevant information that becomes available to inform future Section 404(c) decisions"), and has previously left a proposed determination in place awaiting additional information, AR 193223 (citing 54 Fed. Reg. 30,599 (July 21, 1989)). Because there is no scenario in which EPA would finalize its restrictions without considering the Corps' record, this rationale does not support withdrawing the Proposed Determination.

Pls.' Joint Opening Br.                                                    Page 33
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

EPA's view that it must withdraw the Proposed Determination and start the Section 404(c) process from scratch also runs counter to the principle that agencies have inherent authority to consider new information during the regulatory process. AR 193402. An agency may consider new information received before, during, and even after a public comment period. *See*, *e.g.*, *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) ("After publishing a proposed rule, agencies often receive new information, which in turn improves the accuracy of agency action."); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995) (agency may continue to add certain supplementary data to its record even after the comment period closes). Based on this well-established principle, other courts have held that a purported need to incorporate new information was not a valid reason to withdraw a proposed regulation. *See Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) ("If the agency regarded the information in its record as out-of-date, then it might more reasonably have chosen to supplement the record rather than terminate the docket." (alterations omitted) (quoting *Williams Nat. Gas Co. v. FERC*, 872 F.2d 438, 449 (D.C. Cir. 1989))). EPA's rationale here is no different and should be set aside.

**B. EPA's decision to withdraw the Proposed Determination because of other opportunities to comment on potential impacts is arbitrary.**

EPA's second asserted basis for the withdrawal — "the availability of processes for EPA to address record issues" with the Corps — is similarly arbitrary, because EPA

does not need to withdraw the Proposed Determination to engage in those processes. AR 193398; *see also* 193403–04. There is no basis for EPA's assertion that the "appropriate sequencing" is to allow the Corps "to resolve technical issues during [its] permitting process" prior to any exercise of EPA's Section 404(c) authority. AR 193403. In fact, EPA has fully participated in the Corps' permitting process with the Proposed Determination in place, and EPA previously extended its regulatory deadlines to allow it to work with the Corps while retaining the ability to use its existing Section 404(c) process. This reason does not justify EPA's decision to withdraw the Proposed Determination.

Both EPA's and the Corps' regulations envision concurrent permitting and Section 404(c) processes. 40 C.F.R. § 231.3(a)(2) (if EPA undertakes a 404(c) process "with respect to a particular disposal site for which a permit application is pending but for which no permit has been issued, the [Corps] . . . shall not issue the permit" until the 404(c) process concludes); 33 C.F.R § 323.6(b) ("[T]he Corps will continue to complete the administrative processing of the application while the section 404(c) procedures are underway" but "will not issue a permit" until the Section 404(c) process concludes). Those regulations do not require EPA to halt its Section 404(c) process if the Corps receives a permit application or restrict EPA from exercising its Section 404(c) authority until after the Corps issues a permit. 40 C.F.R. § 231.1(a)–(c); 33 C.F.R. § 323.6(b). Instead, as EPA explained when adopting its regulations, "section 404(c) authority may

be exercised before a permit is applied for, while an application is pending, or after a permit has been issued." AR 196526. EPA's "section 404(c) authority should not be confused" with the agency's "right to comment on and object to permit applications." *Id*.

EPA may also fully participate in any Corps' permitting process regardless of whether there is a concurrent Section 404(c) process pending, as EPA has done here. In its Withdrawal Decision, EPA pointed to three opportunities to resolve its concerns: (1) as a cooperating agency in the preparation of the Corps' EIS, (2) by commenting on the Corp's analysis of PLP's application under the Section 404(b)(1) Guidelines, and (3) by consulting with the Corps pursuant to the 404(q) Memorandum between the agencies. AR 193403–04. But the Proposed Determination was in place when EPA began participating as a cooperating agency in the Corps' EIS process. AR 193403. It was in place when EPA submitted comments on the Corps' DEIS and the wetland fill permit application. *Id*. And the Proposed Determination was in place when EPA began consulting with the Corps pursuant to their Section 404(q) Memorandum. *Id*. Indeed, EPA stated in an April 2018 letter to Congress that PLP's permit application submission "was a factor in" its decision *not* to withdraw the Proposed Determination. AR 202238. Furthermore, EPA acknowledged that "the factual record regarding the permit application can develop notwithstanding the Proposed Determination," and that the agency could still "consider that factual record after it has been further developed" before deciding whether to issue a final determination. AR 193224. EPA's own actions and previous statements

demonstrate that the Proposed Determination does not hinder its participation in the Corps' permitting process.

