BRYAN SCHRODER
United States Attorney
District of Alaska

MARK A. NITCZYNSKI
U.S. Department of Justice – ENRD
Environmental Defense Section
999 18th Street; South Terrace; Suite 370
Denver, CO 80202
Phone: (303) 844-1498; Fax: (303) 844-1350
Email: mark.nitczynski@usdoj.gov

BRIAN UHOLIK
Environment and Natural Resources Division
4 Constitution Square
150 M Street, N.E.
EDS/4th Floor
Washington, D.C. 20002
Phone: (202) 305-0733; Fax: (202) 514-8865
Email: brian.uholik@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA
## AT ANCHORAGE

| | |
|---|---|
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION, *et al.,*<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CHRIS HLADICK, U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.,*<br><br>　　　　Defendants. | CASE NO. 3:19-CV-00265-SLG |
| SALMONSTATE, *et al.,*<br><br>　　　　Plaintiffs,<br><br>　　v. | CASE NO. 3:19-CV-00267-SLG |

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED)

| CHRIS HLADICK, U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| :--- | :--- |
| Defendants. | |
| TROUT UNLIMITED, | CASE NO. 3:19-CV-00268-SLG |
| Plaintiffs, | |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' JOINT OPENING BRIEF

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    I.       STATUTORY AND REGULATORY BACKGROUND ......................................... 2

           A.      Section 404 of the Clean Water Act ................................................. 2

           B.      EPA's regulations implementing section 404(c) ................................ 4

                   1.      Proposed Determination ....................................................... 5

                   2.      Withdrawing a Proposed Determination
                            or Making a Recommended Determination ............................ 6

                   3.      Final Determination ............................................................. 6

           C.      The 404(q) Memorandum ................................................................ 7

    II.      FACTUAL BACKGROUND ............................................................................... 8

STANDARD OF REVIEW ........................................................................................ 14

ARGUMENT ............................................................................................................. 16

    I.       PLAINTIFFS' CLAIMS SHOULD BE DISMISSED ......................................... 16

    II.      EPA WAS NOT REQUIRED TO ASSESS "UNACCPETABLE ADVERSE
             EFFECT" WHEN IT WITHDREW THE PROPOSED DETERMINATION .... 16

           A.      The Withdrawal Decision Was a
                    Discretionary Decision Not to Enforce ............................................ 17

           B.      Section 404(c) Provides Broad Discretion and Does Not
                    Require EPA to Address "Unacceptable Adverse Effects" Here ................. 18

           C.      EPA's Regulations Preserve EPA's Discretion and Do
                    Not Require it to Consider "Unacceptable Adverse Effect" ..................... 20

           D.      Plaintiffs Improperly Continue to Rely on Mattaponi ...................... 22

III.    EPA'S DECISION WAS REASONABLE AND SHOULD BE UPHELD ............24

A.    Plaintiffs Mischaracterize EPA's Decision
and the Question For Review ............................................................24

B.    The Withdrawal Decision Should Be Upheld.......................................25

1.    The 2014 Proposed Determination Was Outdated and
Superseded.............................................................................25

2.    New Information Became Available .......................................26

3.    New Opportunities to Address EPA's Concerns Became
Available ................................................................................28

4.    EPA Was Taking Advantage of New Opportunities to Express
Concerns................................................................................28

5.    The "Normal" Inter-Agency Processes May Resolve EPA's
Concerns................................................................................30

6.    EPA Retained Its Legal Authorities Under Sections 404(q) and
404(c)....................................................................................32

7.    The Case Law Supports Upholding EPA's Decision .........................33

IV.    THE WITHDRAWAL DECISION SHOULD NOT BE VACATED....................35

CONCLUSION........................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*All. to Save the Mattaponi v. U.S. Army Corps of Eng'rs,*
   515 F. Supp. 2d 1 (D.D.C. 2007) ........................................................................ 19, 23

*Cal. Cmtys. Against Toxics v. EPA,*
   688 F.3d 989 (9th Cir. 2012) ...................................................................................... 35

*Cascade Conservation League v. M.A. Segale, Inc.,*
   921 F. Supp. 692 (W.D. Wash. 1996) ................................................................. 17, 19

*City and Cty. of San Francisco v. U.S. Dept' of Transp.,*
   796 F.3d 993 (9th Cir. 2015) .......................................................... 17, 18, 19, 32

*City of Olmstead Falls v. EPA,*
   266 F. Supp. 2d 718 (N.D. Ohio 2003) .............................................................. 19, 20

*City of Santa Clara Cal. v. Andrus,*
   572 F.2d 660 (9th Cir. 1978) ............................................................................... 20, 22

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council,*
   557 U.S. 261 (2009) .................................................................................................... 23

*Consumer Fed'n of America v. Consumer Prod. Safety Comm'n,*
   990 F.2d 1298 (D.C. Cir. 1993) ......................................................................... 33, 34

*Defs. Of Wildlife v. Gutierrez,*
   532 F. 3d 913 (D.C. Cir. 2008) .................................................................................. 15

*E.J. Friedman Co., Inc. v. United States,*
   6 F.3d 1355 (9th Cir. 1993) ................................................................................ 14, 18

*Envtl. Integrity Project v. McCarthy,*
   139 F. Supp. 3d 25 (D.D.C. 2015) ..................................................................... 15, 34

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .................................................................................................... 14

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ..................................................................................................18

*In re Barr Labs., Inc.,*
    930 F.2d 72 (D.C. Cir. 1991) ....................................................................................32

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ............................................................................ 14, 33

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ...............................................................................................15

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ..................................................................................................32

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ............................................................................................ 15, 35

*Menominee Indian Tribe of Wis. v. EPA,*
    *947* F.3d 1065 (7th Cir. 2020) .................................................................... 18, 20, 22

*Mingo Logan Coal Co. v. EPA,*
    714 F.3d 608 (D.C. Cir. 2013)............................................................................. 4, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................................15

*Newport Galleria Grp. v. Deland,*
    618 F. Supp. 1179 (D.D.C. 1985)..............................................................................19

*Pebble Ltd. P'ship v. EPA,*
    155 F. Supp. 3d 1000 (D. Alaska 2014) .....................................................................9

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,*
    915 F. Supp. 378 (N.D. Ga. 1995), *aff'd* 87 F. 3d 1242 (11th Cir. 1996) .................... 18, 19

*Webster v. Doe,*
    486 U.S. 592 (1988) ........................................................................................... 18, 19

*WildEarth Guardians v. EPA,*
    751 F.3d 649 (D.C. Cir. 2014)......................................................................15, 34, 35

*Wildlife v. Gutierrez,*
    532 F.3d 913 (D.C. Cir. 2008)......................................................................................17

*Wild Wildeerness v. Allen,*
    871 F.3d 719 (9th Cir. 2017)......................................................................................14

*Williams Nat. Gas Co. v. FERC,*
    872 F.2d 438 (D.C. Cir. 1989)....................................................................................33

**Statutes**

5 U.S.C. § 701(a)(2)........................................................................................................1

33 U.S.C. § 1251(a)(2)....................................................................................................2

33 U.S.C. § 1311(a)........................................................................................................2

33 U.S.C. § 1344(a)........................................................................................................3

33 U.S.C. § 1344(b)........................................................................................................3

33 U.S.C. § 1344(b)(1)....................................................................................................3

33 U.S.C. § 1344(c)..................................................................................................passim

33 U.S.C. § 1344(e)........................................................................................................3

33 U.S.C. § 1344(f)(1)(A)..............................................................................................17

33 U.S.C. § 1344(h)........................................................................................................3

33 U.S.C. § 1344(h)(1)(A)(i)..........................................................................................3

33 U.S.C. § 1344(j)........................................................................................................18

33 U.S.C. § 1344(q)........................................................................................................3

33 U.S.C. § 1362(6)........................................................................................................2

