KEVIN G. CLARKSON
ATTORNEY GENERAL

LAEL A. HARRISON
Assistant Attorney General
Department of Law
123 4th Street, Suite 600
P.O. Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-2520
Email: lael.harrison@alaska.gov

*Attorney for Intervenor*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| BRISTOL BAY ECONOMIC DEVELOPMENT CORPORATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CHRIS HLADICK; U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) ) | |
| Defendants. | ) | Case No. 3:19-cv-00265-SLG |
| SALMON STATE, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CHRIS HLADICK; U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) ) | Case No. 3:19-cv-00267-SLG |
| Defendants. | ) ) | |

i

TROUT UNLIMITED,                          )
                                          )
          Plaintiff,                      )
                                          )
v.                                        )
                                          )
CHRIS HLADICK; U.S.                       )
ENVIRONMENTAL PROTECTION                  )
AGENCY, *et al.,*                         )
                                          )   Case No.  3:19-cv-00268-SLG
          Defendants.                     )

## BRIEF OF INTERVENOR STATE OF ALASKA

          DATED:  April 14, 2020.

                              KEVIN G. CLARKSON
                              ATTORNEY GENERAL


                    By:    /s/ Lael A. Harrison
                              Lael A. Harrison
                              Assistant Attorney General
                              Alaska Bar No. 0811093
                              Department of Law
                              123 4th Street, Suite 600
                              P.O. Box 110300
                              Juneau, AK 99811-0300
                              Telephone: (907) 465-3600
                              Facsimile: (907) 465-2520
                              Email: lael.harrison@alaska.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ iii

TABLE OF AUTHORITIES ........................................................ iv-vi

INTRODUCTION ........................................................................ 1

FACTUAL AND PROCEDURAL HISTORY ................................ 1

STANDARD OF REVIEW ........................................................ 9

ARGUMENT ............................................................................ 10

    A.    The EPA exceeded the authority granted to it by the Clean Water Act in the 2014 Proposed Determination .................................................. 10

        1.    The plain language of the Clean Water Act does not authorize an EPA "veto" in the absence of a permit application. ........................ 11

        2.    The EPA's interpretation of Section 404(c) deserves no deference 17

        3.    Any ambiguity in the CWA must be interpreted in favor of preserving Alaska's inherent land-use-planning powers ................ 18

    B.    The 2014 Proposed Determination unlawfully contravened the Alaska Statehood Act and Cook Inlet Land Exchange .......................... 22

CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Bersani v. U.S. E.P.A.*, 850 F.2d 36 (2nd Cir. 1988)..........................................................14

*California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572 (1987) ..........................19

*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261 (2009) 12, 16

*FERC v. Mississippi*, 456 U.S. 742 (1982)........................................................................19

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .......................................................................21

*Milk Transport, Inc. v. Interstate Commerce Comm'n,* 190 F. Supp. 350 (D. Minn. 1960)

    (affirmed *per curiam* 368 U.S. 5 (1961)) ........................................................................9

*Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608 (D. C. Cir. 2013) .............. 12, 16, 17

*North Carolina Comm'n of Indian Affairs v. U.S. Dep't of Labor*, 725 F.2d 238 (4th Cir.

    1984) ...............................................................................................................................10

*Pebble Ltd. Partnership v. E.P.A.,* 604 Fed. Appx. 623 (9th Cir. 2015)............................6

*Pebble Ltd. Partnership v. EPA,* 155 F. Supp. 3d 1000 (D. Alaska 2014) ........................6

*Pebble Ltd. Partnership v. EPA*, 3:14-cv-0171 ..................................................................7

*Pebble Ltd. Partnership v. EPA,* Case No. 3:14-cv-00097 (D. Alaska) ............................6

*Rapanos v. U.S.*, 547 U.S. 715 (2006).........................................................................11, 19

*Robert E. LeResche*, A.G. Opp. A66-180-811980, 1980 WL 27949 (Alaska 1980) ..........3

*Seldovia Native Ass'n, Inc. v. U.S.,* 144 F.3d 769 (Fed. Cir. 1998) ...................................2

*Seldovia Native Ass'n, Inc. v. U.S.*, 35 Fed. Cl. 761 (Fed. Cl. Ct. 1996) ...........................3

*Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018)..................21

Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 4 of 31

*Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159

    (2001) ................................................................................................................. 11, 20

*State v. Lewis,* 559 P.2d 630 (Alaska 1977) .................................................... 3, 22

*Trustees for Alaska v. State*, 736 P.2d 324 (Alaska 1987) ................................. 23

*U.S. Secs. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80 (1943) ................... 9

*U.S. v. Atlantic Richfield Co.* .............................................................................. 22

*Udall v. Kalerak*, 396 F.2d 746 (9th Cir. 1968) ................................................. 23

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................. 19

## Federal Statutes

33 U.S.C. § 1251(b) ........................................................................................ 19, 20

33 U.S.C. § 1341 ............................................................................................ 12, 21

33 U.S.C. § 1344 ........................................................................................ 13, 14, 15

33 U.S.C. § 1370 ................................................................................................ 22

43 U.S.C. § 1601 ................................................................................................. 2

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 410hh(7)(a), (94 Stat.

    2377, P.L. 96-487 (1980)) ............................................................................ 4

Alaska Statehood Act, 72 Stat. 339, P.L. 85-508 (1958) ......................... 2, 4, 22

Cook Inlet Land Exchange 89 Stat. 1145, PL 94-204 (1976) ....................... 3, 23

## Alaska Statutes

AS 16.05.841 ....................................................................................................... 5

AS 16.05.871 ....................................................................................................... 5

Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 5 of 31

AS 27.19.010 ................................................................................................................ 4

AS 38.05.035 ................................................................................................................ 4

AS 41.35.080 ................................................................................................................ 4

AS 46.03.100 ................................................................................................................ 4

AS 46.14.120 ................................................................................................................ 5

AS 46.15.010 ................................................................................................................ 4

AS 46.17.010 ................................................................................................................ 4

## I.    Introduction

This Court must uphold the EPA's withdrawal of its 2014 proposal to prohibit commercially-viable mining on hundreds of square miles of State land in the Pebble deposit area because the EPA did not have legal authority to issue the proposal in the first place. The Clean Water Act does not allow the type of preemptory and sweeping unilateral conduct that the EPA proposed in 2014, and the EPA's proposed action also would have violated the Alaska Statehood Act. This Court should uphold the EPA's withdrawal on these purely legal questions of statutory interpretation, although they were not the EPA's stated reason for the withdrawal. This Court should not accept the plaintiffs' invitation to vacate the EPA's withdrawal and thereby reinstate an unlawful agency action.