EPA did not claim — because it could not — that the Proposed Determination *prevented* it from working with the Corps. Instead, EPA tried to justify the Withdrawal Decision by arguing that it could not wait for the Corps' process to finish due to its regulatory deadlines to withdraw or issue a recommended determination. AR 193401. But EPA has discretion to extend its deadlines, *see* 40 C.F.R. § 231.8 (EPA "may, upon a showing of good cause, extend the time requirements in these regulations."), and EPA's 2018 Decision Not to Withdraw already found "good cause" to do so to allow the Corps' permitting process to fully develop and run its full course through completion of the FEIS, *see* AR 193225 (finding good cause "to extend the regulatory time frames . . . to allow for an additional public comment period and to align with the timeframes established in the settlement agreement," which prevents EPA from moving forward in the Section 404(c) process until May 11, 2021 or public notice of a final EIS by the Corps). As EPA acknowledged in 2018, this decision was not unprecedented. *See* AR 193223 (acknowledging another circumstance where EPA found good cause to extend its deadlines "pending completion and review of additional information and analysis by the project proponent"); *see also* 54 Fed. Reg. at 30,599 (extending deadlines so EPA could "fully consider the findings of the [permitting agency's] study prior to taking any further action"). EPA now illogically asserts that it cannot allow the Corps'

process to run its course without withdrawing the Proposed Determination because the "good cause" extension does not contemplate "long-term gaps . . . that could result in decision-making without the full record." AR 193402. But, EPA cites nothing that supports this reading of the "good cause" exception and it is inconsistent with EPA's past actions on Pebble Mine. In any event, as explained above, there is no circumstance that could prevent EPA from considering the full record, no matter how long the gap. *See supra* pp. 31–34.

As EPA recognized in 2018, keeping the Proposed Determination in place "allow[ed] EPA to get the information needed to determine what specific impacts the proposed mining project w[ould] have on [Bristol Bay's] critical resources." AR 200462. Although EPA did not commit to a specific outcome, *see* AR 193224, it acknowledged that it had "serious concerns" and PLP's permit application "must clear a high bar," AR 200462; *accord* AR 202152 (February 2018 letter to Senators). This precautionary approach — working with the Corps while still providing Bristol Bay with the "utmost protection" — is compatible with EPA's regulations and its role as the final arbiter under

Section 404(c).[5] AR 200462. "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). But given there is no reason the Proposed Determination cannot stay in place pending the Corps' process, "[w]hat was provided here [by EPA] was more of a distraction." *Id*. at 2576.

## III.    The Court should vacate the Withdrawal.

The Court should issue a final judgment declaring EPA's Withdrawal Decision arbitrary and vacating it. The APA provides that the reviewing court "shall . . . set aside" arbitrary agency action. 5 U.S.C. § 706(2)(A). Therefore, "vacatur of an unlawful agency action normally accompanies a remand." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (emphasis omitted). A defendant seeking otherwise must "overcome the presumption of vacatur." *Id.* at 1122 (emphasis omitted). Courts will "order remand without vacatur only in limited circumstances" and "leave an invalid rule in place only 'when equity demands.'" *Pollinator Stewardship Council v. EPA*, 806 F.3d

---

[5] In its Motion to Dismiss, EPA suggests that it based the Withdrawal Decision on resource constraints, Doc. 36 at 42–44, but that is a post-hoc rationalization. The Withdrawal Decision never explains how the Proposed Determination diverted resources away from EPA's efforts to consult with the Corps, nor are there any internal EPA documents in the record identifying this as a concern. *See Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision.").

Pls.' Joint Opening Br.                                                        Page 39
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

520, 532 (9th Cir. 2015) (quotation marks and citations omitted); *see also Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (stating remand without vacatur is granted only "in rare circumstances"). Courts weigh "the seriousness of the agency's errors against the disruptive consequences of" vacating the decision. *Pollinator*, 806 F.3d at 532 (quotation marks and citation omitted). The Ninth Circuit has found the rare circumstances justifying remand without vacatur only in unusual cases such as where vacatur would trigger disastrous large-scale consequences or thwart the objective of the statute at issue. *See, e.g.*, *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993–94 (9th Cir. 2012) (denying vacatur where remedy would trigger economically disastrous blackouts across California's south coast basin); *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) (denying vacatur where the remedy would frustrate the aims of the Clean Air Act, under which plaintiffs sued).

Here, there are no circumstances justifying remand without vacatur. EPA's errors are serious, because they are the very basis for its Withdrawal Decision. Far from causing disruption, vacatur would facilitate an orderly process. The effect of vacating the withdrawal would be to reinstate the Proposed Determination. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). This would prevent the Corps from issuing a permit for the proposed Pebble Mine until EPA makes a non-arbitrary decision either to adopt final restrictions or to properly withdraw the Proposed Determination. 33 C.F.R.