**Code of Federal Regulations**

33 C.F.R. § 323.2(c) ................................................................................................3

33 C.F.R. § 323.2(e)(1) ...........................................................................................3

33 C.F.R. § 323.6(b) ...............................................................................................5

40 C.F.R § 1.5(a) ....................................................................................................4

40 C.F.R. pt. 230 .....................................................................................................3

40 C.F.R. § 230.10(c) ............................................................................................31

40 C.F.R. pt. 230 subpt. H ....................................................................................12

40 C.F.R. pt. 230 subpt. J .....................................................................................12

40 C.F.R. pt. 231 ....................................................................................................4

40 C.F.R. § 231.1 ..................................................................................................20

40 C.F.R. § 231.1(a) ..............................................................................................27

40 C.F.R. § 231.2(e) ..........................................................................................5, 31

40 C.F.R. §§ 231.3- 231.6 .....................................................................................25

40 C.F.R. § 231.3 .............................................................................................12, 27

40 C.F.R. § 231.3(a) ...........................................................................5, 20, 21, 23, 30

40 C.F.R. § 231.3(a)(1) .....................................................................................5, 31

40 C.F.R. § 231.3(a)(2) .................................................................................5, 12, 20

40 C.F.R. § 231.4 .............................................................................................21, 27

40 C.F.R. § 231.4(a) ................................................................................ 6, 12

40 C.F.R. § 231.4(b)-(g) ................................................................................6

40 C.F.R. § 231.5 ................................................................................ 5, 6

40 C.F.R. § 231.5(a) ................................................................................ 6, 21

40 C.F.R. § 231.5(b) ................................................................................6

40 C.F.R. § 231.5(c) ................................................................................ 6, 14, 21

40 C.F.R. § 231.5(c)(1) ................................................................................6

40 C.F.R. § 231.6 ................................................................................ 7, 12, 22, 27, 31

40 C.F.R. § 231.8 ................................................................................ 5, 25

40 C.F.R. § 232.2 ................................................................................3

**Federal Register Notices**

44 Fed. Reg. 58,076 (Oct. 9, 1979) ................................................................................passim

82 Fed. Reg. 33,123 (July 19, 2017) ................................................................................9

83 Fed. Reg. 8,668 (Feb. 28, 2018) ................................................................................10

84 Fed. Reg. 45,749 (Aug. 30, 2019) ................................................................................passim

**Legislative Materials**

Sen. Rep. No. 116-123 (2019) ................................................................................17

## INTRODUCTION

As we established in our Motion to Dismiss briefs, ECF 36, 42, these cases should be dismissed because they challenge a United States Environmental Protection Agency ("EPA") decision that is "committed to agency discretion by law" under the Administrative Procedure Act. *See* 5 U.S.C. § 701(a)(2). But even assuming, *arguendo*, that this Court concludes that it has jurisdiction here, it should uphold the reasonable decision of the EPA Regional Administrator ("RA") under Clean Water Act ("CWA" or "Act") section 404(c) to withdraw the 2014 Proposed Determination regarding the Pebble deposit in southwestern Alaska.

In support of the withdrawal decision, EPA provided a detailed explanation that addressed the numerous, relevant factors it considered. For example, EPA explained that the 2014 Proposed Determination had been superseded by the permit application that Pebble Limited Partnership ("PLP") submitted; additional review processes for the vast amount of new information being generated had become available to EPA; and withdrawing the Proposed Determination returned EPA and the United States Army Corps of Engineers ("Corps")—the sole permitting authority under CWA section 404 here—to the more "normal" processes under CWA section 404. EPA provided a rational explanation for the withdrawal decision, which was reasonable under the unique circumstances here.

This Court should reject Plaintiffs' argument that the RA was required to base his discretionary enforcement decision on whether the proposed Pebble project will have an "unacceptable adverse effect." If judicial review is permitted, the courts address numerous factors in conducting their especially deferential review. In addition, consistent with the arguments we made in support of our Motion to Dismiss, neither the CWA nor EPA's

regulations specify a standard for the RA's discretionary withdrawal decision. Both the statute and regulations provide that the statutory standard—that the unacceptable adverse effect *will* result from the proposed discharge—applies only at a later stage in the process, if the EPA Administrator makes a final determination that limits or prohibits discharges.

Finally, this Court should not vacate the withdrawal decision even if this Court determines that the decision was not reasonable despite the deference accorded to EPA here. The decision placed both the Corps and EPA in their more customary positions for reviewing the pending permit application, with EPA's section 404(c) authority intact, and leaving the RA's withdrawal decision in place would preserve that orderly process.[1]

## **BACKGROUND**

### I. STATUTORY AND REGULATORY BACKGROUND

#### A.  *Section 404 of the Clean Water Act*

The Clean Water Act of 1972 sets out several goals, including attainment and preservation of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife . . . ." 33 U.S.C. § 1251(a)(2). To further its goals, the Act prohibits "discharge of any pollutant" into navigable waters except in accordance with the Act's terms. *Id.* § 1311(a). The term "pollutant" includes materials such as rock and sand. *Id.* § 1362(6).

The Act creates two types of permits that authorize discharges of pollutants, one of which is relevant here. Section 404 enables the Corps and approved States to issue permits

---

[1]  Plaintiffs' Joint Opening Brief ("Plaintiff's Brief" or "Pls. Br."), ECF 48, included a request for oral argument. Oral argument should not be necessary because this Court should not reach the merits. Assuming, *arguendo*, that this Court addresses the merits, EPA defers to this Court's judgment regarding whether to hold argument.

for discharges of dredged or fill material. 33 U.S.C. § 1344(a), (e), (h). Pollutants are "fill material" when their discharge either replaces any portion of a water of the United States with dry land or changes the bottom elevation of a water body. *See* 33 C.F.R. § 323.2(e)(1); 40 C.F.R. § 232.2. The term "dredged material" means "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c); 40 C.F.R. § 232.2.

Congress established an intricate balance between the Corps and EPA for implementing the section 404 program, including various responsibilities over permitting, rulemaking, enforcement, and project "vetoes." For example, the Corps is the federal entity charged with issuing section 404 permits, 33 U.S.C. § 1344(a), and the Corps issues all section 404 permits in Alaska. The CWA vests EPA with several authorities, including the ability to authorize individual States to issue section 404 permits, 33 U.S.C. § 1344(h), but Alaska has not sought to assume this authority. The Act requires EPA, in conjunction with the Corps, to issue regulations known as "404(b)(1) Guidelines" that govern the evaluation of permit applications. *Id.* § 1344(b)(1), (h)(1)(A)(i); *see* 40 C.F.R. pt. 230. The Act also requires the Corps to enter into an agreement with EPA to coordinate regarding the issuance of section 404 permits. 33 U.S.C. § 1344(q). Accordingly, EPA and the Corps have entered into a memorandum of agreement referred to here as the "404(q) Memorandum." *See* Administrative Record ("AR") Document 12,585.

The Act also provides that the Corps' permitting authority under section 404(a) is subject to EPA's authority under section 404(c). 33 U.S.C. § 1344(b), (c). Section 404(c) authorizes EPA to prohibit the specification of, or deny or restrict the use of, any defined area as a disposal site for dredged or fill material:

> The [EPA] Administrator is *authorized to* prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, *whenever* he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an *unacceptable* adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator *shall* consult with the [Corps]. The Administrator *shall* set forth in writing and make public his findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c) (emphasis added). There is no mention of proposed determinations or withdrawals of proposed determinations in section 404(c). *Id.*

Section 404's division of authority between EPA and the Corps is the result of a Congressional compromise. Congress allowed the Corps to specify disposal sites and issue permits, but it authorized EPA to prohibit, withdraw, deny or restrict use of any defined area for disposal whenever EPA determines that the discharge will have certain unacceptable adverse effects. *See Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 612-14 (D.C. Cir. 2013).

B. *EPA's regulations implementing section 404(c)*

In 1979, EPA promulgated regulations regarding its section 404(c) authority. *See* 40 C.F.R. pt. 231; 44 Fed. Reg. 58,076 (Oct. 9, 1979). The discretionary review process begins with an RA,[2] who "may" initiate certain actions if the RA has "reason to believe," after evaluating the available information, that an "'unacceptable adverse effect' *could result*" from the use of any defined area as a disposal site. 40 C.F.R. § 231.3(a) (emphasis added).[3] The

---

[2] EPA has ten regional offices, designated EPA Region 1 through EPA Region 10. The head of each regional office is the RA. *See* 40 C.F.R § 1.5(a). EPA Region 10 is based in Seattle, and has responsibility for EPA matters in Alaska, Washington, Oregon, and Idaho.

[3] "Unacceptable adverse effect" is defined to mean "impact on an aquatic or wetland ecosystem which is likely to result in *significant degradation* of municipal water supplies

"information available" to the RA customarily would include any record developed during coordination between EPA and the Corps as described in the 404(q) Memorandum. 84 Fed. Reg. 45,749, 45,752 (Aug. 30, 2019). Once the RA initiates the process, the Corps may not issue the permit until EPA takes final action—a time period that the regulations envision as lasting only for several months. 40 C.F.R. § 231.3(a)(2); 33 C.F.R. § 323.6(b). However, the Corps will continue to process a permit application during the process. 33 C.F.R. § 323.6(b).