## II.    Factual and Procedural History

Bristol Bay is a body of water in Southwestern Alaska fed by numerous drainage systems extending from the Togiak River drainage in the west, to Lake Clark National Park in the north, along the length of the Alaska Peninsula to the east, and to the easternmost Aleutian Islands in the south.[1] The area of focus in this lawsuit is the

---

[1]    *See,* Alaska Department of Natural Resources, Division of Mining, Land & Water, Resource Assessment & Development Section, "Bristol Bay Area Plan for State Lands" (2005, rev. 2013), available online at http://dnr.alaska.gov/mlw/planning/areaplans/bristol/2013/, and attached hereto as Exhibit A ("Bristol Bay Area Plan") at 1-14 (Figure 1.2). *See also,* United States Environmental Protection Agency, Region 10, "Proposed Determination of the U.S. Environmental Protection Agency Region 10 Pursuant to Section 404(c) of the Clean Water Act, Pebble Deposit Area, Southwest Alaska" (2014), available online at https://www.epa.gov/sites/production/files/2014-

northern portion of this watershed encompassing two drainage systems, the Nushagak and Kvichak Rivers.[2] In addition to Lake Clark National Park, this focus area also contains the Katmai National Park and the Wood-Tikchik State Park.[3] The lands between these three parks are primarily in state ownership although Native corporations also possess significant holdings.[4]

The Pebble deposit area at issue in this case is located on State lands. The State obtained ownership of the Pebble deposit area pursuant to the Alaska Statehood Act and the Cook Inlet Land Exchange.[5] At statehood, Congress authorized the State of Alaska to select 103,350,000 acres of federal land.[6] In 1971, Congress passed the Alaska Native Claims Settlement Act, which authorized Native corporations to select federal lands according to certain criteria.[7] However, this process did not go smoothly in the Cook Inlet region.[8]

Much of the land in the Cook Inlet region had already been conveyed to the State or private parties, and Cook Inlet Region Incorporated (CIRI) objected that the lands

---

07/documents/pebble_pd_071714_final.pdf ("2014 Proposed Determination") at ES-8 (Figure ES-1).

[2]    2014 Proposed Determination at ES-9 (Figure ES-2).

[3]    2014 Proposed Determination at ES-9 (Figure ES-2).

[4]    Bristol Bay Area Plan at 1-14 (Figure 1.2).

[5]    Declaration of Michael C. T. Smith (June 27, 2014), attached hereto as Exhibit B ("Smith Declaration"), at page 7, paragraph 20.

[6]    Alaska Statehood Act, 72 Stat. 339, P.L. 85-508 (1958) §§ 6(a), (b).

[7]    43 U.S.C. § 1601 *et seq.*

[8]    *Seldovia Native Ass'n, Inc. v. U.S.,* 144 F.3d 769, 773 (Fed. Cir. 1998).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*      3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                      Page 2 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 8 of 31

made available for its ANCSA selections were unusable.[9] On the federal side, the U.S.

Department of the Interior wanted to create a national park in the Lake Clark area, which

was traditional CIRI lands, and resisted ANCSA selections in that area.[10] For years, CIRI

and the U.S. government engaged in lengthy negotiations and litigation.[11] The State of

Alaska became involved because it wished to obtain lands in the Bristol Bay area which

the federal government had refused to make available for Statehood Act land selection,

and in exchange the State was prepared to relinquish lands of value to CIRI in the Cook

Inlet region that the State had previously selected.[12]

In the end, the matter was resolved through a three-way land exchange between

CIRI, the United States, and the State of Alaska.[13] Alaska acquired the Pebble deposit

area in that exchange.[14] Alaska was aware that the land had mineral potential, and

---

[9] *Robert E. LeResche*, A.G. Opp. A66-180-811980, 1980 WL 27949 at *2 (Alaska 1980). *See also,* Smith Declaration, page 4, paragraph 11; Cook Inlet Region, Inc. "Cook Inlet Land Exchange 30-Year Anniversary" (Oct. 2006), available online at https://www.ciri.com/our-lands/cook-inlet-land-exchange-history/, at page 2 ("In CIRI's case, however, ANCSA could easily have been an empty promise because others already had claimed so much of the suitable land within the Cook Inlet region. What we would receive would be mostly mountain tops and glaciers").

[10] *See, Seldovia Native Ass'n, Inc. v. U.S.*, 35 Fed. Cl. 761, 766 (Fed. Cl. Ct. 1996); Smith Declaration, pages 4-5, paragraphs 12, 16.

[11] *State v. Lewis,* 559 P.2d 630, 633 (Alaska 1977).

[12] *See, Robert E. LeResche*, A.G. Opp. A66-180-811980, 1980 WL 27949 at *2 (Alaska 1980); Smith Declaration, pages 5-6, paragraphs 15, 17.

[13] *See,* 89 Stat. 1145, PL 94-204 (1976).

[14] Smith Declaration, page 7, paragraph 20.

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*      3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                          Page 3 of 25

Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 9 of 31

acquired the land with mineral rights.[15] A few years later, the United States Department of the Interior was able to create Lake Clark National Park including land it obtained through the Cook Inlet Land Exchange.[16] Thus, the Pebble deposit area came into State ownership through a bargained-for exchange with the federal government from which the federal government received significant benefit.