§ 323.6(b). Reinstating the Proposed Determination will ensure that the Corps would issue a permit only after EPA has lawfully completed its Section 404(c) process, and only if the agencies meaningfully address the serious concerns previously identified by EPA regarding unacceptable adverse effects. Remanding the Withdrawal Decision without vacatur would be substantially more disruptive. It would allow the Corps to issue a permit that EPA may then have to override pursuant to the Section 404(c) process based on the same considerations that prompted the Proposed Determination in the first place. In so doing, it would require EPA and all interested parties to invest significant additional and unnecessary time and resources.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should hold EPA's Withdrawal Decision arbitrary and vacate it.

Respectfully submitted this 31st day of January, 2020.

*s/ Jeffrey M. Feldman*
Jeffrey M. Feldman (AK Bar No. 7605029)
SUMMIT LAW GROUP PLLC

Ralph H. Palumbo (*Pro Hac Vice*)
Lynn M. Engel (*Pro Hac Vice*)
YARMUTH LLP

*Attorneys for Bristol Bay Economic Development Corporation, Bristol Bay Native Association, Inc., and Bristol Bay Reserve Association*

Pls.' Joint Opening Br.                       Page 41
*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

*s/ Megan R. Condon*
Megan R. Condon (AK Bar No. 1810096)
Matthew N. Newman (AK Bar No. 1305023)
NATIVE AMERICAN RIGHTS FUND

*Attorneys for United Tribes of Bristol Bay*

*s/ Scott Kendall*
Scott Kendall (AK Bar No. 0405019)
HOLMES, WEDDLE & BARCOTT

*Attorney for Bristol Bay Regional Seafood Development Association, Inc.*

*s/ Brian Litmans*
Brian Litmans (AK Bar No. 0111068)
Katherine Strong (AK Bar No. 1105033)
TRUSTEES FOR ALASKA

*Attorneys for SalmonState, Alaska Center, Alaska Community Action on Toxics, Alaska Wilderness League, Cook Inletkeeper, Defenders of Wildlife, Friends of McNeil River, McNeil River Alliance, National Parks Conservation Association, National Wildlife Federation, Sierra Club, and Wild Salmon Center*

*s/ Jacqueline M. Iwata*
Jacqueline M. Iwata (*Pro Hac Vice*)
Thomas D. Zimpleman (*Pro Hac Vice*)
Joel R. Reynolds (*Pro Hac Vice*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Natural Resources Defense Council*

*s/ Erin Whalen*

Erin Whalen (AK Bar No. 1508067)
Thomas S. Waldo (AK Bar No. 9007047)
EARTHJUSTICE

*Attorneys for Earthworks*

*s/ Austin Williams*

Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED

Paul A. Werner (*Pro Hac Vice*)
Steven P. Hollman (*Pro Hac Vice*)
Abraham J. Shanedling (*Pro Hac Vice*)
Rachelle P. Bishop (*Pro Hac Vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*Attorneys for Trout Unlimited*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I certify that this brief contains 9,988 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limit of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 31st day of January, 2020.

*s/ Erin Whalen*
Erin Whalen

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Norman Van Vactor |
| 2 | Declaration of Ralph Andersen |
| 3 | Declaration of Alannah Hurley |
| 4 | Declaration of Andrew Wink |
| 5 | Declaration of Robert Kehoe |
| 6 | Declaration of Timothy Bristol |
| 7 | Declaration of Lindsey Bloom |
| 8 | Declaration of Louis Flora |
| 9 | Declaration of James Frederick Stratton |
| 10 | Declaration of Pamela K. Miller |
| 11 | Declaration of Patti J. Saunders |
| 12 | Declaration of Patrick James Pourchot |
| 13 | Declaration of Robert Shavelson |
| 14 | Declaration of Nicole Whittington-Evans |
| 15 | Declaration of Bonnie Gestring |
| 16 | Declaration of Everett Leroy Thompson |
| 17 | Declaration of Drew Heaton Hamilton |
| 18 | Declaration of Wayne Hall |
| 19 | Declaration of James Whitten Adams |

*Bristol Bay Economic Development Corp. v. Hladick*,
Case No. 3:19-cv-00265-SLG

i

20      Declaration of Walter Richardson

21      Declaration of Anders Per Wold Gustafson

22      Declaration of Gina Trujillo

23      Declaration of Maureen Knutsen

24      Declaration of Konrad Schaad

25      Declaration of Robert Standish

26      Declaration of Christine Hill

27      Declaration of Todd Radenbaugh

28      Declaration of Emily Anderson

29      Declaration of Nelli Williams

30      Declaration of John Holman

31      Declaration of Brian Kraft

32      Declaration of Nanci Morris Lyon

33      Declaration of Jessie Ritter

*Bristol Bay Economic Development Corp. v. Hladick*,                                    ii
Case No. 3:19-cv-00265-SLG