       1. <u>Proposed Determination</u>

The first step in the discretionary process is that the RA notifies the Corps' District Engineer, the site owner, and the permit applicant, if any, that the RA intends to issue notice of a proposed determination. 40 C.F.R. § 231.3(a)(1). Then, there is a 15-day period in which the owner or applicant may seek to demonstrate, to the "satisfaction" of the RA, that no unacceptable adverse effects will occur. *Id.* § 231.3(a)(2).[4] If the demonstration is not made, and the Corps does not notify the RA that the Corps will take corrective action that is "satisfactory," the RA publishes notice of a proposed determination. *Id.*[5] A "proposed determination does *not* represent a judgment that discharge of dredged or fill material *will* result in unacceptable adverse effects; it merely means that the [RA] believes that the issue should be explored." 44 Fed. Reg. 58,082 (emphasis added). After publication, interested

---

[4] The Administrator or RA may extend such time periods for good cause. *Id.* § 231.8.

[5] The Corps may provide information relating to potential "unacceptable adverse effect(s)" before the RA issues a proposed determination, 40 C.F.R. § 231.3(a), but no "unacceptable adverse effect" standard applies to the RA's subsequent withdrawal of a proposed determination. 40 C.F.R. § 231.5; 44 Fed. Reg. at 58080; *see* 33 U.S.C. § 1344(c).

persons may submit comments during a 30- to 60-day period. 40 C.F.R. § 231.4(a). Under

certain circumstances, the RA convenes a public hearing. *Id.* § 231.4(b)-(g).

### 2. Withdrawing a Proposed Determination or Making a Recommended Determination

Within 30 days after the conclusion of the public hearing or, if no hearing is held,

within 15 days after the conclusion of the public comment period, the RA must "either

withdraw the proposed determination or prepare a recommended determination to prohibit

or withdraw specification, or to deny, restrict, or withdraw the use or specification, of the

disposal site because the discharge of dredged or fill material at such site *would be likely* to

have an unacceptable adverse effect." *Id.* § 231.5(a) (emphasis added). The regulations

provide a process—but not a standard—for a decision to withdraw a proposed

determination. *See* 40 C.F.R. § 231.5. If the RA decides to withdraw, the RA must

"promptly" notify the Administrator of the RA's intent to do so. *Id.* § 231.5(c). The

Administrator then has 10 days to notify the RA of his intent to review. *Id.* § 231.5(c). If

the Administrator decides against review, the RA publishes notice of the withdrawal, which

constitutes "final agency action." *Id.* § 231.5(c)(1). The regulations do not require the RA to

provide an explanation for the withdrawal or specify any reasons for it. *See id.* § 231.5(c). If

the RA instead prepares a recommended determination, it must be "promptly" forwarded

along with the administrative record to the Administrator. *Id.* § 231.5(b).

### 3. Final Determination

After reviewing the RA's recommendation, EPA Headquarters must consult with the

Corps' Chief of Engineers, the owner, and the permit applicant, if any, who have 15 days to

notify EPA Headquarters of their intent to take corrective action to prevent the "likely"

unacceptable adverse effects. *Id.* § 231.6. EPA must then make a final decision affirming, modifying, or rescinding the recommended determination, and publish notice of the decision. *Id.* That final determination constitutes "final agency action" for purposes of judicial review. *Id.* If—and only if—EPA decides to prohibit or restrict discharges in a final determination, that action would include the determination that the discharge "*will* have an unacceptable adverse effect." 33 U.S.C. § 1344(c) (emphasis added).

C. *The 404(q) Memorandum*

Consistent with Congress's intricate division of section 404 authority, the 404(q) Memorandum affirms that the Corps is the sole federal entity responsible for making final section 404 permit decisions and that EPA retains its authority under section 404(c). AR 193462-63, 193470-71. The 404(q) Memorandum also establishes policies and procedures that "provide and encourage communication and full consideration of [the] agencies' views concerning proposed projects . . . ." *Id.* at 193464. The Corps is to serve as the "project manager" for the evaluation of permit applications, but "[i]t is recognized that the EPA has an important role in the [Corps'] Regulatory Program under the Clean Water Act, [the National Environmental Policy Act ("NEPA")], and other relevant statutes." *Id.* at 193463.

EPA is to provide "substantive, project-related information (within EPA's area of expertise and authority) on the impacts of activities being evaluated by the Corps," along with expert information on "appropriate and practicable measures to mitigate adverse impacts." *Id.* "Pursuant to [EPA's] authority under Section 404(b)(1)," EPA also may provide its "views regarding compliance with the section 404(b)(1) Guidelines." *Id.* The Corps, in turn, is to "fully consider EPA's comments when determining compliance with

[NEPA], the section 404(b)(1) Guidelines, and other relevant statutes, regulations and policies." Specifically, the Corps will "fully consider the EPA's views when determining whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit." *Id.* The 404(q) Memorandum also sets forth procedures for elevating policy issues and individual permit decisions within the agencies. *Id.* at 193466-71.

## II.    FACTUAL BACKGROUND

The Pebble deposit contains copper, gold and molybdenum, and is located in the Bristol Bay region, approximately 200 miles southwest of Anchorage. *See* Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska, 84 Fed. Reg. 45,749. The Bristol Bay watershed includes large salmon fisheries, including the largest sockeye salmon fishery in the world, which support significant commercial, sport, and subsistence fishing activities. *See id.*

In 2011, EPA began an assessment to understand how large-scale mining could affect the fisheries in the Bristol Bay watershed. *Id.* EPA issued the Bristol Bay Watershed Assessment in January 2014. *Id.* While such an assessment is not required under section 404(c), it was part of the information on which EPA Region 10 relied in 2014, when it initiated its CWA section 404(c) review. *See id.* In July 2014, EPA Region 10 "preemptively" (*i.e.*, before a section 404 permit application had been submitted) published its Notice of Proposed Determination to restrict the use of certain waters for use as disposal sites. *Id.* at

45,749-50.  The Proposed Determination addressed hypothetical mining scenarios based on information from various sources.  *Id.* at 45,749, 45,753.[6]

The next step in the 404(c) process typically would have been for Region 10 either to forward a recommended determination to EPA Headquarters or withdraw the Proposed Determination.  *Id.*  However, PLP filed a lawsuit alleging that EPA formed *de facto* advisory committees in violation of the Federal Advisory Committee Act ("FACA").  *Id.  See Pebble Ltd. P'ship v. EPA,* No. 3:14-cv-00171 (D. Alaska).  In November 2014, the court determined that PLP had a fair chance of success on the merits and enjoined the section 404(c) process. 84 Fed. Reg. at 45,750.  In May 2017, EPA and PLP entered into a settlement that resolved the FACA litigation and other matters.  *Id.*  EPA agreed to "initiate a process to propose to withdraw the Proposed Determination," and the court dissolved the injunction and dismissed the action.  *Id.*  EPA also agreed not to move forward with a recommended determination (if any) until May 11, 2021, or until EPA publishes a notice of the Corps' final Environmental Impact Statement ("EIS"), whichever is earlier.  *Id.*

In July 2017, EPA Region 10 proposed to withdraw the Proposed Determination.  *Id.* at 45,750; *see* 82 Fed. Reg. 33,123 (July 19, 2017).  In the notice, Region 10 stated:

> Because the Agency retains the right under the settlement [of the FACA litigation and other matters] to ultimately exercise the full extent of its discretion under section 404(c), including the discretion to act prior to any potential Army Corps authorization of discharge of dredged or fill material associated with mining the Pebble deposit, the Agency believes that withdrawing the Proposed Determination now, while allowing the factual

---

[6]  PLP challenged the initiation of the review process, but this Court dismissed the challenge because there was no final agency action, *Pebble Ltd. Partnership v. EPA*, 155 F. Supp. 3d 1000 (D. Alaska 2014), and the Ninth Circuit affirmed in an unpublished opinion.

record regarding any forthcoming permit application to develop, is
appropriate at this time for this particular matter.

*Id.* at 45,752 (quoting 82 Fed. Reg. 33,124).

In December 2017, PLP submitted its section 404 permit application. *Id.* at 45,750.

In early January 2018, the Corps issued a notice of the permit application and stated that an

EIS for the application would be required under NEPA. *Id.* The Corps invited federal and

state agencies, including EPA, to be cooperating agencies in developing the EIS. *Id.* In late

January 2018, Region 10 issued a notice that announced a "suspension" of the proceeding to

withdraw the Proposed Determination. *Id; see* 83 Fed. Reg. 8,668 (Feb. 28, 2018).

On March 1, 2018, Region 10 accepted the Corps' invitation to serve as a cooperating

agency for development of the EIS. 84 Fed. Reg. at 45,750. EPA participated in meetings,

provided comments on early drafts, and provided "scoping" comments. *Id.* The Corps

released a Preliminary Draft EIS and "Section 404 Public Notice" in February 2019. *Id.*

EPA could not initiate coordination under the 404(q) Memorandum until the Corps

provided that notice of the application for comment. 84 Fed Reg. at 45,755; *see* AR 193465.

On July 1, 2019, EPA submitted lengthy and detailed comments on the Corps' draft EIS and

section 404 public notice. *Id.* EPA also initiated the dispute resolution procedures for

individual permit cases pursuant to the 404(q) Memorandum. *Id.* at 45,755.