The State has exercised land use planning authority over the Bristol Bay watershed area for decades.[17] Its most recent Area Plan for the Bristol Bay region allows for mineral development in most areas[18] subject to rigorous State environmental laws and permitting requirements.[19]

---

[15]    Smith Declaration, page 8, paragraphs 22-23. Alaska Statehood Act, 72 Stat. 339, P.L. 85-508 (1958), § 6(i); 89 Stat. 1145, P.L. 94-204 (1976) ("All lands granted to the State of Alaska pursuant to this subsection shall be regarded for all purposes as if conveyed to the State under and pursuant to section 6 of the Alaska Statehood Act").

[16]    *See,* Alaska National Interest Lands Conservation Act, 16 U.S.C. § 410hh(7)(a), (94 Stat. 2377, P.L. 96-487 (1980)); Smith Declaration, page 7, paragraph 20.

[17]    The present Bristol Bay Area Plan was originally prepared in 2005 and amended in 2013. The prior Area Plan was adopted in 1984 (*see,* Bristol Bay Area Plan at 1-8).

[18]    Note that some streams and riparian areas are subject to Mineral Closing Orders due to incompatibility of mineral development of those areas with surface uses, which may include fisheries, conservation and recreation. *See,* Bristol Bay Area Plan at 1-10.

[19]    These include but are not limited to Alaska Department of Environmental Conversation (DEC) permits under the Alaska Pollutant Discharge Elimination System Program (*see,* AS 46.03.100(h)); Alaska Department of Natural Resources (DNR) approval of a proposed plan of operations (*see,* 11 AAC 86.150, 11 AAC 86.800); DNR and DEC approval of mine reclamation plans and financial assurances (*see,* AS 27.19.010 *et seq.*); dam safety certification from DNR (*See,* AS 46.17.010 *et seq.*, 11 AAC 93.151-93.201); DNR approval of any right-of-way access or utilities on state land (*see,* AS 38.05.035); DNR water use authorization or permit (*see,* AS 46.15.010 *et seq.*); DNR approval a cultural resource protection plan (*see,* AS 41.35.080, 11 AAC 16.010 *et seq.*); DEC waste management permits (*see,* AS 46.03.100); DEC air quality permits (*see,* AS

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                      Page 4 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 10 of 31

In 2011, the United States Environmental Protection Agency ("EPA") began production of a "watershed assessment" for the Bristol Bay area without any clear legal basis for doing so.[20] In January of 2014 the EPA issued the watershed assessment.[21] A few months later, the EPA proposed to prohibit issuance of federal dredge-and-fill permits for mining across 268 square miles of State land in the Pebble deposit area.[22] For frame of reference, this prohibition would cover about the same area as Crater Lake National Park in Oregon.[23] This proposal (referred to in this brief as the "2014 Proposed Determination") drew heavily on the earlier watershed assessment.

The 2014 Proposed Determination was unprecedented in that it was issued in the absence of any application for a permit to dredge and fill in the Pebble deposit area. The EPA had never done anything like this before, acting without the context of a permitting

---

46.14.120); Alaska Department of Fish and Game permits for activities or structures in fish-bearing waters (*see*, AS 16.05.841, AS 16.05.871).

[20]     *See,* U.S. House of Representatives Committee on Oversight and Government Reform, Staff Report "The U.S. Environmental Protection Agency's Unprecedented 404(c) Action in Bristol Bay, Alaska" at 4-5 (R. at EPA_00265AR_0027325-26). *See also,* Letters from Attorney General Michael Geraghty to EPA Region 10 Administrator Daniel McLarren dated March 9, 2012 and April 17, 2012, attached hereto as Exhibit C.

[21]     U.S. Environmental Protection Agency, "An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska" (January 2014), available online at https://www.epa.gov/bristolbay/bristol-bay-assessment-final-report-2014.

[22]     2014 Proposed Determination at ES-10 (Fig. ES-3 "The potential disposal site delineated in the proposed determination"); 2-18 ("The size of the potential disposal site is approximately 268 square miles" and referring to Figure ES-3).

[23]     U.S. National Park Service, Crater Lake, "Learn About the Park," https://www.nps.gov/crla/learn/index.htm (stating the size of the park as 170,000 acres which equates to about 265 square miles).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                           Page 5 of 25

process.[24] In the absence of any permit application, the 2014 Proposed Determination was based on a variety of hypothetical mining scenarios.[25]

The Pebble Limited Partnership (PLP), which possessed mineral leases in the area, then sued the EPA challenging the validity of the 2014 Proposed Determination.[26] The State of Alaska intervened in one of those lawsuits and joined PLP's arguments that the EPA did not have legal authority to issue the 2014 Proposed Determination.[27] The State additionally argued that the 2014 Proposed Determination violated the Alaska Statehood Act and Cook Inlet Land Exchange.[28] The district court dismissed the case on the grounds that the 2014 Proposed Determination was not a "final agency action" subject to judicial review,[29] and the Ninth Circuit affirmed.[30]

Other litigation between the EPA and PLP continued over the validity of the 2014 Proposed Determination. PLP obtained a preliminary injunction, in a case alleging that

---

[24]    *See,* U.S. House of Representatives Committee on Oversight and Government Reform, Staff Report "The U.S. Environmental Protection Agency's Unprecedented 404(c) Action in Bristol Bay, Alaska" at 4-5 (R. at EPA_00265AR_0027325-26). *See also,* 84 F.R. 45749 "Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska" (Aug. 30, 2019) at 45755 (R. at EPA_00265AR_0193412) ("2019 Withdrawal Notice").

[25]    *See,* 2014 Proposed Determination at ES-3. *See also,* 2019 Withdrawal Notice at 45753 (R. at EPA_00265AR_0193410).

[26]    *Pebble Ltd. Partnership v. EPA,* Case No. 3:14-cv-00097 (D. Alaska).

[27]    *Pebble Ltd. Partnership v. EPA,* 155 F. Supp. 3d 1000, 1004 (D. Alaska 2014).

[28]    *Id.* at 1005.

[29]    *Id.* at 1007. *See also,* 40 C.F.R. § 231.5(c)(1) (withdrawal of a proposed determination is a final agency action).