In June 2019, the EPA General Counsel, acting by delegated authority for the

Administrator, who has recused himself from Pebble-related matters, directed Region 10 to

"continue deliberating regarding whether to withdraw the 2014 Proposed Determination or,

alternatively, decide to leave the 2014 Proposed Determination in place." *Id.* at 45,750.

EPA Region 10 published notification of its withdrawal of the Proposed Determination in

the Federal Register on August 30, 2019.  *Id.* at 45,749.  In the notice, the Region clarified that it was not basing its decision on technical judgments about whether PLP's mine proposal will comply with the section 404(b)(1) Guidelines or result in "unacceptable adverse effects" under CWA section 404(c).  *Id.* at 45,756.  Instead, EPA emphasized that key circumstances had changed significantly after PLP submitted its permit application and the Corps published notice of it.  For example, the hypothetical mining scenarios in the Proposed Determination had been superseded.  Project-specific information had been, and was continuing to be, developed in connection with the multi-year permitting process.  *Id.* at 45,752-756.  The record had grown significantly and would continue to grow until the Corps issues a final EIS.  *Id.* at 45,753.  In addition, the Corps had made preliminary determinations that, in certain respects, conflicted with EPA's preliminary assessments in the 2014 Proposed Determination.  *Id.*  Furthermore, separate opportunities became available to address EPA's environmental concerns with the Corps.  *Id.* at 45,752-53.

Using the "process opportunities" now available in both the NEPA and CWA contexts, EPA had provided significant technical comments and expressed specific concerns regarding the potential impacts of the project.  *Id.* at 45,754-55.  For example, EPA expressed concerns and exchanged technical information with the Corps "regarding the extent and magnitude of the substantial proposed impacts to streams, wetlands, and other aquatic resources that may result" from the proposed project.  *Id.* at 45,754.

EPA Region 10 explained that the Corps, through well-established processes of analysis and coordination, may resolve issues that EPA raised.  *Id.* at 45,755.  EPA also emphasized that, under its regulations and preamble, where a permit application is pending,

the "normal" process in the *initial* stages of a potential section 404(c) proceeding involve the RA's review of the record developed during EPA's coordination with the Corps through the permit review process. *Id.* at 45,752; *see* 40 C.F.R. § 231.3; 44 Fed. Reg. at 58,080.

Furthermore, the Region emphasized that EPA is to coordinate with the Corps throughout the section 404(c) process to assess whether "corrective action" may be taken to prevent an "unacceptable adverse effect" that otherwise might be addressed in a section 404(c) final determination. 84 Fed. Reg. at 45,755; *see* 40 C.F.R. §§ 231.3(a)(2), 231.4(a), 231.6.[7] This includes consultation with the Corps before the RA publishes a proposed determination and before EPA makes a final determination. 40 C.F.R. §§ 231.3(a)(2), 231.6. The Corps' engagement in EPA's 2014 process was limited because PLP had not yet submitted its permit application, and the Corps is now in a far better position to provide information regarding corrective actions. 84 Fed. Reg. at 45,755.

Accordingly, EPA Region 10 explained in the withdrawal notice that, "at this time, the appropriate sequencing" is to work through the usual permitting process "rather than through a separate 404(c) process initiated in 2014 that does not reflect the full record." 84 Fed. Reg. at 45,754. For these and other reasons, the Region determined:

> [I]t is more appropriate to use well-established mechanisms to raise project-specific issues as the record develops during the permitting

---

[7] As the section 404 permitting authority, the Corps plays a key role in implementing any corrective action measures. 84 Fed. Reg. at 45,752; *see* 44 Fed. Reg. at 58,081. The Corps also plays a central role in ensuring that any discharge of dredged or fill material complies with the section 404(b)(1) Guidelines, which include requirements to, among other things, minimize the adverse effects of the discharge of dredged or fill material, and use compensatory mitigation to offset unavoidable impacts that are authorized by a section 404 permit. *See* 40 C.F.R. pt. 230, Subparts H, J.

process and consider the full record before potential future decision-making on this matter, instead of maintaining a section 404(c) process that is now five years old and does not account for the voluminous information provided in the permitting process.

*Id.* at 45,753.

The Region also explained that EPA did not know when it issued its 2018 suspension how long the NEPA process would take and how it would proceed. *Id.* The status of that process made it clear that the "2014 Proposed Determination does not account for the significant project-specific information that has been developed[.]" *Id.* Thus, even though EPA stated earlier that the factual record could develop notwithstanding the 2014 Proposed Determination, EPA concluded that the Proposed Determination, which "does not account for the full record and does not grapple with [the agencies'] differing conclusions . . . should not serve as a basis" for a section 404(c) decision. *Id.* at 45,755.

EPA explained that its decision would provide "clarity and certainty that EPA Region 10 will be working through the Corps' permitting process, including as a cooperating agency, and the [404(q) Memorandum][8] process for engagement on this matter." *Id.* at 45,756. EPA stated repeatedly that, if its concerns are not adequately resolved, then it may choose to initiate a new 404(c) process based on the full record. *Id.* at 45,754-56.

---

[8] EPA's 1979 regulations refer to a "section 404 referral process" that is now established in the 1992 404(q) Memorandum. *See* 84 Fed. Reg. at 45,752 n.3.

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 13

## STANDARD OF REVIEW

Plaintiffs seek review of the RA's withdrawal decision under the APA. However, the APA does not waive sovereign immunity here because EPA's decision is unreviewable under APA section 701(a)(2), and Plaintiffs must clear that jurisdictional hurdle before obtaining judicial review. *E.J. Friedman Co., Inc. v. United States*, 6 F.3d 1355, 1357, 1359-60 (9th Cir. 1993). In searching for a basis for review here, Plaintiffs rely on case law addressing withdrawals of proposed rulemakings, as Plaintiffs did in opposition to our Motion to Dismiss. *See, e.g.,* ECF 48 at 25, 34. As we established in our prior brief, however, that case law is inapplicable and these consolidated cases should be dismissed. *See* ECF 42 at 17-20.[9]

Assuming, *arguendo*, that this Court reviews the RA's decision, applying the case law Plaintiffs cite for reviewing withdrawal of a proposed rule, EPA's decision would be subject to the requirement of reasoned decisionmaking. This Court would consider numerous factors and assess whether the decision is supported by the record and whether the Agency gave a "reasoned account" of its decision. *See, e.g., Int'l Union, United Mine Workers of Am. v.*

---

[9] We respectfully incorporate by reference our Motion to Dismiss arguments addressing withdrawals of proposed rules and denials of petitions for rulemakings. ECF 42 at 17-20. In addition, the case law Plaintiffs cite regarding a "reasoned explanation" standard for changes in agency policy is inapposite in this discretionary enforcement matter. *See* Pls. Br. at 31. The situation here also is more analogous to that in *Wild Wilderness v. Allen*, 871 F.3d 719, 726-27 (9th Cir. 2017) ("reasoned explanation" requirement did not apply to decision not to complete an EIS where agency complied with its own procedural requirement to publish a withdrawal "notice"). *See* 40 C.F.R. § 231.5(c) (requiring "notice" but no explanation for the RA's withdrawal of a proposed determination). Furthermore, even if this Court were to apply the "reasoned explanation" standard, EPA "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy be permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

*U.S. Dep't of Labor*, 358 F.3d 40, 43-45 (D.C. Cir. 2004) ("*Int'l Union*"); *Envtl. Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 38-48 (D.D.C. 2015). While an agency may not withdraw a proposed rule for "no reason whatsoever," the decision here would be entitled to "enhanced deference," greater than for a decision to promulgate a new rule or to rescind an existing one. *Envtl. Integrity Project*, 139 F. Supp. 3d at 39 (quoting *Int'l Union,* 358 F.3d at 43, 44).

Applying case law regarding an agency's denial of a petition for rulemaking would accord EPA even more deference. Such judicial review "is '*extremely limited*' and '*highly deferential*'." *Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007) (emphasis added). The agency has "broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," including to determine its timing and priorities. *Id.* at 527, 533; *see also Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 921 (D.C. Cir. 2008). Where the agency provides a "reasonable explanation" for its exercise of discretion and the reasons are "consistent with the agency's delegated authority and supported by the record," the agency's decision is to be upheld. *WildEarth Guardians v. EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014).

To the extent that Plaintiffs challenge the Agency's assessment of the record, this Court must defer to EPA and avoid "substitut[ing] its judgment for that of the agency." *Envtl. Integrity Project*, 139 F. Supp. 3d at 39 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The reviewing court's analysis "must also be guided by appropriate deference to the agency's discretion to set the 'timing and priorities of its regulatory agenda.'" *Id.* (quoting *WildEarth Guardians,* 751 F.3d at 651).[10]

---

[10] In addition, EPA's interpretation of a "genuinely ambiguous" regulation should be controlling unless it is plainly erroneous or inconsistent with the regulation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-19 (2019).