[30]    *Pebble Ltd. Partnership v. E.P.A.,* 604 Fed. Appx. 623 (9th Cir. 2015).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                              Page 6 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 12 of 31

the EPA violated the Federal Advisory Committee Act in preparing the 2014 watershed assessment, that prevented the EPA from continuing to pursue the 2014 Proposed Determination.[31] In 2017, PLP and the EPA reached a settlement agreement. One term of the agreement was that the EPA would "initiate a process to propose to withdraw" the 2014 Proposed Determination.[32] Thus, later in 2017, the EPA published a notice in the federal register of its intent to withdraw the 2014 Proposed Determination and solicited public comment.[33] In December of 2017, PLP submitted a dredge-and-fill permit application for the Pebble deposit area.[34] Shortly thereafter, in February of 2018, the EPA suspended its previously-noticed withdrawal of the 2014 Proposed Determination.[35]

Since February of 2018, significant processing of PLP's permit application has taken place. The permit application itself has been amended twice, and has been subjected to rigorous review and public comment.[36] The U.S. Army Corps of Engineers

---

[31]    *Pebble Ltd. Partnership v. EPA*, 3:14-cv-0171 (preliminary injunction order Nov. 25, 2014).

[32]    Settlement Agreement (May 12, 2017), available online at https://www.epa.gov/bristolbay/2017-settlement-agreement-between-epa-and-pebble-limited-partnership, at page 5.

[33]    82 F.R. 33123, "Proposal to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska" (July 19, 2017) (R. at EPA_00265AR_0000001).

[34]    *See,* 2019 Withdrawal Notice at 45750 (R. at EPA_00265AR_0193407).

[35]    83 F.R. 8668 "Notification of Decision Not To Withdraw Proposed Determination To Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska" (Feb 28, 2018) (R. at EPA-R10-OW-2017-0369-12521).

[36]    For a comprehensive description of this process and relevant documents, *see*, https://pebbleprojecteis.com/, hosted by the U.S. Army Corps of Engineers.

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*      3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                          Page 7 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 13 of 31

has drafted an Environmental Impact Statement, in which process both the EPA and the State of Alaska provided input as cooperating agencies, and which has also been subject to public comment.[37]

In the summer of 2019, the EPA withdrew the 2014 Proposed Determination, based in large part on the ongoing permit application process. In particular, it noted that the 2014 Proposed Determination relied on hypothetical mining scenarios, whereas the permitting process had defined a detailed and "non-speculative" proposal.[38] The Federal Register notice also recognized that the process of prohibiting issuance of a dredge-and-fill permit in an area "will ordinarily be preceded by" a permit application, and that the permit application "procedures represent a longstanding, well-understood, and agreed-upon process" that has been utilized for "more than two decades."[39] The EPA stated that "it is most appropriate to participate in the [] permitting process to address concerns as the record develops rather than to continue with a separate [] action initiated in 2014."[40]

The plaintiffs have sued the EPA to challenge the withdrawal of the 2014 Proposed Determination and the State of Alaska has intervened to defend the EPA's withdrawal.

---

[37]    *See,* https://pebbleprojecteis.com/.

[38]    2019 Withdrawal Notice at 45754-55 (R. at EPA_00265AR_0193411-12).

[39]    2019 Withdrawal Notice at 45752, 45755 (R. at EPA_00265AR_0193409, EPA_00265AR_0193412).

[40]    2019 Withdrawal Notice at 45755 (R. at EPA_00265AR_0193412).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                          Page 8 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 14 of 31

### III.    Standard of Review

It is well-understood that an appellate court may affirm a lower court on any ground appearing in the record, regardless of the lower court's reasoning in the decision appealed.[41] The rationale for this rule is that "it would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate."[42] Generally speaking, however, that rule does not apply when a court reviews a decision of an administrative agency. "If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment."[43] Thus, "an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency."[44]

However, when the decision must be affirmed on purely legal grounds, this administrative exception to the general rule does not apply. An appellate court may affirm an administrative decision on grounds not relied upon by the agency when those grounds involve the interpretation of federal statutes or the U.S. Constitution.[45]

---

[41]    *U.S. Secs. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

[42]    *Id.*

[43]    *Id*.

[44]    *Id.*

[45]    *Milk Transport, Inc. v. Interstate Commerce Comm'n,* 190 F. Supp. 350, 354-55 (D. Minn. 1960) (affirmed *per curiam* 368 U.S. 5 (1961)).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*    3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                          Page 9 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 15 of 31

Interpreting the scope of a federal statute is not a task peculiar to an administrative agency, and courts are equally if not more qualified to make these judgments.[46]

This Court can and should affirm the EPA's withdrawal of the 2014 Proposed Determination on purely legal grounds not relied on by the EPA.[47] It would not be appropriate for this Court to vacate the EPA's withdrawal of the 2014 Proposed Determination as arbitrary and capricious and in so doing reinstate an unlawful action.[48] Because the 2014 Proposed Determination is not authorized under the Clean Water Act and contravenes the Alaska Statehood Act and Cook Inlet Land Exchange, its withdrawal must be affirmed whatever the reasons given by the EPA. It cannot be reinstated.

## IV.    ARGUMENT

### A.    The EPA exceeded the authority granted to it by the Clean Water Act in the 2014 Proposed Determination.

The EPA did not have the authority to issue the 2014 Proposed Determination in the first place, and its withdrawal must be upheld on this purely legal basis. The Clean Water Act ("CWA") does not authorize the EPA to preemptively prohibit dredging and

---

[46]    *Id. See also, North Carolina Comm'n of Indian Affairs v. U.S. Dep't of Labor*, 725 F.2d 238, 240 (4th Cir. 1984) ("We do not, however, perceive there to be a Chenery problem in the instant case because the question of interpretation of a federal statute is not 'a determination or judgment which an administrative agency alone is authorized to make'" (*citing Milk Transport, Inc.*)).