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED

As we established in briefing our Motion to Dismiss, ECF 36, 42, Plaintiffs' claims should be dismissed because the RA's decision was "committed to agency discretion by law" under APA section 701(a)(2).  But even assuming, *arguendo*, that this Court rules on the merits, this Court should uphold the withdrawal decision, as discussed further below.

## II.  EPA WAS NOT REQUIRED TO ASSESS "UNACCEPTABLE ADVERSE EFFECT" WHEN IT WITHDREW THE PROPOSED DETERMINATION

EPA was not required to address "unacceptable adverse effect," for reasons similar to those that we previously briefed.  ECF 36 at 25-31; ECF 42 at 3-10.  As we discuss below, that standard is inapposite for three main reasons.  First, EPA's decision was a discretionary enforcement decision not to act.  Second, the substantive terms of section 404(c) provide EPA with extraordinarily broad discretion in deciding whether to act, including when not to act.  In addition, section 404(c) says nothing about withdrawals of proposed determinations.  And the "unacceptable adverse effect" standard in section 404(c) applies only to an affirmative final determination—*i.e.*, to restrict or prohibit discharges.  Third, EPA's regulations preserve the discretionary nature of EPA's section 404(c) authority.  While EPA's regulations refer to the likelihood of "unacceptable adverse effect(s)" in providing guideposts that could lead to an affirmative final determination, they do not provide any standard for the RA's withdrawal decision or require any explanation in support of it.  Furthermore, requiring EPA to address "unacceptable adverse effect" as Plaintiffs suggest risks subjecting every EPA decision not to initiate a section 404(c) proceeding to judicial review under that standard.

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 16

## A. The Withdrawal Decision Was a Discretionary Decision Not to Enforce

Section 404(c) authorizes EPA to undertake an adjudicatory proceeding to determine whether to prohibit or restrict a regulated party's ability to discharge dredged or fill material. Those prohibitions or restrictions effectively enjoin discharges. Section 404(c) also gives EPA unusually broad discretion about when to act. The EPA Administrator "is authorized to" act "whenever he determines" that there will be an "unacceptable adverse effect" on certain resources. 33 U.S.C. § 1344(c). Given those hallmarks of enforcement authority, EPA's decision not to impose prohibitions or restrictions here was a decision "not to enforce" (or close analog thereof) that is akin to prosecutorial discretion. *See City and Cty. of San Francisco v. U.S. Dept' of Transp.*, 796 F.3d 993, 1001-02 (9th Cir. 2015).

Indeed, various authorities have recognized that section 404(c), along with the analogous provisions in CWA section 404(j), provide EPA with discretionary enforcement authority. *Cascade Conservation League v. M.A. Segale, Inc.*, 921 F. Supp. 692, 699 (W.D. Wash. 1996), addressed EPA's decision not to review under section 404(c) the Corps' determination that activities were exempt from regulation as "normal farming" pursuant to CWA section 404(f)(1)(A), 33 U.S.C. § 1344(f)(1)(A). The court determined that EPA's "decision not to take enforcement action" was unreviewable and that section 404(c) provided no "statutory criteria for enforcement decisions that could guide the Court's inquiry[.]" *Id.* Similarly, in the context of the proposed Pebble Mine, a Senate Report recently agreed that the exercise of EPA's section 404(c) authority constitutes "enforcement." S. REP. NO. 116-123, at 87 (2019).

In addition, the Seventh Circuit recently determined, in the analogous context of EPA's withdrawal of an objection to a State-issued dredge and fill permit under section 404(j), that EPA's withdrawal was a "discretionary enforcement decision." *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1072-73 (7th Cir. 2020) ("*Menominee Tribe*").[11] And it is even clearer here that EPA's regulatory oversight role constitutes discretionary enforcement authority, because EPA has authority to prohibit or restrict discharges under section 404(c) but does not have that authority under section 404(j). *See* 33 U.S.C. § 1344(j).

**B.** **Section 404(c) Provides Broad Discretion and Does Not Require EPA to Address "Unacceptable Adverse Effects" Here**

The substantive portions of section 404(c) are drafted in terms of broad discretion. Indeed, the "is authorized to" language is the same text that the Supreme Court concluded gave "complete discretion" to the agency to decide how and when its discretionary enforcement authority should be exercised. *Heckler v. Chaney*, 470 U.S. 821, 825 (1985); *see also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 915 F. Supp. 378, 381 (N.D. Ga. 1995), *aff'd* 87 F.3d 1242 (11th Cir. 1996). In addition, the discretionary language of section 404(c) is strikingly similar to—and fits *well* within—that in other cases where the Supreme Court and Ninth Circuit have held that the broad statutory grants of discretion provided "no law to apply." ECF 42 at 6-7. *See, e.g., Webster v. Doe*, 486 U.S. 592, 594 (1988); *City and Cty. of San Francisco*, 796 F.3d at 996, 1002-03; *E.J. Friedman Co.*, 6 F.3d at

---

[11] In *Menominee Tribe*, the plaintiff recently sought rehearing on grounds other than that for which we cite it.

1359-60.  Overall, this is "classic language of discretion," *City and County of San Francisco*, 796 F.3d at 1002, that "fairly exudes deference" to the agency.  *Webster*, 486 U.S. at 600.

Unsurprisingly then, the courts have emphasized EPA's discretion under section 404(c).  *See, e.g., Mingo Logan Coal Co.*, 714 F.3d at 612-14; *Newport Galleria Grp. v. Deland*, 618 F. Supp. 1179, 1181-82, 1186 (D.D.C. 1985).  In addition, the courts have almost uniformly declined to review under the "unacceptable adverse effect" standard EPA's 404(c) decisions, short of a final determination to prohibit or restrict discharges.  *See City of Olmstead Falls v. EPA*, 266 F. Supp. 2d 718, 722-23 (N.D. Ohio 2003); *Cascade Conservation League*, 921 F. Supp. at 698-99; *Preserve Endangered Areas of Cobb's History, Inc.,* 915 F. Supp. at 381.[12]

Within this extremely broad grant of discretion to EPA, section 404(c) says nothing about a decision to withdraw a proposed determination.  33 U.S.C. § 1344(c).  In addition, such decisions occur at an early stage in the section 404(c) review process, well in advance of a final determination to prohibit or restrict discharges, when the "unacceptable adverse effect" standard comes into play.  *Id.*; *see Cascade Conservation League*, 921 F. Supp. at 698.  The

---

[12]  The one outlier case is *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 7-9 (D.D.C. 2007) ("*Mattaponi*"), which decided that EPA's decision not to initiate section 404(c) proceedings was reviewable under the APA.  That case is incorrect because it wrongly applies the "unacceptable adverse effect" standard from section 404(c) to EPA's decision not to initiate a section 404(c) review, even though EPA's decision is wholly discretionary and the standard comes into play only if the EPA Administrator makes a final determination to prohibit or restrict discharges.  *See, e.g., Cascade Conservation League*, 921 F. Supp. at 698, 699.  In addition, that case is factually different.  *Mattaponi* emphasized that the Corps already had issued the permit.  515 F. Supp. 2d at 3, 8.  Accordingly, EPA had the full record from the Corps' proceedings before it, and the court viewed EPA's inaction as "essentially a decision . . . to indirectly approve a permit[.]"  *See id.* at 8.  As we explain further in Section III below, that is distinctly not the case here.  *See also supra* at 11-13.

text of section 404(c) makes clear that EPA need only address "unacceptable adverse effect" when EPA makes a final determination to prohibit or restrict discharges.

The analysis in *Menominee Tribe* applies here. The Seventh Circuit correctly determined that, even though EPA's objection to a State dredge-and-fill permit must be based on certain factors, those factors did not apply to EPA's withdrawal of the objection. *Menominee Tribe*, 947 F.3d at 1072. Instead, EPA's choice of whether to object in the first place remained discretionary, and so did EPA's decision to withdraw that objection. *Id.* at 1072-73. Accordingly, the standards for *objecting* to a permit (or *maintaining* the objection) do not provide a standard for reviewing the *withdrawal* of the objection. *Id.* at 1073. *See also City of Santa Clara, Cal. v. Andrus*, 572 F.2d 660, 666 (9th Cir. 1978).