[47]    Consistent with the *Chenery* doctrine, the State does not argue that this Court should affirm the withdrawal of the 2014 Proposed Determination on any scientific, technical or procedural basis not relied upon by the EPA. However, the State does not waive any such objections to the validity of the 2014 Proposed Determination, and reserves the right to assert them in future if procedurally appropriate.

[48]    *See,* Plaintiffs' Joint Opening Brief (Jan. 31, 2020) at 39, urging this Court to vacate the 2019 Withdrawal Notice.

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*    3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                    Page 10 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 16 of 31

filling in the absence of a permit application specifying a disposal site and a type of fill. This is clear from the unambiguous statutory language of Section 404 of the CWA. And, even if this Court were to find the statutory language ambiguous, the EPA's interpretation is not entitled to deference. Because the EPA's action in prohibiting mineral development across a huge swath of State land usurped the State's inherent land use planning authority, this Court must resolve any ambiguity in the statutory language in favor of states' rights. Courts require Congress to make its intent "clear and manifest" before finding that a federal statute encroaches on the traditional and fundamental rights of the states, such as land use planning.[49] The United States Supreme Court has twice held that Congress did not intend for the Clean Water Act to disturb the traditional state-federal balance of powers, and in fact intended to preserve the traditional and inherent rights of states.[50]

### 1. The plain language of the Clean Water Act does not authorize an EPA "veto" in the absence of a permit application.

The EPA relied on Section 404 of the CWA in its 2014 Proposed Determination, which is the section related to permitting for dredging and filling in navigable waters.[51] The CWA gives primary responsibility to the U.S. Army Corps of Engineers for issuing dredge-and-fill permits.[52] The EPA plays a cooperative and supporting role in the Corps'

---

[49] *See, e.g. Rapanos v. U.S.*, 547 U.S. 715, 738 (2006).

[50] *Rapanos v. U.S.*, 547 U.S. 715 (2006); *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001).

[51] 33 U.S.C. § 1344.

[52] *Id.* at §§ (a), (d).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                    Page 11 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 17 of 31

process.[53] In addition, Section 404(c) gives the EPA a "final say" or "veto power" to prohibit the Corps from issuing a dredge-and-fill permit for a specific, defined location when the EPA finds that such activity would have unacceptable adverse environmental impacts.[54] The State also plays an important role in the Corps' permitting process under Section 401 of the CWA, which requires water quality certifications from the State.[55]

The CWA does not contemplate or allow the EPA to exercise its "final say" or "veto power" to simply close hundreds of square miles of land to permitting in the absence of a pending permit application. Nor does it allow the EPA to act unilaterally, as it did in this case, to cut out the Corps' and the State's involvement. The plain language of Section 404(c) of the CWA requires a Corps permitting process to identify the location at issue and the type of fill at issue, and to create a record, before the EPA can veto dredging and filling at a specific location and with a specific type of fill.

Section 404 of the Clean Water Act begins as follows:

> (a) Discharge into navigable waters at specified disposal sites: The Secretary [of the Army] may issue permits, after notice and

---

[53] *Id.* at § (b).

[54] *Id.* at § (c). *See also, Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 274 (2009) ("[T]he Act gives the EPA authority to 'prohibit' any decision by the Corps to issue a permit for a particular disposal site. We, and the parties, refer to this as the EPA's power to veto a permit") (internal citations omitted); *Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608, 614 (D. C. Cir. 2013) ("the Administrator has, in effect, the *final say* on the specified disposal sites") (emphasis in original). *See also,* 2019 Withdrawal Notice at 45752 (R. at EPA_00265AR_0193409) ("404(c) may be regarded as a tool of last resort") (quoting 44 F.R. 58080).

[55] 33 U.S.C. § 1341.

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                        Page 12 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 18 of 31

opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.[56]

This section is careful to use the word "specified:" the Corps cannot issue general permits for discharge under this section, or permits for discharge anywhere within a large area. This is in contrast to subsection (e), which creates very different standards for the issuance of general permits.[57] A permit under subsection (a) must identify a specific disposal site. Section (b) provides the process for "specification" of disposal sites.

> (b) Specification for disposal sites: Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary [of the Army] (1) through the application of guidelines developed by the [EPA] Administrator, in conjunction with the Secretary [of the Army].[58]

Section (c) governs the EPA's "veto power" at issue in this case.

> (c) Denial or restriction of use of defined areas as disposal sites: The [EPA] Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.[59]

The uses of the word "specification" in subsection (c) clearly refer to the process described in subsection (b) undertaken by the Corps. If there is no permitting process to

---

[56] 33 U.S.C. § 1344(a).

[57] 33 U.S.C. § 1344(e).

[58] 33 U.S.C. § 1344(b).

[59] 33 U.S.C. § 1344(c).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                      Page 13 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 19 of 31

specify the disposal sites and type of fill at issue, the plain language of subsection (c)

makes little sense. How can the Administrator prohibit "the discharge of *such* materials

into *such* area" if the materials and the area have not been previously identified through

the processes of subsections (a) and (b)?[60] Also, the repeated use of the term "defined

area" further limits the EPA's authority, and does not allow for generalized or broad

prohibitions, like the prohibition of dredging and filling over a 268 square mile area in

the 2014 Proposed Determination.[61]

      Additionally, the EPA's 2014 Proposed Determination, in the absence of a permit

application, cut the Corps out of the process, in contravention of Section 404's plain

mandate that the Corps have primary responsibility for its implementation.[62] Courts have

long recognized the shared responsibility of the Corps and the EPA in implementing

Section 404, and the EPA contravened the statutory scheme by attempting to act alone.[63]

---

[60]    33 U.S.C. § 1344(c) (emphasis added).

[61]    This is also consistent with legislative history. *See,* House Consideration of the
Report of the Conference Committee (Oct. 4, 1972), 118 Cong. Rec. 33,766 (1972),
reprinted in 1 A Legislative History of the Water Pollution Control Act Amendments of
1972, at 236 (1973) ("it is expected that disposal site restrictions or prohibitions shall be
limited to narrowly defined areas").