### C. EPA's Regulations Preserve EPA's Discretion and Do Not Require it to Consider "Unacceptable Adverse Effect"

EPA's implementing regulations preserve the discretionary nature of EPA's section 404(c) authority, and do not specify a standard for the RA's withdrawal of a proposed determination. For example, the Administrator "is authorized to" prohibit or restrict discharges, and "may" do so. 40 C.F.R. § 231.1. In addition, the RA's decision to issue a proposed determination is discretionary and occurs as part of EPA's *initiation* of the section 404(c) process. 40 C.F.R. § 231.3(a) (if the RA has "*reason to believe* . . . that an 'unacceptable adverse effect' *could result*," then he "*may* initiate" certain actions) (emphasis added). *See City of Olmstead Falls*, 266 F. Supp. 2d at 723 (emphasizing regulatory language in concluding that EPA's section 404(c) authority is of an "obvious discretionary nature").

One of the early actions that the RA "may" initiate is publishing a proposed determination. 40 C.F.R. § 231.3(a)(2). Importantly, as EPA explained in its 1979 preamble,

a "proposed determination does *not* represent a judgment that discharge of dredged or fill material *will* result in unacceptable adverse effects; it merely means that the [RA] believes that the issue should be explored." 44 Fed. Reg. 58,082 (emphasis added). After the Region has published a proposed determination and concluded the public input process,[13] the RA must "either withdraw the proposed determination or prepare a recommended determination . . . ." *Id.* § 231.5(a). The RA's decision to withdraw the proposed determination "is at the discretion of the [RA] 'after review of the available information.'" 84 Fed. Reg. at 45,751 (quoting 44 Fed. Reg. at 58,082). The regulations do not require the RA to provide an explanation for the withdrawal or specify any reasons for it. *See* 40 C.F.R. § 231.5(c). In short, the regulations regarding the RA's withdrawal of a proposed determination, consistent with EPA's 1979 preamble, do not require the RA to address "unacceptable adverse effect." 40 C.F.R. § 231.5(a), (c); 44 Fed. Reg. at 58,082.

While the parties agree that "unacceptable adverse effect" appears throughout EPA's regulations, those uses of the standard provide preliminary, interim guideposts as EPA considers moving to a final determination that restricts or prohibits discharges. As discussed above, the RA may initiate the section 404(c) process if he has "reason to believe . . . that an 'unacceptable adverse effect' *could* result" from the discharge. 40 C.F.R. § 231.3(a) (emphasis added). If the process moves forward to a recommended determination, then the inquiry becomes whether the discharge "would be *likely* to have an unacceptable adverse effect." 40

---

[13] Comments on a proposed determination are to be directed at both the general issue of "whether the proposed determination should become the final determination" and the more specific issue of whether "corrective action that could be taken to reduce the adverse impact of the discharge." 40 C.F.R. § 231.4.

C.F.R. § 231.5(a) (emphasis added). Consistent with section 404(c), the statutory standard for prohibiting or restricting discharges—that the discharge "*will* have an unacceptable adverse effect"—does not come into play unless and until the EPA Administrator makes a final determination to prohibit or restrict discharges. 40 C.F.R. § 231.6. *See City of Santa Clara, Cal.,* 572 F.2d at 666.

 *Menominee Tribe* also calls for this result. In that case, as here, there was no statutory or regulatory standard that applied directly to EPA's withdrawal decision. *Menominee Tribe,* 947 F.3d at 1072-73. The plaintiffs suggested that the court "fill the gap" by looking to the regulatory standards—including whether the permit was outside the Section 404(b)(1) Guidelines—governing EPA's discretionary decision to object in the first place. *Id.* at 1072. The Seventh Circuit rejected the suggestion, instead holding that the decision to withdraw the objection "is as committed to the agency's discretion as the decision to object in the first instance." *Id.* at 1073. Accordingly, the decision to withdraw the objection was a "judgment call" that "may depend on many factors" that are not limited to whether the State adequately responded to EPA's objection. *Id.* The same goes for EPA's decision here.

### D.  *Plaintiffs Improperly Continue to Rely on Mattaponi*

 Plaintiffs' continued reliance on *Mattaponi*, Pls. Br. at 28, is misplaced and demonstrates the danger in allowing review based on an "unacceptable adverse effect" standard. As discussed above and in connection with our Motion to Dismiss, *Mattaponi* is an outlier and was wrongly decided. *See supra* at 19 n.12; ECF 36 at 28 n. 13, ECF 42 at 8 n.3. In addition, Plaintiffs' arguments leave no meaningful distinction between reviewing—based on an "unacceptable adverse effect" standard—a withdrawal of a proposed determination

versus a decision not to initiate a section 404(c) process in the first place. Plaintiffs look to the "unacceptable adverse effect" standard because it occurs throughout EPA's regulations; indeed, it even applies to the RA's assessment of whether to initiate a section 404(c) process. 40 C.F.R. § 231.3(a). And Plaintiffs again rely on *Mattaponi*, which allowed review of EPA's decision not to initiate a section 404(c) proceeding. *See Mattaponi*, 515 F. Supp. 2d at 4, 7.

If *Mattaponi* (and Plaintiffs) were correct, then a vast number of EPA decisions would be subject to review based on an "unacceptable adverse effect" standard. That result would turn the section 404 program on its head. The Corps issues thousands of permits each year, only some of which EPA reviews, and only a miniscule number of permits prompt EPA to initiate a section 404(c) process. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 303 n. 5 (Ginsburg, J, dissenting) (2009) (EPA had made a dozen affirmative section 404(c) final determinations over 36 years, which encompassed more than one million permit applications).[14] Furthermore, in Plaintiffs' view, none of those EPA decisions (or non-decisions), even in the context of an otherwise uncontroversial permit, would survive judicial review if EPA's decision was based on anything related to, for example, allocation of agency resources, agency priorities, or how to effectively manage its section 404(c) program. That result simply is not what Congress intended when it provided EPA with extraordinarily broad discretion in section 404(c), nor is it what EPA's regulations provide.

---

[14] *See also Clean Water Act Section 404(c) "Veto Authority"* ("Although the Corps authorizes approximately 68,000 permit activities in the Nation's waters each year, EPA has used its Section 404(c) authority very sparingly, issuing only 13 final determinations since 1972.") (available at https://www.epa.gov/sites/production/files/2016-03/documents/404c.pdf).

## III.   EPA'S DECISION WAS REASONABLE AND SHOULD BE UPHELD

Plaintiffs' arguments that the RA's withdrawal decision was "arbitrary" are based on their mischaracterization that the RA decided that EPA was *required* to withdraw the Proposed Determination.  They also are wrong on the merits.  EPA Region 10's withdrawal decision was far from arbitrary.  The RA reasonably weighed a number of relevant factors when he determined that withdrawal was appropriate under the unique circumstances here.

### A.   *Plaintiffs Mischaracterize EPA's Decision and the Question For Review*

Plaintiffs' Brief repeatedly states, in contrast to the explanations that EPA Region 10 provided in the withdrawal notice, that EPA decided that it was *required* to withdraw the Proposed Determination.  *See* Pls. Br. at 32, 33, 34, 35, 37.  To the contrary, the Region emphasized that it was choosing the better course under the unique circumstances present here.  For example, the Region explained that the "more appropriate" course was to use the processes available under the section 404(q) Memorandum before making future decisions under section 404(c); that it was "most appropriate" to participate in the Corps' permitting processes rather than continue with the section 404(c) process initiated in 2014; and that the "appropriate sequencing" was to work through the usual permitting process rather than the separate 404(c) process that did not address the full record.  84 Fed. Reg. at 45,754, 45,755.  Accordingly, EPA has not taken the position that leaving the suspension in place would have been impermissible; there was more than one course that EPA legitimately could have pursued here.  *See* ECF 42 at 16.  However, EPA was not *required* to maintain the Proposed Determination, as Plaintiffs would have it.  And the merits question before this Court is not whether Region 10 was required to withdraw the Proposed Determination.  Instead, the

proper merits question is whether the RA's decision was adequately supported and explained, under the deference accorded to EPA's discretionary decisionmaking here.

### B. The Withdrawal Decision Should Be Upheld

The RA's decision to withdraw the Proposed Determination was well-supported and should be upheld on the merits. EPA Region 10 was addressing unique circumstances, considered numerous relevant factors, and provided a detailed explanation for its decision.

#### 1. The 2014 Proposed Determination Was Outdated and Superseded

One of the many factors EPA considered is that, because EPA had taken the unusual step of issuing the Proposed Determination before PLP submitted a permit application, the Proposed Determination addressed *hypothetical* scenarios that were superseded by the application and the project-specific information that had been, and would continue to be, developed. 84 Fed. Reg. at 45,752-56. Due to developments in the FACA litigation, EPA was prevented from moving forward in its section 404(c) process for several years even though EPA's regulations contemplate that the process will only take several months. *Id.* at 45,750; 40 C.F.R. §§ 231.3-231.6. In addition, while EPA's regulations *allow* for extensions of the regulatory deadlines for "good cause," such extensions are discretionary, and EPA reasonably determined they should not be extended further. *See* 40 C.F.R. § 231.8; 84 Fed. Reg. at 45,753. The Proposed Determination was five years old when EPA withdrew it, and one and a half years had elapsed after EPA suspended it. 84 Fed. Reg. at 45,749-750. Accordingly, EPA recognized that it was "incumbent on the Agency to reanalyze its prior position, which was based on hypothetical scenarios, now that there is actual, non-speculative information before EPA in the form of a section 404 permit application and

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 25

associated information." *Id.* at 45,755. EPA's reliance on those relevant considerations is strong evidence of reasonable decisionmaking.