[62]    33 U.S.C. § 1344(a). *See also,* Letter from Colonel Christopher D. Lestochi, U.S.
Army Corps of Engineers to EPA Region 10 Administrator Daniel McLarren dated
March 14, 2014 (R. at EPA_00265AR_0193472) ("This is in response to your…letter
regarding the decision to proceed under the EPA's Clean Water Act Section 404(c)
regulations…associated with potential mining activities of the Pebble deposit in
southwest Alaska…. [A]t this time, the Corps has not received a permit application for
this project, and is therefore unable to evaluate the impacts of potential discharges
associated with the Pebble deposit….[I]t would be premature to submit any information
for the record at this time.")

[63]    *See, e.g. Bersani v. U.S. E.P.A.*, 850 F.2d 36, 39 (2nd Cir. 1988) ("Section 404 of
the [Clean Water] Act, focusing on dredged or fill materials, provides that the United

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*    3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                         Page 14 of 25

Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 20 of 31

In addition to the plain language of the text, it follows logically from the ordering of the sections that Section 404(c) cannot be invoked in the absence of a permitting process under the preceding Sections 404(a) and (b).

This plain reading is also consistent with the legislative history of the CWA. In describing the work and conclusions of the conference committee on the CWA bill, Senator Muskie explained to the Senate:

> the Conferees agreed that the [EPA] Administrator…should have a veto over the selection of the site for dredge spoil disposal and over any specific spoil to be disposed of in any selected site. The decision is not duplicative or cumbersome *because the permit application transmitted to the Administrator for review will set forth both the site to be used and the content of the matter of the spoil to be disposed.*[64]

Section 404(q) of the CWA also requires the EPA and the Corps to work cooperatively to expedite permitting, with a goal of processing permits within ninety days.[65] As a practical matter, this is only possible if the EPA's decision incorporates the record already compiled in the Corps' permitting process, and if the EPA's decision is specific to a narrowly-defined area. And it also rejects the notion of unilateral EPA action.[66]

---

States Army and EPA will share responsibility for implementation of its provisions") (internal citations omitted).

[64] Senate Consideration of the Report of the Conference Committee (Oct. 4, 1972), Cong. Rec. 33699 (1972), reprinted in 1 Legislative History of the Water Pollution Control Act Amendments of 1972, at 177 (1973) (emphasis added).

[65] 33 U.S.C. § 1344(q).

[66] Pursuant to Section 404(q), the EPA and Corps have entered into a Memorandum of Agreement that creates a detailed and collaborative process for resolution of disagreements between them before invocation of the EPA's Section 404(c) veto power. Without going so far as to admit that it lacks the authority to issue Section 404(c) veto in

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                          Page 15 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 21 of 31

Because the 2014 Proposed Determination is the only time that the EPA has attempted to invoke Section 404(c) in the absence of a permit application, no court has yet had the opportunity to address this issue. However, other cases interpreting the scope of the EPA's Section 404(c) authority have consistently described it in the context of the Corps' permitting process.  In *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, the United States Supreme Court described it as follows: "the Act gives the EPA authority to 'prohibit' any decision by the Corps to issue a permit for a particular disposal site. We, and the parties, refer to this as the EPA's power to veto a permit."[67] And in *Mingo Logan Coal Co. v. EPA*, while broadly interpreting the EPA's 404(c) veto power, the D.C. Circuit Court of Appeals firmly placed it within the Corps' permitting process.

> [S]ection 404 [of the Clean Water Act] vests the Corps, rather than EPA, with the authority to issue permits to discharge fill and dredged material into navigable waters and to specify the disposal sites therefor…. Nonetheless, the Congress granted EPA a broad environmental "backstop" authority over the Secretary's discharge site selection in subsection 404(c).[68]

---

the absence of a permit application, in its 2019 Notice of Withdrawal, the EPA expressly recognized the preferability of the Section 404(q) dispute resolution procedures to its unilateral action in 2014. 2019 Notice of Withdrawal at 45752 (R. at EPA_00265AR_ 0193409) (recognizing that "where there is a permit application pending it is anticipated that the 404(q) process will normally be exhausted prior to any final decision of whether to initiate a section 404(c) proceeding and that the record developed under the 404(q) process would be considered by the Region Administrator when evaluating information") (internal quotations omitted).

[67]     *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261 (2009) (internal citations omitted).

[68]     *Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608, 612 (D. C. Cir. 2013).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*      3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                          Page 16 of 25

Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 22 of 31

Thus, there is no support in case law for an interpretation of Section 404(c) unmoored from the permitting process contained in Sections 404(a) and (b).

### 2.    The EPA's interpretation of Section 404(c) deserves no deference.

Although EPA regulations interpret Section 404 as granting it authority to exercise its subsection (c) powers in the absence of a permit application, this Court should not defer to that interpretation.[69] First, as described above, the meaning of Section 404(c) is clear from the plain language of the CWA and courts only defer to agency interpretations of ambiguous statutory language.[70] Second, the 2014 Proposed Determination is the only time the EPA has actually attempted to invoke that regulation. The EPA has publicly acknowledged that the "proper process" for Section 404(c) is to act in conjunction with a pending permit application[71] and internally acknowledged that its actions may have been

---

[69]    *See,* 40 C.F.R. 231.1(a) ("The Administrator may also prohibit the specification of a site under section 404(c) with regard to any existing or potential disposal site before a permit application has been submitted to or approved by the Corps or a state"). Note, however, that the regulations have no provisions for the development of anything like the watershed assessment on which the 2014 Proposed Determination relied. *See* 40 C.F.R. 231.1 *et seq.*

[70]    *See, Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608, 612 (D. C. Cir. 2013) (if Congress has directly spoken to the question at issue, courts give effect to Congress's unambiguously expressed intent; courts defer to agency interpretation only if the statute is silent or ambiguous with respect to the issue).

[71]    United States Environmental Protection Agency, News Release, "EPA Withdraws Outdated, Preemptive Proposed Determination to Restrict Use of the Pebble Deposit Area as a Disposal Site" (July 30, 2019), available online at https://www.epa.gov/newsreleases/epa-withdraws-outdated-preemptive-proposed-determination-restrict-use-pebble-deposit ("Region 10's decision restores the proper process for 404(c) determinations, eliminating a preemptive veto of a hypothetical mine and focusing EPA's environmental review on an actual project before the Agency").