### 2. New Information Became Available

Relatedly, although Plaintiffs acknowledge that EPA considered the availability of new, post-suspension information in making its withdrawal decision, Plaintiffs improperly downplay that factor. EPA Region 10 explained that the Corps' Draft EIS, which the Corps issued after EPA's suspension notice and which comprised more than 1,400 pages, included "significant project specific information that was not accounted for in the 2014 Proposed Determination[.]" *Id.* at 45,750, 45,752. Likewise, the Region explained that it "did not know and could not know when it issued its 2018 suspension exactly how long the NEPA process would take and how it would proceed." *Id.* at 45,753. Accordingly, "[g]iven the current status of the NEPA process," EPA concluded that it was "clear that EPA's 2014 Proposed Determination does not account for the significant project-specific information that has been developed and will be developed during the multi-year permitting process." *Id.*

Plaintiffs also fail to recognize several key issues regarding the new information. Perhaps most importantly, the new information was project-specific, in contrast to the hypothetical information in the Proposed Determination. *See, e.g., id.* The new information was voluminous and would continue to grow. *Id.* at 45,750, 45,753. The mining scenarios addressed in the Proposed Determination, which had been superseded by the permit application, were becoming more outdated as time passed and the Corps' record grew. *Id.* at 45,752-756. In addition, the Corps was developing different preliminary views regarding potential impacts. *Id.* at 45,752-753. Thus, although EPA stated in connection with the

2018 suspension that the factual record could develop notwithstanding the 2014 Proposed Determination, EPA reasonably reached a different conclusion as circumstances changed: "given the need for any final EPA 404(c) decision to be based on the entire record, EPA . . . concluded that a Proposed Determination which in its current form does not account for the full record and does not grapple with differing conclusions . . . should not serve as a basis for such a decision." *Id.* at 45,755.

Furthermore, in arguing that it is improper for EPA to consider the availability of new information because the 404(c) process provides "multiple opportunities to engage with the public and involved parties," Pls. Br. at 33, Plaintiffs ignore the key role that a proposed determination plays in the public outreach part of that process. A proposed determination is the central document on which the public may provide input—including a comment period of at least 30 days and a public hearing under certain circumstances—on the substance of EPA's proposed course of action. *See* 40 C.F.R. §§ 231.3, 231.4.[15] Thus, EPA explained that it retained its authority to issue a new proposed determination in a separate section 404(c) process based on the full record, which would ensure "meaningful public engagement through the public comment period," in contrast to relying on the public process that occurred for the outdated and superseded Proposed Determination. 84 Fed. Reg. at 45,754.

Finally, Plaintiffs' argument that EPA was required to consider all of the record information as part of a section 404(c) process misses the point. While the RA and the Administrator are to make decisions based on the available information, *see, e.g.,* 40 C.F.R. §

---

[15] In contrast, and contrary to Plaintiffs' suggestion, the public is not given an opportunity to comment regarding a final determination. 40 C.F.R. § 231.6; *cf.* Pls. Br. at 32-33.

231.1(a), the question here is whether EPA was required to consider all such information within the context of the superseded, 2014 Proposed Determination. For the reasons discussed in the withdrawal notice and herein, Region 10 reasonably decided not to do so.

### 3. New Opportunities to Address EPA's Concerns Became Available

EPA also considered that new opportunities became available after the suspension to address its environmental concerns with the Corps, including by working as a cooperating agency in the Corps' NEPA process, as a commenter on the Corps' section 404 Public Notice, and by invoking the processes available under the 404(q) Memorandum. *See, e.g.,* 84 Fed. Reg. at 45,751-53. Plaintiffs incorrectly argue that this factor does not support EPA's decision because EPA's regulations "envision concurrent permitting and Section 404(c) processes" and EPA was engaged in such opportunities while the Proposed Determination was still in place. Pls. Br. at 35-39. Plaintiffs' arguments are misplaced. EPA does not take the position that it lacked the discretion to continue to leave the Proposed Determination in place. Moreover, the Region reasonably determined that the new opportunities alleviated any need to maintain the outdated section 404(c) process. *See* 84 Fed. Reg. at 46,749, 753-56. Plaintiffs also ignore critical issues related to this factor, as discussed below.

### 4. EPA Was Taking Advantage of New Opportunities to Express Concerns

EPA Region 10 explained that it had, in fact, used the new opportunities to raise its concerns to the Corps. For example, pursuant to the 404(q) Memorandum, the Region conveyed that the project "*may have* substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance." AR 1095122 (emphasis added). EPA also provided more than 50 pages of

comments and recommendations on the section 404 Public Notice.  For example, EPA stated that "the extent and magnitude of the proposed impacts to streams, wetlands, and other aquatic resources should be carefully and thoroughly evaluated[.]"  AR 1095132.  EPA also recommended that the Corps characterize the degree to which the functions provided by the potentially affected aquatic resources will change as a result of the discharges or explain why the Corps' initial, more general approach was adequate.  AR 1095140.

Similarly, as a cooperating agency under NEPA, EPA provided "scoping" comments to the Corps, participated in meetings regarding the analysis for the project, and provided comments on early drafts of EIS materials, including on the Preliminary Draft EIS.  84 Fed. Reg. at 45,750; *see* AR 1096146.  Thereafter, on July 1, 2019, EPA provided 100 pages of comments on the Corps' Draft EIS.  84 Fed. Reg. at 45,750; *see* AR 1096154-253.  Among other things, EPA advised that fish spawning and rearing habitats "need to remain both sufficiently represented and connected, throughout the project area, to sustain resiliency and persistence of fish populations."  AR 196198.  Importantly, EPA pledged to "continue to work constructively with the Corps as a cooperating agency, providing special expertise in specific areas requested by the Corps," including project alternatives, water and sediment quality, wetlands and special aquatic sites, and mitigation.  AR 1096151.  EPA also suggested that the agencies build upon and expand their areas of coordination.  *Id.*

EPA's ongoing exchange of information and expressions of concern showed that the permitting-related processes discussed in the withdrawal notice were providing the critical opportunities for input that EPA addressed in the notice, and that EPA was taking advantage of those opportunities.  EPA also expressed its commitment to continue to work

with the Corps to address key environmental issues. Consistent with its previous expressions of concern about the potential impacts of the project, the Region considered those concerns—and its ability to continue to address them—in making the withdrawal decision. This consideration further supports the conclusion that it was reasonable for EPA to decide to focus first on the ongoing permitting process before deciding whether to exercise its discretionary section 404(c) authority.

### 5. The "Normal" Inter-Agency Processes May Resolve EPA's Concerns

Plaintiffs also fail to recognize EPA's explanation that its concerns may be resolved through the well-established processes of analysis and coordination between the agencies. 84 Fed. Reg. at 45,755. Likewise, while Plaintiffs are correct that EPA's regulations *allow* EPA to engage in a separate section 404(c) review during the Corps' processing of a permit application, Plaintiffs fail to acknowledge that the regulations also clarify that the more customary process is for EPA to engage first in the Corps' permitting process. *See id.* at 45,752. In the "normal" course, the RA would consider the record developed during the permitting process when evaluating whether to *initiate* a section 404(c) proceeding. 84 Fed. Reg. at 45,752; *see* 40 C.F.R. § 231.3(a) (the 404(q) Memorandum process "will normally be exhausted" prior to any decision to initiate). EPA explained that this approach is consistent with its 1979 preamble, which states that the *start* of the section 404(c) process "will ordinarily be preceded by an objection to the permit application[.]" 84 Fed. Reg. at 45,752 (quoting 44 Fed. Reg. at 58,080). The Region further explained that the preamble also provides that "[t]he fact that 404(c) may be regarded as a tool of last resort implies that EPA will first employ its tool of 'first resort,'" that is, "comment and consultation with the

permitting authority at all appropriate stages of the permit process." *Id.* at 45,752 (quoting 44 Fed. Reg. at 58,080.) Thus, "[t]he Corps should have the first opportunity to consider project-specific information here without having to contend with a 404(c) proposal that does not account for all of the available information." *Id.* at 45,755.[16]

In explaining its decision, Region 10 also discussed the Corps' involvement in EPA's section 404(c) process. That involvement also may resolve differences between the agencies. The Corps plays the key role in identifying and incorporating "corrective action" measures that may prevent an "unacceptable adverse effect" from occurring. *Id.* at 45,752, 45,755; *see* 44 Fed. Reg. at 58,081. Consistent with the Corps' role in the permitting process, EPA's regulations call for the Corps to be consulted *throughout* the section 404(c) process. 40 C.F.R. §§ 231.3(a)(1), (2), 231.6; *see* 84 Fed. Reg. at 45,752, 45,755. However, the Corps' engagement in the 2014 process was limited because there was no permit application pending, and the current process puts the Corps in a much better position to provide information during a 404(c) review. 84 Fed. Reg. at 45,755.