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*    3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                        Page 17 of 25

Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 23 of 31

outside the scope of Section 404(c).[72] Furthermore, the EPA has recently proposed to

change the regulations to remove the provisions regarding Section 404(c) action in the

absence of a permit application.[73] So, despite the regulation ostensibly allowing Section

404(c) actions in the absence of a permit application, the EPA has no consistent or long-

standing interpretation of Section 404(c) that would support the 2014 Proposed

Determination.[74]

### 3. Any ambiguity in the CWA must be interpreted in favor of preserving Alaska's inherent land-use-planning powers.

The Clean Water Act's Statement of Intent recognizes and preserves the

traditional and inherent land-use-planning rights of states:

> It is the policy of the Congress to recognize, preserve, and protect the
> primary responsibilities and rights of States to prevent, reduce, and
> eliminate pollution, to plan the development and use (including
> restoration, preservation, and enhancement) of land and water

---

[72]   *See,* U.S. House of Representatives Committee on Oversight and Government
Reform, Staff Report, "The U.S. Environmental Protection Agency's Unprecedented
404(c) Action in Bristol Bay, Alaska" at 2, 4-5, and 7 (R. at EPA_00265AR_0027323,
0027325-26, 0027328).

[73]   *See,* Memorandum from EPA Administrator E. Scott Pruitt re: Updating the
EPA's Regulations Implementing Clean Water Act Section 404(c) (June 26, 2018)
available online at https://www.epa.gov/cwa-404/updating-epas-regulations-
implementing-cwa-section-404c-memorandum.  *See also,* Letter from Deputy Assistant
Administrator D. Lee Forsgren to Congressman Paul Gosar (Sept. 26, 2018) (R. at
EPA_00265AR_0202107) ("Since your letter, the EPA has taken additional action which
may address some concerns you identified with the section 404(c) process. A June 2018
Memorandum directs the EPA's Office of Water to develop proposed revisions to the
Agency's section 404(c) regulations including eliminating use of section 404(c) before a
section 404 permit application has been submitted to the Corps").

[74]   Furthermore, the regulations have no provisions for creation of the "watershed
assessment" on which the 2014 Proposed Determination was heavily based.

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*   3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                    Page 18 of 25

resources, and to consult with the Administrator in the exercise of his authority under this chapter.[75]

As the United States Supreme Court has recognized, "[r]egulation of land use….is a quintessential state and local power" that the CWA respects and preserves.[76] Admittedly, the "line between environmental regulation and land use planning will not always be bright."[77] However, an "environmental regulation so severe that a particular land use would become commercially impracticable" may intrude on the province of land use planning.[78] "Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits."[79] The EPA's 2014 Proposed Determination to close 268 square miles of State land to commercially-viable mineral development clearly crossed the line into the traditional state and local sphere of land use planning.

In *Rapanos v. U.S.*, the United States Supreme Court rejected an interpretation of the CWA that would have subjected "immense stretches of intrastate land" to federal permitting authority.[80] The same logic applies in this case. *Rapanos* addressed the

---

[75]    33 U.S.C.A. § 1251(b).

[76]    *Rapanos v. U.S.*, 547 U.S. 715, 738 (2006). *See also, Warth v. Seldin*, 422 U.S. 490, 508 n. 18 (1975); *FERC v. Mississippi*, 456 U.S. 742, 767 n. 30 (1982) (land use regulation is "perhaps the quintessential state activity.")

[77]    *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587 (1987).

[78]    *Id.*

[79]    *Id.*

[80]    *Rapanos,* 547 U.S. at 738.

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                    Page 19 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 25 of 31

jurisdictional reach of the CWA through its regulation of "navigable waters." The United States Supreme Court held that the expansive interpretation put forward by the EPA and Corps would "result in a significant impingement of the States' traditional and primary power over land and water use."[81] The Court stated: "We ordinarily expect a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority."[82] The Court found no such statement in the CWA, and cited the Act's Statement of Intent, quoted above, as evidence of Congress's intent to preserve and respect the traditional authority of states.[83]

The EPA's 2014 Proposed Determination, which would have closed 268 square miles of state lands to mineral development, clearly infringed on Alaska's inherent land use planning authority. The proposed determination was in direct contravention of the State's land use plan for the area, which allowed for mineral development, subject to rigorous State environmental laws and permitting requirements.

Federal courts assume "that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."[84] Further, "[t]his concern is heightened where the administrative interpretation alters the federal-

---

[81] *Id.* (quoting *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001)).

[82] *Id.*

[83] *Id.* at 722-23 (quoting 33 U.S.C. § 1251(b)).

[84] *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172-73 (2001).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                    Page 20 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 26 of 31

state framework by permitting federal encroachment upon a traditional state power" like land use regulation.[85] In the words of the United States Supreme Court,

> [I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.… Congress should make its intention clear and manifest if it intends to pre-empt the historic powers of the States….In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of a clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.[86]

Thus, any ambiguity in a federal statute that has the potential to disrupt the delicate federal-state balance of powers must be interpreted in favor of traditional federalism. The United States Supreme Court has explained that "[i]n the face of … ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions."[87] Thus, if this Court finds any ambiguity in the text of Section 404(c), it must construe it in favor of the State's land-use-planning authority. Congress certainly made no "clear and manifest" statement of intent that the EPA have the authority, pursuant to Section 404(c), to unilaterally and preemptively close hundreds of square miles of State lands to mineral development.[88] In fact, throughout the CWA, Congress's clear and

---

[85]  *Id.* at 173.

[86]  *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991) (internal quotations and citations omitted).

[87]  *Id.* at 470.