The Region's decision brought the exercise of the Corps' section 404(a) permitting authority *and* EPA's section 404(c) authority into accord with the agencies' more customary processes. *See id.* at 45,755 (the approach "will ensure that both agencies will be able to consider the full record and engage on issues consistent with their respective roles provided

---

[16] As the permitting authority, the Corps plays a central role in ensuring that any discharge of dredged or fill material complies with the CWA section 404(b)(1) Guidelines. *See supra* at 12 n.7. Both the 404(b)(1) Guidelines and the "unacceptable adverse effect" standard address whether the discharge will cause "significant degradation" of the environment. *See* 40 C.F.R. §§ 230.10(c); 231.2(e).

CASE NO. 3:19-CV-00265-SLG (CONSOLIDATED) - 31

for under the Clean Water Act and EPA's implementing regulations").  This consideration is

critical because the Region made its decision within the context of the unique, intricate

relationship between the Corps and EPA that Congress established through its CWA

compromise and that the agencies have memorialized in the 404(q) Memorandum and their

regulations.  This is the sort of relationship that "courts are not institutionally well-equipped

to micromanage." *City and Cty. of San Francisco*, 796 F.3d at 1002.  This Court should defer to

EPA's reasonable decision regarding how to manage its section 404(c) program and interact

with the Corps as the agencies evaluate this project.  *See, e.g.*, *In re Barr Labs., Inc.*, 930 F.2d

72, 76 (D.C. Cir. 1991) (the "agency is in a unique—and authoritative—position to view its

projects as a whole, estimate the prospects for each, and allocate its resources in the optimal

way"); *see also Lincoln v. Vigil,* 508 U.S. 182, 193 (1993) (courts should "give [the] agency the

capacity to adapt to changing circumstances and meet its statutory responsibilities in what it

sees as the most effective or desirable way"); *infra* at 33-35.

> 6.  EPA Retained Its Legal Authorities Under Sections 404(q) and 404(c)

While Plaintiffs barely acknowledge the issue, EPA also considered that it retains its

legal authorities under CWA section 404 in spite of the withdrawal.  In addition to exercising

its coordination and review authorities under the 404(q) Memorandum, EPA retained its

authority to elevate the permitting decision as set forth there.  84 Fed. Reg. at 45,755.  In

addition, EPA repeatedly emphasized that it retained its authority to initiate a new 404(c)

process.  *Id.* at 45,754-56.  And that process would be based on the full record.  *Id.* at 45,754.

For these reasons and more, EPA rationally decided that it was more appropriate to

participate first in the Corps' ongoing permitting process, EPA's engagement with the Corps

and other agencies, and the new, voluminous record that is being developed, rather than continuing with the outdated 404(c) process. 84 Fed. Reg. 45,755; *see also id.* at 45,754.

### 7. The Case Law Supports Upholding EPA's Decision

EPA's withdrawal decision also is consistent with the case law addressing withdrawals of proposed rulemakings and denials of petitions for rulemaking, even though those cases are not directly applicable because they do not address the unique legal or factual situation here. Plaintiffs rely most heavily on *International Union* and *Williams Natural Gas Co. v. FERC*, 872 F.2d 438 (D.C. Cir. 1989), but those cases are readily distinguishable. Those cases criticized the agency decisions at issue for being "without explanation," "conclusorily asserting that agency priorities had changed," failing to "offer anything approaching a comprehensive solution," and asserting that the issue was "no longer of any consequence" even though the notice of proposed rulemaking indicated that the situation would violate the underlying statute. *Int'l Union*, 358 F.3d at 44-45; *Williams Nat. Gas Co.* 872 F.2d at 446, 449-50. Here, in contrast, EPA thoroughly explained its decision and comprehensively addressed how it had approached—and would continue to approach—the agencies' processes for reviewing the proposed project, including through assessment of the section 404(b)(1) Guidelines and the potential, future exercise of its section 404(c) authority.

The more analogous cases support EPA's decision here. In *Consumer Federation of America v. Consumer Product Safety Commission*, 990 F.2d 1298, 1306-09 (D.C. Cir. 1993), the court addressed the decision of the Consumer Product Safety Commission ("CPSC") to terminate a rulemaking proceeding that included a ban on sales of adult-size ATVs for use by children under age 16. *Id.* at 1299. The court upheld the CPSC's decision "in view of the

[CPSC's] ongoing efforts to check ATV safety hazards by other means, and CPSC's indication that it will reconsider the rulemaking route if current responses to ATV hazards prove inadequate[.]" *Id.* at 1299. The court recognized that the CPSC could have left the proposed rulemaking in place while it gained additional information, but determined that the agency's choice was "rational" in light of its statements that it could revisit the ban if the ongoing monitoring revealed the need for it. *Id.* at 1307.

Similarly, in *Environmental Integrity Project*, the court reviewed EPA's decision not to promulgate a CWA rule that would have required industrial livestock operations to provide information to EPA to facilitate EPA's ability to regulate their pollutant discharges. 139 F. Supp. 3d at 28. In upholding EPA's decision, the court determined that, even though EPA would not obtain as much information, EPA's "plain" and "coherent" explanation was sufficient because EPA believed it was "sensible" to address the existing sources of information "while maintaining the option of adopting a mandatory reporting requirement or other approach based on what the Agency learns from its current efforts." *Id.* at 41. The court also emphasized that the proposed rule implicated only "one tool that Congress provided to the EPA to assist it in fulfilling its broader statutory mandate," and determined that "[t]o conclude . . . that the Agency's decision to withdraw a proposed rule on the ground that it would have better enabled the EPA to perform its statutory mission would unduly encroach on the discretion of the Agency to decide how best to allocate its resources and to perform its assigned functions." *Id.* at 48.

In addition, in *WildEarth Guardians v. EPA*, the court upheld EPA's decision not to initiate a rulemaking to establish Clean Air Act standards for coal mines. 751 F.3d at 650-51.

The court determined that EPA's decision "easily passe[d] muster." *Id.* at 651. The court emphasized that EPA "'has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities,'" including the "discretion to determine the timing and priorities of its regulatory agenda." *Id.* at 651 (quoting *Massachusetts v. EPA*, 549 U.S. at 527, 533). Because EPA provided a "reasonable explanation" as to the exercise of its discretion, and the reasons given were "consistent with the agency's delegated authority and supported by the record," the court upheld EPA's decision. *Id.* The court relied on the fact that EPA had not yet finally decided whether to regulate the coal mines, and "decline[d] to second-guess EPA's decision to prioritize regulatory actions in a way that best achieves" its statutory objectives. *Id.* at 654, 656.

Likewise, this Court should defer to EPA's reasonable and detailed explanation about how to implement its section 404(c) program, and how to structure the timing and context of its inter-agency coordination with the Corps under the unique circumstances here.

## IV.    THE WITHDRAWAL DECISION SHOULD NOT BE VACATED

Even if this Court were to determine that the RA did not reasonably decide to withdraw the 2014 Proposed Determination, the decision should not be vacated. The decision placed both the Corps and EPA in their more customary positions to review the pending permit application, and leaving the decision in place would preserve that orderly process. *See Cal. Cmtys. Against Toxics v. EPA,* 688 F.3d 989, 992-93 (9th Cir. 2012).

## <u>CONCLUSION</u>

For the reasons stated above, the RA's withdrawal decision should be upheld.

Respectfully submitted this 20th day of March, 2020.

/s/ Mark A. Nitczynski
MARK A. NITCZYNSKI
United States Department of Justice - ENRD
Environmental Defense Section
999 18th Street; South Terrace, Suite 370
Denver, CO 80202
Phone: (303) 844-1498; Fax: (303) 844-1350
Email: mark.nitczynski@usdoj.gov

BRIAN UHOLIK
Environment and Natural Resources Division
4 Constitution Square
150 M Street, N.E.
EDS/4th Floor
Washington, D.C. 20002
Phone: (202) 305-0733; Fax: (202) 514-8865
Email: brian.uholik@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2020, I caused to be filed the foregoing DEFENDANTS' OPPOSITION TO PLAINTIFFS' JOINT OPENING BRIEF using the Court's CM/ECF system, which serves copies on counsel of record.


<u>/s/ Mark A. Nitczynski</u>