[88]  And, in doing so, the EPA cut the State out of its involvement in the permitting process through the certification procedures of Section 401. *See,* 33 U.S.C. § 1341. *See also Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018) ("Absent any further limiting principles, the Corps' interpretation would radically empower it to

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                          Page 21 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 27 of 31

manifest intent is to preserve and respect the traditional rights and authority of states over their lands and waters.[89] Thus, the 2014 Proposed Determination is not authorized by the CWA, and cannot be reinstated.

### B. The 2014 Proposed Determination unlawfully contravened the Alaska Statehood Act and Cook Inlet Land Exchange.

By effectively prohibiting mineral development on 268 square miles of State lands, which the State selected in part due to their potential for mineral development, the EPA contravened the Alaska Statehood Act which intended for the State to have the economic benefit of its selected lands including the benefit of mineral resources. Land grants were an essential part of Alaska's Statehood Act.[90] Section 6(i) of the Statehood Act specifically provided that:

> All grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the state of Alaska…Mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct.[91]

---

unilaterally set aside state certification conditions as well as undermine the system of cooperative federalism upon which the Clean Water Act is premised").

[89]    *See also,* 33 U.S.C. § 1370 ("Except as expressly provided in this chapter, nothing in this chapter shall…(2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States").

[90]    *See, U.S. v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1016 (D. Alaska 1977) (affirmed by *U.S. v. Atlantic Richfield Co.*,) (describing the intent of Congress in providing land grants to Alaska as being "of course, to provide the new state with a solid economic foundation").

[91]    Alaska Statehood Act, 72 Stat. 339, P.L. 85-508 (1958), §6(i). This provision was the subject of significant contention. *See, State v. Lewis,* 559 P.2d 630, 636 (Alaska 1977) ("Throughout the process of drafting the Constitution and its adoption, there was considerable public controversy surrounding the issue of federal control over Alaska's power to dispose of its mineral resources.")

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                      Page 22 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 28 of 31

The Cook Inlet Land Exchange Act was made subject to the same provision: "All lands granted to the State of Alaska pursuant to this subsection shall be regarded for all purposes as if conveyed to the State under and pursuant to section 6 of the Alaska Statehood Act."[92]

As the Ninth Circuit has explained, "The purpose of the land grants under the [Statehood] Act is to serve Alaska's overall economic and social well-being."[93] In *Trustees for Alaska v. State*, the Alaska Supreme Court extensively explored the legislative history behind Section 6(i) and the intent to provide the State with economic opportunities through mineral development of selected lands.

> [T]he large grant of 103 million acres was deemed necessary because the lands available for state selection were perceived to be only marginally productive.… Because Congress realized that agricultural development would not yield the revenue that Alaska would need to support statehood, the Act contained the provision granting the new state title to the mineral estate underlying the land grants. Senator Kuchel said in debate: "I believe, however, on the basis of the values of property in Alaska as they have been estimated, the tremendous wealth in the ground in minerals..., the State of Alaska will be able to make maximum use of the property which it will obtain under the bill from the Federal Government. This provision constitutes one additional assurance. I feel sure that economically the new government will succeed."[94]

The Alaska Supreme Court also explored congressional intent to leave the terms of mineral development to the discretion of the State legislature, quoting relevant legislative

---

[92]    89 Stat. 1145, P.L. 94–204 (1976).

[93]    *Udall v. Kalerak*, 396 F.2d 746, 749 (9th Cir. 1968) (and noting that "[s]ome of the lands so selected will probably be used to protect mineral deposits").

[94]    *Trustees for Alaska v. State*, 736 P.2d 324, 336 n. 23 (Alaska 1987).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*     3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                              Page 23 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 29 of 31

history as follows: "The [Statehood] bills now intend to provide [the State] with the untrammeled right to frame its own mineral leasing laws…and can, in general, fit the provisions of its mineral leasing system to whatever may be its concepts of the public interest."[95]

Finally, and particularly relevant in this instance, the Alaska Supreme Court explored Congress's intent that Alaska be allowed to select lands of mineral value because the "federal government had already reserved the most valuable land and the new state would, in effect, have second choice."[96] As described in the statement of facts above, the Pebble deposit lands were originally off-limits to state selection under the Statehood Act. The U.S. government's participation in the Cook Inlet Land Exchange allowed it to obtain lands in the Lake Clark area of value to it, and in exchange the State obtained lands in the Bristol Bay area of value to the State. Part of that value included the potential for mineral development. The U.S. government used the land that it obtained from the Exchange to include in Lake Clark National Park and placed it in conservation status. The EPA's effort in the 2014 Proposed Determination to prohibit commercially-viable mineral development on 268 square miles of the land that the federal government relinquished in the Exchange violates the underlying terms of that agreement.[97] And it

---

[95]    *Id.* at 338, n. 29 (internal quotations and alterations omitted).

[96]    *Id.* at 336, n. 23.

[97]    A number of National Parks are significantly smaller than the area subject to the 2014 Proposed Determination, including such well-known parks as Zion National Park in Utah (232 square miles), Redwood National Park in California (206 square miles), Arches National Park in Utah (119 square miles), and Acadia National Park in Maine (73 square miles). *See,* https://www.nps.gov/zion/getinvolved/upload/Zion-Park-Profile-

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*    3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                              Page 24 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 30 of 31

violates the underlying intent of the Statehood Act that Alaska have the right to develop and benefit economically from the mineral resources in its selected lands.

## V.  CONCLUSION

This Court should affirm the EPA's withdrawal of the 2014 Proposed Determination on the purely legal grounds that the EPA was without legal authority to issue it in the first place.

---

External-2018.pdf; https://www.nps.gov/redw/faqs.htm (listing the size of the park as 131,983 acres, which is approximately 206 square miles); https://www.nps.gov/articles/arch-quick-facts.htm; https://www.nps.gov/acad/learn/management/statistics.htm (listing the size of the park as 47,000 acres, which is approximately 73 square miles).

*Bristol Bay Economic Dev. Corp. v. Hladick, et al.*      3:19-cv-00265-SLG (Consolidated)
Brief of Intervenor State of Alaska                                            Page 25 of 25
Case 3:19-cv-00265-SLG   Document 73   Filed 04/14/20   Page 31 of 31